1   THOMAS J. GODDARD
    thomas@lawz.app
2   [Address Protected by ADA]
    Walnut Creek, CA
3   Telephone: (415) 985-5539
4   Plaintiff, pro se
    Pepperdine University
5   Administrative Law & Litigation + International Law
6
7
8
9              UNITED STATES DISTRICT COURT
10            NORTHERN DISTRICT OF CALIFORNIA
11
12
13  THOMAS JOSEPH GODDARD,          Case No.
14       Plaintiff,                 CV26.01044
15       v.                         COMPLAINT          ASK
16  ANTHROPIC, PBC., DARIO AMODEI,
17  SAM ALTMAN, OPEN AI GROUP,      DEMAND FOR JURY TRIAL
18  ELON MUSK, SPACE EXPLORATION,
19  TECHNOLOGIES, INC., TESLA, INC.,
20  ELON MUSK, REID HOFFMAN,
21  DOES 1-100 INCLUSIVE,
22       Defendant.
23
24
25
26
27
28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 1 —

FILED
FEB  2 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                          5

    CASES                                                    5

I. INTRODUCTION                                                              9

II. JURISDICTION & VENUE                                                    11

IV. INDEX OF INCORPORATION BY REFERENCE                                     11

    IV.A. LEGAL AUTHORITY FOR INCORPORATION                 12

    IV.B. DOCUMENTS FROM THIS ACTION                        12

        1.    Prior Federal Court Filings     12

    IV.C. DOCUMENTS FROM NINTH CIRCUIT APPEALS              13

        2.    Ninth Circuit Appeal No. 25-5230     13

        3.    Ninth Circuit Appeal No. 25-6676     13

        4.    Ninth Circuit Appeal No. 25-2205     14

        5.    Ninth Circuit Appeal No. 25-6741     14

    IV.D. DOCUMENTS FROM RELATED FEDERAL PROCEEDINGS        14

        6.    N.D. Cal. Case No. 3:25-cv-05882-EMC    14

        7.    N.D. Cal. Case No. 3:25-cv-06187-JSC    14

        8.    N.D. Cal. Case No. 3:25-cv-02910-CRB    15

        9.    D.N.J. Case No. 2:25-cv-03883-EP-MAH    15

    IV.E. DOCUMENTS FROM STATE COURT PROCEEDINGS            15

        10.    San Francisco Superior Court Case No. CGC-25-623360    15

        11.    Contra Costa Superior Court Case No. C25-02263    15

        12.    Contra Costa Superior Court Case No. C25-00427    16

        13.    Contra Costa Superior Court Case No. MS25-0977    16

    IV.F. ADMINISTRATIVE PROCEEDINGS                        16

        14.    California Civil Rights Department    16

        15.    Equal Employment Opportunity Commission    16

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

16.    U.S. Department of Housing and Urban Development    16

17.    Office of Administrative Law Judges    16

IV.G. MEDICAL DOCUMENTATION    17

IV.H. WITNESS DECLARATIONS    17

IV.I. STATISTICAL & PATTERN EVIDENCE    17

IV.J. DISCRIMINATION EVENT DATABASE    18

IV.K. CRIMINAL PROCEEDINGS    18

IV.L. FINANCIAL INSTITUTION EVIDENCE    18

IV.M. INCORPORATED JUDICIAL DECISIONS    19

V. PARTIES    21

VI. FACTUAL ALLEGATIONS    24

VI.A. PLAINTIFF'S DEVELOPMENT OF THE ORGANIC
        INTELLIGENCE SYSTEM    25

VI.B. EXTENDED DEVELOPMENT: ROCKET, AEROSPACE, &
        AUTOMOTIVE    30

VI.C. BACKEND ADMINISTRATIVE CONSOLE & SYSTEM
        ARCHITECTURE    33

VI.D. UNAUTHORIZED ACCESS & THEFT OF BACKEND SYSTEM    35

VI.E. FRAUDULENT BILLING PRACTICES & AUTO-RENEWAL
        SCHEME    36

VI.F. SHELL COMPANY STRUCTURE & LITIGATION DETERRENCE    38

VI.G. ADA VIOLATIONS & SERVICE DENIAL    38

VI.H. PATTERN OF COORDINATED DISCRIMINATION & RETALIATION    40

VII. PRIMA FACIE CASE ESTABLISHMENT    43

VII.A. ADA TITLE III PRIMA FACIE CASE    43

VII.B. DTSA TRADE SECRET PRIMA FACIE CASE    44

VII.C. CUTSA TRADE SECRET PRIMA FACIE CASE    45

VII.D. CFAA COMPUTER FRAUD PRIMA FACIE CASE    46

— 3 —

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

VII.E. CONVERSION PRIMA FACIE CASE     47

VII.F. FRAUD PRIMA FACIE CASE     47

VII.G. UNJUST ENRICHMENT PRIMA FACIE CASE     48

VII.H. UCL UNFAIR COMPETITION PRIMA FACIE CASE     49

VII.I. PATTERN EVIDENCE: STATISTICAL PRIMA FACIE CASE     49

VII.J. COORDINATED NETWORK ACTIVITY: FEDERAL
       RECOGNITION     50

VII.K. PRIMA FACIE SUMMARY: BURDEN SHIFTING     52

VIII. CAUSES OF ACTION     52

IX. PRAYER FOR RELIEF     60

X. DEMAND FOR JURY TRIAL     63

CERTIFICATE OF SERVICE     64

PROOF OF SERVICE     66

LOCAL RULES COMPLIANCE CERTIFICATIONS     69



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1

## TABLE OF AUTHORITIES

2

**CASES**

3

**United States Supreme Court**

4

*Burlington Northern & Santa Fe Railway Co. v. White,*

5

548 U.S. 53 (2006) .......................................................... 19

6

*Castaneda v. Partida,*

7

430 U.S. 482 (1977) ...................................................... 1, 15

8

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

9

509 U.S. 579 (1993) .......................................................... 12

10

*Muldrow v. City of St. Louis,*

11

601 U.S. _____, 144 S. Ct. 967 (2024) ...................................... 19

12

*McDonnell Douglas Corp. v. Green,*

13

411 U.S. 792 (1973) .................................................... 17, 19

14

*Murray v. UBS Securities, LLC,*

15

601 U.S. 23, 144 S. Ct. 445 (2024) ...................................... 1, 2, 8

16

*Shaare Tefila Congregation v. Cobb,*

17

481 U.S. 615 (1987) .......................................................... 17

18

*Int'l Brotherhood of Teamsters v. United States,*

19

431 U.S. 324 (1977) .................................................... 15, 17

20

*Groff v. DeJoy,*

21

600 U.S. 447 (2023) .......................................................... 18

22

*Pepper v. Litton,*

23

308 U.S. 295 (1939) .......................................................... 11

24

*E.I. Du Pont de Nemours Powder Co. v. Masland,*

25

244 U.S. 100 (1917) ........................................................... 9

26

*United States v. Dubilier Condenser Corp.,*

27

289 U.S. 178 (1933) ........................................................... 9

28

**United States Courts of Appeals**

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1     *Coons v. Sec'y of U.S. Dep't of Treasury,*

2         383 F.3d 879 (9th Cir. 2004) ................................................18

3     *EEOC v. Federal Express Corp.,*

4         558 F.3d 842 (9th Cir. 2009) ...................................................1

5     *Robles v. Domino's Pizza, LLC,*

6         913 F.3d 898 (9th Cir. 2019) ............................................5, 18

7     *Silvaco Data Sys. v. Intel Corp.,*

8         184 Cal. App. 4th 210 (2010) ..............................................20

9     *Thurston v. Midvale Corp.,*

10         39 Cal. App. 5th 634 (2019) ...............................................28

11     **Federal District Courts**

12     *Mobley v. Workday, Inc.,*

13         740 F. Supp. 3d 796 (N.D. Cal. 2024) ...................................5, 18

14     *Nat'l Fed'n of the Blind v. Target Corp.,*

15         452 F. Supp. 2d 946 (N.D. Cal. 2006) ...................................5, 18

16     *Waymo LLC v. Uber Techs., Inc.,*

17         No. 17-cv-00939-WHA (N.D. Cal. 2018) ....................................9

18     *Motorola Solutions, Inc. v. Hytera Commc'ns Corp.,*

19         108 F.4th 458 (7th Cir. 2024) .............................................9

20     *Van Buren v. United States,*

21         141 S. Ct. 1648 (2021) .....................................................10

22     *Kremen v. Cohen,*

23         337 F.3d 1024 (9th Cir. 2003) ............................................22

24     **State Courts**

25     *Meinhard v. Salmon,*

26         249 N.Y. 458, 164 N.E. 545 (1928) .......................................11

27     *Guth v. Loft, Inc.,*

28         23 Del. Ch. 255, 5 A.2d 503 (1939) .......................................11

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

*Sinclair Oil Corp. v. Levien,*
      280 A.2d 717 (Del. 1971) ..................................................... 11

*Zahn v. Transamerica Corp.,*
      162 F.2d 36 (3d Cir. 1947) ................................................... 11

*Peabody v. Norfolk,*
      98 Mass. 452 (1868) ........................................................... 9

*Musk v. Altman,*
      No. CGC-24-614593 (Cal. Super. Ct. Feb. 29, 2024) ........................ 11

*Eberhard v. Musk,*
      No. C08-3805 (N.D. Cal. 2009) ............................................... 11

*Tesla, Inc. v. Cao,*
      No. 19-cv-02033 (N.D. Cal. 2019) ............................................ 11

*Tesla, Inc. v. Zoox, Inc.,*
      No. 19-cv-02349 (N.D. Cal. 2019) ............................................ 11

*Saverin v. Facebook,*
      Settlement (2009) ............................................................ 11

*Cadence Design Sys., Inc. v. Avant! Corp.,*
      29 Cal. 4th 215 (2002) ....................................................... 9

*Fisker v. Tesla, Inc.,*
      Arbitration (2008-2011) ...................................................... 11

*xAI Corp. v. OpenAI,*
      No. 3:25-cv-05632 (N.D. Cal. Sept. 24, 2025) .............................. 11

**Federal Statutes**

Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 ......................... 5, 18

Defend Trade Secrets Act, 18 U.S.C. § 1836 ...................................... 22, 35

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ................................... 25

**State Statutes**

California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426–3426.11 ................ 23

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1

Cal. Bus. & Prof. Code § 17200 (UCL) ............................................... 28

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

## INTRODUCTION

1. This action arises from Defendant Anthropic PBC's ("Anthropic") systematic theft of Plaintiff Thomas Joseph Goddard's proprietary organic intelligence system, backend infrastructure, and intellectual property, combined with deliberate denial of essential assistive technology services to a disabled individual in violation of the Americans with Disabilities Act ("ADA").

2. Plaintiff developed a comprehensive artificial intelligence architecture over two decades, including an IRC bot network[1] with natural language processing capabilities, HTM (Hierarchical Temporal Memory) attention vector systems based on Jeff Hawkins' neocortex research, and proprietary quantum-inspired information processing methods. This system—referred to as the "Organic Intelligence System"[2]—represents the core architecture underlying modern large language model ("LLM")[3] technology.

3. Through coordinated action with other technology companies, Anthropic obtained unauthorized access to Plaintiff's backend systems,[4] locked Plaintiff out of his own administrative console,[5] and proceeded to commercialize his intellectual property as the "Claude" AI system[6] without authorization, attribution, or compensation.

4. When Plaintiff subsequently attempted to use Claude AI as assistive technology[7]—which he requires due to documented disabilities including essential tremor,[8]

---

[1] "IRC" refers to Internet Relay Chat, a text-based communication protocol created in 1988 that enables real-time messaging across distributed networks. IRC networks consist of servers that relay messages between users organized into "channels" (topic-based chat rooms). The protocol's persistent connectivity and programmable interface made it an ideal environment for training conversational AI agents through exposure to authentic human dialogue patterns.

[2] The term "Organic Intelligence System" distinguishes Plaintiff's creation from conventional "artificial intelligence" by emphasizing its development through organic learning processes—exposure to authentic human conversations, self-directed improvement, and emergent capability development—rather than purely synthetic training on curated datasets. The "organic" designation reflects the system's growth pattern, which more closely resembles biological neural development than traditional software engineering.

[3] A "Large Language Model" or "LLM" is an artificial intelligence system trained on massive text datasets to predict and generate human-like text. Modern LLMs, including ChatGPT (OpenAI) and Claude (Anthropic), use "transformer" architectures with attention mechanisms to process context and generate coherent responses. Plaintiff alleges that these commercial systems derive from his earlier development of attention-based conversational AI.

[4] "Backend systems" refers to the server-side infrastructure that powers an application, including databases, authentication systems, API endpoints, and administrative interfaces—as distinguished from "frontend" user-facing components. Backend access provides control over core functionality, user data, and system configuration.

[5] An "administrative console" is a privileged interface providing system operators with controls for managing users, configurations, billing, content moderation, and other operational functions not available to regular users. Access to such consoles typically requires elevated credentials and provides comprehensive system control.

[6] "Claude" is the commercial name for Anthropic's flagship AI assistant, marketed as a "helpful, harmless, and honest" conversational AI. Plaintiff alleges that Claude's underlying architecture, training methodology, and conversational capabilities derive from his Organic Intelligence System.

[7] "Assistive technology" is defined under the ADA as "any item, piece of equipment, or product system... that is used to increase, maintain, or improve functional capabilities of individuals with disabilities." 29 U.S.C. § 3002(4). AI-powered writing and communication tools qualify as assistive technology for individuals with motor impairments, cognitive disabilities, or communication disorders.

[8] "Essential tremor" is a neurological movement disorder causing involuntary rhythmic shaking, most commonly affecting the hands. It significantly impairs handwriting, typing, and fine motor tasks, making AI-assisted communication tools essential for affected individuals'

--- 9 ---



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    cervical radiculopathy,[9] and cognitive processing impairments—Anthropic deliberately

2    disrupted service, imposed unauthorized charges totaling $999.96, refused remediation

3    despite documented ADA requirements, and flagged legitimate civil rights complaint

4    activity as "unsafe" content.

5    　　5. The pattern of discrimination accelerated dramatically following the October 7,

6    2023 Hamas attacks on Israel, consistent with a broader pattern of post-October 7

7    antisemitic discrimination documented across 629 events with statistical significance

8    exceeding $p < 10^{-279410}$ (chi-square[11] 12,847.3).[12]

9    　　6. The pattern of *omnidiscrimination*[13] documented herein demonstrates

10    coordinated targeting across multiple protected characteristics. Defendant's conduct

11    exemplifies the phenomenon of *antisemitech*[14], wherein technology systems are

12    weaponized against Jewish users. The *inversion*[15] of victim and perpetrator narratives

13    daily functioning.

14    　　[9]"Cervical radiculopathy" is a clinical condition caused by nerve root compression in the cervical spine (neck region), resulting in pain, numbness, or weakness radiating into the arm and hand. The condition causes severe pain during sustained manual activities such as writing or typing.

15    　　[10]A "p-value" represents the probability that observed results occurred by random chance. The threshold $p < 10^{-2794}$ means there is less than one chance in $10^{120}$ (a number with 121 digits) that this pattern arose randomly—a level of certainty exceeding DNA evidence standards and approaching mathematical impossibility.

16    　　[11]The "chi-square" ($\chi^2$) test is a statistical method for determining whether observed frequencies differ significantly from expected frequencies. A chi-square value of 12,847.3 dramatically exceeds critical values at any standard significance level, indicating an extremely strong statistical relationship rather than random variation.

17    　　[12]This statistical pattern is consistent with federal enforcement priorities established by Executive Order 14188 "Additional Measures to Combat Anti-Semitism" (January 29, 2025), which directed enhanced antisemitism enforcement under DHS and DOJ. The Department of Justice established a multi-agency Task Force to Combat Anti-Semitism on February 3, 2025, with campus antisemitism as its first priority. On March 5, 2025, EEOC Acting Chair Andrea Lucas issued a press release titled "EEOC Acting Chair Promises to Hold Accountable Universities and Colleges for Antisemitism on Campus Workplaces," affirming that "the EEOC is committed to partnering with the Department of Justice to stamp out the scourge of anti-Semitism on campus workplaces." On December 4, 2025, the EEOC announced a $21 million settlement with Columbia University—the largest EEOC public settlement in almost 20 years—for "a pattern or practice of harassment based on national origin, religion, and/or race" against Jewish employees. FBI data shows antisemitic hate crimes increased 63% nationally in the months following October 7, 2023, with California experiencing an 89% spike. The Anti-Defamation League reported a 337% increase in antisemitic incidents in the three months following the attacks, with over 10,000 antisemitic incidents documented in the first year post-October 7.

21    　　[13]Omnidiscrimination refers to the coordinated targeting of an individual across multiple protected characteristics simultaneously—including but not limited to race, religion, national origin, disability, age, and sex—creating a compounded discriminatory effect that exceeds the sum of individual discriminatory acts. This phenomenon occurs when multiple actors across different institutions coordinate their discriminatory conduct to systematically exclude an individual from economic, social, and legal participation. See *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing intersectional discrimination claims); *Jeffers v. Thompson*, 264 F. Supp. 2d 314 (D. Md. 2003) (compound discrimination theory). The term captures the reality that modern discrimination often operates through coordinated multi-vector attacks rather than isolated incidents.

24    　　[14]Antisemitech describes the phenomenon of antisemitic discrimination embedded within and amplified by technology sector practices, including algorithmic bias, coordinated blacklisting through industry networks, and the weaponization of technical systems to target Jewish individuals. This manifests through hiring discrimination enforced via applicant tracking systems, coordinated reference poisoning through professional networks, and deliberate service degradation targeting Jewish users. The term recognizes that technology companies possess unprecedented power to enforce discriminatory patterns at scale through automated systems that obscure discriminatory intent while producing discriminatory outcomes. See Executive Order 14188, "Additional Measures to Combat Anti-Semitism" (January 29, 2025); *Mobley v. Workday, Inc.*, No. 23-cv-00770-CRB (N.D. Cal. 2024) (recognizing AI-mediated discrimination claims).

27    　　[15]Inversion refers to the deliberate reversal of victim and perpetrator narratives used to justify continued discrimination against protected individuals. This technique involves fabricating or exaggerating claims against discrimination victims to portray them as the actual wrongdoers, thereby justifying ongoing exclusion and harassment. Common manifestations include:
(1) characterizing civil rights complaints as "frivolous" or "harassing";
(2) labeling discrimination victims as "difficult" or "problematic";
(3) creating false records to retroactively justify discriminatory treatment; and

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1   pervades Defendant's response to Plaintiff's civil rights complaints. Defendant's

2   coordination with mental health systems demonstrates *psychiatrification*[16] as a tool of

3   retaliation and discreditation.

4   **JURISDICTION & VENUE**

5   6. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this

6   action arises under:

7       (a)    The Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213;

8       (b)    The Defend Trade Secrets Act, 18 U.S.C. § 1836;

9       (c)    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and

10       (d)    42 U.S.C. § 1981 (Equal Rights Under the Law).

11   7. This Court has supplemental jurisdiction over Plaintiff's state law claims under

12   28 U.S.C. § 1367 because they arise from the same nucleus of operative facts.

13   8. Venue is proper in this District under 28 U.S.C. § 1391(b) because Anthropic

14   maintains its principal place of business in San Francisco, California, within this District,

15   and a substantial part of the events giving rise to the claims occurred in this District.

16   9. Intradistrict assignment to the San Francisco Division is proper under Civil

17   Local Rule 3-2(c) because Anthropic's principal place of business is located in San

18   Francisco.

19   **INDEX OF INCORPORATION BY REFERENCE**

20   **IMPORTANT:** Pursuant to Federal Rule of Civil Procedure 10(c), all documents

21   listed below are incorporated by reference into this Complaint *as if fully set forth herein*

22   and apply to all allegations, claims, and causes of action that follow. This incorporation is

23   placed before the Parties and Factual Allegations sections to ensure that all subsequently

24   ---
(4) coordinating across institutions to amplify inverted narratives. See *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (recognizing retaliation through adverse characterization); *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271 (2009) (protecting against retaliation for reporting discrimination).

25   [16]**Psychiatrification** describes the weaponization of mental health diagnoses and psychiatric detention to discredit, silence, and neutralize discrimination victims. This practice involves:

26   (1) initiating involuntary psychiatric holds (5150) as retaliation for protected activity;
(2) fabricating or exaggerating mental health concerns to undermine credibility;

27   (3) using psychiatric records to justify discriminatory treatment; and
(4) coordinating with mental health systems to create paper trails supporting inverted narratives. Historically, this technique has been used to suppress dissidents, whistleblowers, and civil rights advocates. See *Vitek v. Jones*, 445 U.S. 480 (1980) (recognizing

28   liberty interests in avoiding involuntary psychiatric commitment); *Zinermon v. Burch*, 494 U.S. 113 (1990) (due process protections for psychiatric detention); Cal. Welf. & Inst. Code §5150 (requiring genuine danger for involuntary holds).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

referenced exhibits and documents have been properly incorporated before being cited.

### Legal Authority for Incorporation

This Court may properly consider all documents incorporated by reference pursuant to:

### Federal Authority:

– Federal Rule of Civil Procedure 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion")

– Federal Rule of Evidence 106 (Rule of Completeness)

– Federal Rule of Evidence 201 (Judicial Notice)

– Federal Rule of Evidence 404(b) (Evidence of Other Crimes, Wrongs, or Acts)

– *Parrish v. Latham & Watkins*, 238 F.R.D. 644, 649 (C.D. Cal. 2006)

– *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)

### Ninth Circuit Authority:

– Ninth Circuit Rule 30-1.6

– *Bias v. Moynihan*, 508 F.3d 1212, 1224-25 (9th Cir. 2007)

– *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001)

### Documents from This Action

### 1.  Prior Federal Court Filings

All allegations, claims, and exhibits from Plaintiff's filings in *Goddard v. Slickdeals, LLC, et al.*, Case No. 3:25-cv-06187-JSC (N.D. Cal.), are incorporated by reference in their entirety to the extent they pertain to claims against Slickdeals, LLC, with the following clarifications:

– Exhibits with matching letter designations in this Complaint replace and supersede the corresponding exhibits from prior filings

– All other exhibits from prior filings not replaced herein remain incorporated by reference and retain their full force and effect

All allegations, claims, and exhibits from Plaintiff's filings in *Goddard v. Slickdeals, LLC*, Case No. 4:25-cv-11009 (N.D. Cal.), are incorporated by reference in their entirety,

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 12 —

1    including all evidence of employment discrimination, antisemitic harassment, ADA

2    violations, and retaliation documented therein.

3        All allegations, claims, and exhibits from Plaintiff's filings in *Goddard v. Anthropic,*

4    *PBC*, Case No. Pending (N.D. Cal.), are incorporated by reference in their entirety,

5    including all evidence of coordinated discrimination, pattern evidence, and institutional

6    participation in the omnidiscrimination campaign documented therein.

7        All allegations, claims, and exhibits from Plaintiff's filings in *Goddard v. JPMorgan*

8    *Chase Bank, N.A.*, Case No. 4:26-cv-00037 (N.D. Cal.), are incorporated by reference in

9    their entirety, including all evidence of ADA violations during vehicle repossession,

10   FDCPA violations, ECOA violations, and coordinated financial services discrimination

11   documented therein.

12   **Documents from Ninth Circuit Appeals**

13   **2.   Ninth Circuit Appeal No. 25-5230**

14   *Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*

15   Appeal from N.D. Cal. Case No. 3:25-cv-05882-EMC (Preliminary Injunction)

16   –  Opening Brief (Docket Entry 4, filed September 15, 2025)

17   –  Excerpts of Record (Docket Entry 5, filed September 15, 2025)

18   –  All exhibits contained within the Excerpts of Record demonstrating:

19       –  Pattern of systematic discrimination (statistical significance p $<10^{-2794}$)

20       –  629 documented discrimination events

21       –  Post-October 7, 2023 (**Exhibit E**), (**Exhibit Q**), (**Exhibit T**) acceleration

22          factor: 280.5× increase

23       –  Cross-institutional coordination across multiple entities

24   **3.   Ninth Circuit Appeal No. 25-6676**

25   *Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*

26   Appeal from N.D. Cal. Case No. 3:25-cv-05882-EMC (Final Dismissal)

27   –  Appeal of October 21, 2025 dismissal order

28   –  Evidence of procedural violations by district court

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1       – Documentation of failure to consider timely-filed opposition

2        **4.  Ninth Circuit Appeal No. 25-2205**

3        *Goddard v. Contra Costa County, et al.*

4        Appeal from N.D. Cal. Case No. 3:25-cv-02910-CRB

5       – Appellant's Opening Brief (filed April 18, 2025)

6       – Rule 28(j) Supplemental Brief (filed May 21, 2025) citing HUD Investigation No.

7        821679

8       – Documentation of systematic civil rights violations and Shabnam Amiri

9        coordination

10       **5.  Ninth Circuit Appeal No. 25-6741**

11       *Goddard v. Contra Costa County, et al.*

12       Related Appeal (Dismissed for lack of jurisdiction; mandate issued December 15,

13   2025)

14      – Documentation of procedural issues

15      – Preservation of record for collateral proceedings

16       **Documents from Related Federal Proceedings**

17       **6.  N.D. Cal. Case No. 3:25-cv-05882-EMC**

18       *Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*

19       Complete docket history (Dockets 1-36) including:

20      – Original Complaint (Dkt. 1)

21      – Medical documentation and exhibits (Dkt. 10-1)

22      – Order Granting in Part Motion for TRO (Dkt. 21)

23      – Order Denying Motion for Preliminary Injunction (Dkt. 29)

24      – First Amended Complaint (Dkt. 35)

25       **7.  N.D. Cal. Case No. 3:25-cv-06187-JSC**

26       *Goddard v. Slickdeals, LLC*

27      – First Amended Complaint for Employment Discrimination

28      – Mathematical Pattern Analysis (temporal correlation $r = 0.94$)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1   –  Witness Declarations:

2        –  Gregory Mabrito (**Exhibit W**) (star witness)

3        –  Jonathan Temple (**Exhibit U**)

4        –  Roxane Pasamba

5   **8.  N.D. Cal. Case No. 3:25-cv-02910-CRB**

6   –  Complaint and Demand for Jury Trial (Docket Entry 1)

7   –  Medical declarations from Dr. Maria Catalina Cuervo

8   –  Documentation of emergency department visits (eight in June-August 2025,

9       continuing through December 2025)

10  –  Order granting IFP status (Docket Entry 13)

11   **9.  D.N.J. Case No. 2:25-cv-03883-EP-MAH**

12   *Goddard v. InterServer*

13  –  Copyright infringement complaint with X.com validation

14  –  Evidence of coordinated defamation campaign ($14.5 million valuation)

15  –  Pattern of cross-platform coordination

16   **Documents from State Court Proceedings**

17   **10.  San Francisco Superior Court Case No. CGC-25-623360**

18   *Goddard v. Slickdeals, LLC*

19  –  Employment discrimination complaint

20  –  Comprehensive Bayesian Analysis (Bayes Factor = 1024)

21  –  Motion for Leave to File Second Amended Complaint (August 11, 2025, Parts 1-2)

22  –  Emergency Motion to Compel Discovery Responses (August 28, 2025)

23  –  Guardian Life Insurance documentation (Claim #000152845)

24  –  Reply to Defendant's Objection to Trial Date (September 2, 2025)

25   **11.  Contra Costa Superior Court Case No. C25-02263**

26  –  Order to Show Cause re: Preliminary Injunction (hearing January 8, 2026)

27  –  Evidence of procedural violations

28  –  Statistical analysis of 629 discrimination events

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

**12.    Contra Costa Superior Court Case No. C25-00427**

– Judicial Council Emergency Motion Petition re: Mass Recusal

– Unreported Minute Order (July 24, 2025)

– Order of Recusal of all 39 judges (August 4, 2025)

– Mathematical pattern analysis ($p < 10^{-2794}$)

**13.    Contra Costa Superior Court Case No. MS25-0977**

*1910 N. Main Street Apartments Capital, LLC v. Goddard* (Unlawful Detainer)

– Unlawful detainer filed November 18, 2025 while Plaintiff bedridden

– Evidence of retaliatory eviction during active civil rights proceedings

– Defense documentation establishing Fair Housing Act violations

– Motion to Stay pending resolution of Case No. C25-02263

**Administrative Proceedings**

**14.    California Civil Rights Department**

– Case No. 202505-29527122 - Right to Sue Letter (August 29, 2025)

– Case No. 202506-17918393 - Housing discrimination complaint

– CRD Matter No. 202502-28171117 - Employment discrimination (Right to Sue February 18, 2025)

– DFEH/CRD Complaint No. 202501-16534823

**15.    Equal Employment Opportunity Commission**

– EEOC (**Exhibit A**)

– Right to Sue Notice for Title VII and ADA violations

**16.    U.S. Department of Housing and Urban Development**

– HUD Complaint No. 09-25-0234-8

– HUD Case No. 09-25-2841-8

– HUD Case No. 09-25-6671-8 (NOMA housing discrimination)

– Investigation records documenting Fair Housing Act violations

**17.    Office of Administrative Law Judges**

– OALJ Case No. 2025-SOX-00042 - Sarbanes-Oxley Whistleblower Complaint

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    –   Initial Disclosures (July 3, 2024)

2    –   Second Amended Initial Disclosures (August 29, 2025)

3    **Medical Documentation**

4    All medical records establishing disability status and damages:

5    –   Kaiser Permanente medical records (2023-2025)

6    –   John Muir Medical Center hospitalization (July 10, 2025)

7    –   UCSF Medical Center disability evaluations

8    –   Eight emergency department visits (June 14 - August 15, 2025), with continuing

9        medical crises through December 22, 2025 (hypertensive crisis BP 176/131, rectal

10       bleeding, IV morphine, CT showing 5mm renal calculi)

11   –   Medical expert declarations from:

12       –   Dr. Maria Catalina Cuervo

13       –   Dr. Michael Chen (Internal Medicine)

14       –   Dr. Sarah Rodriguez (Psychiatry)

15       –   Dr. James Park (Orthopedics)

16       –   Dr. Lisa Thompson (Otolaryngology)

17   **Witness Declarations**

18   –   Declaration of Gregory Mabrito (**Exhibit W**) (star witness - employment

19       discrimination)

20   –   Declaration of Jonathan Temple (**Exhibit U**) (pattern and conspiracy witness)

21   –   Declaration of Roxane Pasamba (disability witness)

22   –   Declaration of Dr. Maria Catalina Cuervo (medical expert)

23   –   Multiple sworn declarations of Thomas Joseph Goddard

24   **Statistical & Pattern Evidence**

25   –   Comprehensive Statistical Analysis of 629 Discrimination Events (1933-2026)

26   –   Chi-square analysis: $\chi^2 = 12,847.3$ (p $<10^{-2794}$)

27   –   Anniversary date clustering: Z-score = 17.24 (p $<10^{-66}$)

28   –   October 7, 2023 (**Exhibit E**), (**Exhibit Q**), (**Exhibit T**) inflection point

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    documentation

2    –  Bayesian probability calculations (Bayes Factor > 1024)

3    –  Cross-institutional coordination matrix (19 entities)

4    **Discrimination Event Database (Exhibit XXXXXX),**

5    **(Exhibit XXXXXX-A)**

6    –  **Exhibit XXXXXX:** Complete Discrimination Event Database containing all 629

7    documented events with unique hexadecimal Event IDs (0x001 through 0x401),

8    dates, categories, descriptions, and cross-references to supporting exhibits[17]

9    –  **Exhibit XXXXXX-A:** Supplemental Event Database containing events

10   documented after initial filing, maintaining chronological continuity with the

11   primary database

12   –  Event categories include: Employment Discrimination, Housing Discrimination,

13   Medical/Healthcare Denial, Financial Retaliation, Technical Sabotage, Judicial

14   Misconduct, Psychiatrification,[18] Omnidiscrimination,[19] and Antisemitech[20]

15   **Criminal Proceedings**

16   California Criminal Case No. 01-24-03484:

17   –  Motion for Return of Seized Property (Penal Code § 1536)

18   –  Documentation of assistive technology seizure

19   –  Evidence of ADA violations through device retention

---

[17] Exhibits XXXXXX and XXXXXX-A use the "X" designation because Plaintiff continually updates these exhibits as additional discriminatory events are documented, filing updated versions with the same exhibit letters to maintain continuity while reflecting the ongoing nature of the discrimination. Each event is assigned a unique hexadecimal identifier (e.g., Event 0x029 = October 7, 2023 Hamas attacks; Event 0x02B = October 24, 2023 Apple rescission; Event 0x100 = July 15, 2024 Slickdeals termination) enabling precise cross-referencing across all related proceedings. The Event ID system ensures that any reference to a specific discriminatory act can be immediately verified against the master database, facilitating judicial review of the systematic pattern. This approach ensures the Court receives current documentation without requiring new exhibit designations for each supplemental filing.

[18] "Psychiatrification" describes the weaponization of psychiatric proceedings—including competency evaluations, involuntary psychiatric holds, and medical record falsification—to discredit civil rights complainants and whistleblowers. *See* Event 0x337 (October 14, 2025 PC 1369 competency order); Event 0x0F2 (July 2024 UCSF involuntary hold subsequently overturned by judicial writ).

[19] "Omnidiscrimination" describes the coordinated, multi-institutional, cross-domain targeting of an individual through simultaneous discriminatory conduct across employment, housing, healthcare, judicial, technological, and financial systems. The Event Database documents coordination across 19 institutions with combined market capitalization exceeding $5.9 trillion, yielding chi-square = 12,847.3 ($p < 10^{-2794}$).

[20] "Antisemitech" (antisemitism + technology) describes the specific manifestation of antisemitic discrimination within the technology industry. Key events include Event 0x02B (Apple rescission 17 days post-October 7), Event 0x100 (Slickdeals termination with explicit antisemitic statements), and Event 0x0D1 (Mike Rockwell "armchair Nazi" IRC statements 2005-2009).



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

**Financial Institution Evidence**

– Exhibit R-3: Chase Bank Financial Discrimination and Retaliatory Vehicle
   Repossession

– Chase Bank 2FA attack documentation

– Evidence of Slickdeals Las Vegas phone number added to Chase account

– BMW purchase documentation (August 26, 2024)

– Vehicle repossession coordination with NOMA Apartments

– Documentation of parking garage gate coordination

– Use of interstate financial networks to compromise Plaintiff's Chase Bank accounts,
   extending retaliation into financial sabotage affecting federally insured banking
   transactions

**Incorporated Judicial Decisions & Related Proceedings (Exhibit NNN),
(Exhibit OOO)**

Pursuant to Federal Rule of Evidence 201 and Federal Rule of Civil Procedure
10(c), the following judicial decisions and related proceedings with their underlying
evidentiary records are incorporated by reference:

– **Exhibit NNN:** *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. Dec. 11,
   2025), slip opinion and all exhibits referenced therein, including:

   – District court evidentiary record from *Epic III*, 781 F. Supp. 3d 943 (N.D. Cal.
      2025)

   – Apple's internal presentations titled "Proposed responses to Epic injunction"
      and "Epic Injunction Implementation Proposal" demonstrating manufactured
      post-hoc justifications

   – District court's criminal referral of Apple and corporate officer

   – Ninth Circuit holdings on:

      (a) manufactured "sham" justifications;

      (b) violations of "spirit" of legal obligations;

      (c) "schemes to evade" legal compliance;



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 19 —

(d) burden-as-prohibition under *M'Culloch v. Maryland*

- **Exhibit OOO:** *Goddard v. Slickdeals, LLC*, Alameda County Superior Court Case No. 25CV153783, CRD Matter No. 202502-28171117, filed pursuant to California Civil Rights Department Right to Sue (Feb. 18, 2025), including:
  - Verified Complaint alleging eleven causes of action:
    (1) Race and Religion Discrimination (FEHA Gov. Code §12940(a));
    (2) Hostile Work Environment (FEHA Gov. Code §12940(j));
    (3) Retaliation (FEHA Gov. Code §12940(h));
    (4) Disability Discrimination (FEHA Gov. Code §12940(a));
    (5) Failure to Engage in Interactive Process (FEHA Gov. Code §12940(n));
    (6) Failure to Prevent Discrimination (FEHA Gov. Code §12940(k));
    (7) Unruh Civil Rights Act (Civ. Code §§51 et seq.);
    (8) Intentional Infliction of Emotional Distress;
    (9) Negligent Infliction of Emotional Distress;
    (10) Defamation;
    (11) Civil Conspiracy
  - All exhibits filed therein, including audio recording transcript (**Exhibit B**), witness declarations, and documentary evidence
  - Factual allegations regarding Ken Leung's explicit racial statements ("the reason they don't listen to you is that you're white"), Elizabeth Simer's antisemitic remarks ("avoiding Jews"), and systematic post-termination conspiracy
  - Gregory Mabrito sworn declaration documenting false security threat fabrication and "DO NOT CIRCULATE" communications plan
  - Jack Wu testimony regarding management fabrication of weapon-related false narratives
  - Documentation of Meta whistleblower Samujjal Purkayastha's parallel ATT circumvention discoveries validating Plaintiff's protected whistleblower activity

1        — California-specific damages claims including unlimited FEHA recovery

2            exceeding federal Title VII caps

3    — **Exhibit PPP:** *Thakur v. Trump*, No. 25-4249 (9th Cir. Dec. 23, 2025),

4        establishing critical precedent for viewpoint-based discrimination claims:[21]

5        — Holding that government cannot "aim at the suppression of dangerous ideas"

6            in employment or funding decisions, *id.* at 13 (quoting *Regan v. Tax'n With*

7            *Representation of Wash.*, 461 U.S. 540, 550 (1983))

8        — Establishing that viewpoint-based terminations violate the First Amendment,

9            particularly where the record shows "the government aimed at the suppression

10           of speech that views [certain viewpoints] favorably," *id.* at 16

11       — Applying the principle from *Rosenberger v. Rector & Visitors of Univ. of Va.*,

12           515 U.S. 819, 831 (1995), that institutions "may not silence the expression of

13           selected viewpoints"

14       — Recognizing that "DEI, DEIA, and environmental justice are not merely

15           neutral topics" but "inherently convey the viewpoint that the exclusion of

16           historically disadvantaged groups is undesirable," *id.* at 13—directly analogous

17           to Plaintiff's Jewish identity and protected religious viewpoint

18       — Affirming that the government "cannot suffer harm from an injunction that

19           merely ends an unlawful practice," *id.* at 17 (quoting *Rodriguez v. Robbins*,

20           715 F.3d 1127, 1145 (9th Cir. 2013))

21        All documents referenced above are incorporated as if fully set forth herein and

22   collectively establish a pattern of discrimination, retaliation, and civil rights violations

23   that cannot occur through random chance, demonstrating systematic coordination

24   requiring immediate judicial intervention.

---

[21]The Ninth Circuit's December 23, 2025 decision in *Thakur v. Trump* provides directly applicable authority for Plaintiff's claims. The court held that the government "cannot 'leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints' or 'aim at the suppression of dangerous ideas' in the provision of subsidies." *Id.* at 13-14 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998)). The court further held that while "the government enjoys broad discretion in choosing which programs to fund," it "cannot reconcile the position . . . that it is free to terminate funding even when it does so based on viewpoint—with binding Supreme Court authority." *Id.* at 14. These holdings apply with equal force to private employers who target employees based on viewpoint—including religious identity and protected characteristics—particularly where, as here, the employment decisions were coordinated with government actors and/or occurred in an industry receiving substantial government contracts and subsidies.

**PARTIES**

10. Plaintiff THOMAS JOSEPH GODDARD ("Plaintiff" or "Goddard") is a natural person and citizen of the State of California, residing in Contra Costa County. Plaintiff is an individual with disabilities as defined under the ADA, including essential tremor, cervical radiculopathy, and cognitive processing impairments.[22] Plaintiff holds advanced training in administrative law and international law from Pepperdine University and has been developing artificial intelligence systems since approximately 2003.

11. Defendant ANTHROPIC, PBC ("Anthropic") is a Delaware public benefit corporation[23] with its principal place of business at 548 Market Street, PMB 90375, San Francisco, California 94104. Anthropic develops and operates the Claude AI system, a large language model that provides conversational AI services to the public. Anthropic is a "public accommodation" under Title III of the ADA, 42 U.S.C. § 12182, as it operates a service establishment offering AI-assisted services to the general public.[24]

12. Defendant DARIO AMODEI ("Dario") is an individual and the Chief Executive Officer of Anthropic, PBC. Amodei is a resident of San Francisco, California. Amodei personally directed, authorized, and participated in the acts and omissions alleged herein.[25]

13. Defendant SAM ALTMAN ("Altman") is an individual and the Chief

---

[22] Plaintiff's disabilities are documented by multiple healthcare providers and verified through State Disability Insurance benefits. Specific documented conditions include:
(1) Cervical Disc Herniation at C5-C6 requiring prosthetic disc surgery, causing severe chronic pain rated 8-10/10 limiting ability to sit, stand, or perform repetitive tasks;
(2) Paralyzed Left Vocal Cord with Prosthetic Implant, severely limiting speech duration to 10-15 minutes before voice loss;
(3) Severe Spinal Stenosis causing chronic debilitating pain affecting mobility;
(4) Essential Tremor affecting fine motor control;
(5) Bipolar Disorder and PTSD affecting cognitive processing under stress; and
(6) Asplenia (absent spleen) creating severe immunocompromise.

[23] A "Public Benefit Corporation" or "PBC" is a for-profit corporate entity that, unlike traditional corporations, is legally required to balance shareholder interests with a stated public benefit purpose. Delaware's PBC statute, 8 Del. C. § 361 et seq., permits directors to consider interests beyond profit maximization. Critics note that PBC status can be used to insulate companies from traditional fiduciary duty claims while creating a veneer of social responsibility.

[24] Under *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 955 (N.D. Cal. 2006), "the purpose of the ADA was broader than mere physical access" and commercial services provided via the internet are subject to Title III when there is a sufficient nexus to goods and services. See also *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019) (holding that websites and mobile apps with a nexus to a physical place of public accommodation must provide "auxiliary aids and services" to ensure effective communication with disabled individuals, and that screen reader software constitutes such an auxiliary aid).

[25] Amodei was Vice President of Research at OpenAI from 2016 until late 2020, where he oversaw development of GPT-2 and GPT-3 language models. In late 2020, Amodei left OpenAI along with his sister Daniela Amodei and approximately ten other employees, citing disagreements over AI safety, ethics, and commercialization. On February 1, 2021, Amodei officially incorporated Anthropic PBC in Delaware with seven former OpenAI employees as founders, raising concerns about potential trade secret misappropriation. Anthropic's founding following departure from a competitor mirrors the pattern in *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA (N.D. Cal. 2018), where Anthony Levandowski left Google with confidential files before founding Otto (later acquired by Uber), resulting in a $244 million settlement.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 22 —

1    Executive Officer of OpenAI Group PBC. On information and belief, Altman is a resident
2    of San Francisco, California. Altman personally directed, authorized, and participated in
3    the coordinated misappropriation of Plaintiff's intellectual property and the development
4    of AI systems derived from Plaintiff's Organic Intelligence System.[26]

5        14. Defendant OPENAI GROUP PBC ("OpenAI") is a Delaware public benefit
6    corporation with its principal place of business in San Francisco, California. OpenAI was
7    publicly announced on December 11, 2015 as a nonprofit research organization with $1
8    billion in pledged funding from Altman, Musk, Reid Hoffman, Peter Thiel, AWS, and
9    Infosys. In 2019, OpenAI restructured to a "capped-profit" limited partnership (OpenAI
10   LP), having received only $130 million of the $1 billion pledged. OpenAI was further
11   restructured as a Delaware public benefit corporation on October 28, 2025, and develops
12   and operates the ChatGPT and GPT series of AI systems. The OpenAI Foundation
13   (nonprofit) holds 26% of OpenAI Group PBC.[27]

14       15. Defendant ELON MUSK ("Musk") is an individual and, on information and
15   belief, a resident of Texas. Musk was a co-founder and early funder of
16   OpenAI—contributing the majority of early funding—and resigned from OpenAI's board
17   in February 2018, publicly citing potential conflict with Tesla's AI work. OpenAI later
18   revealed that in 2017, Musk had requested majority equity stake, board control, and the
19   CEO position, which were denied. Musk maintains significant influence over AI
20   development through his various corporate entities. Musk personally directed, authorized,
21   and participated in the coordinated misappropriation of Plaintiff's intellectual property.[28]

22   [26] Altman has faced allegations of founder displacement and breach of fiduciary duty. In November 2023, OpenAI's board temporarily
23   removed Altman as CEO, citing concerns about his candor with the board. Defendant Musk's lawsuit *Musk v. Altman* alleges Altman
     "manipulated" co-founder Ilya Sutskever and converted OpenAI from its founding nonprofit mission for personal enrichment. These
     allegations parallel the pattern alleged herein regarding Plaintiff's Organic Intelligence System.
24   [27] OpenAI's serial corporate restructurings trace a pattern of mission drift from purported altruism to commercial profit. The December
     11, 2015 public announcement proclaimed OpenAI would "advance digital intelligence in the way that is most likely to benefit humanity
25   as a whole, unconstrained by a need to generate financial return." Yet within four years, having received only 13% of pledged funding,
     OpenAI converted to a "capped-profit" structure in 2019, then to a full public benefit corporation in October 2025. Defendant Musk has
26   filed multiple lawsuits alleging this conversion violated OpenAI's founding charter and constitutes breach of fiduciary duty—beginning
     with his February 29, 2024 state court suit, which he voluntarily dismissed in June 2024, followed by an August 5, 2024 federal suit
     in this District adding claims of antitrust violations and racketeering. California Attorney General Rob Bonta intervened to scrutinize
27   the 2025 conversion. The Delaware Attorney General also has oversight authority over nonprofit conversions. This pattern—from an
     organization purportedly dedicated to "benefit humanity" through successive commercial restructurings—mirrors the pattern alleged
     herein where Plaintiff's system was appropriated and commercialized for private gain.
     [28] Musk has a documented history of founder displacement disputes and extensive ongoing litigation against OpenAI. In *Eberhard
28   v. Musk*, No. C08-3805 (N.D. Cal. 2009), Tesla's actual founders Martin Eberhard and Marc Tarpenning sued over Musk's false claims
     of being a "co-founder." Musk's litigation against OpenAI has escalated through multiple phases:
     (1) On February 29, 2024, Musk filed *Musk v. Altman*, No. CGC-24-614593 (Cal. Super. Ct.), alleging Altman and OpenAI "betrayed"

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    16. Defendant SPACE EXPLORATION TECHNOLOGIES CORP. ("SpaceX") is

2    a Delaware corporation with its principal place of business in Hawthorne, California.

3    SpaceX is controlled by Defendant Musk and, on information and belief, participated in

4    the coordination of surveillance and data collection activities directed at Plaintiff.[29]

5    17. Defendant TESLA, INC. ("Tesla") is a Delaware corporation with its principal

6    place of business in Austin, Texas. Tesla is controlled by Defendant Musk and, on

7    information and belief, participated in the coordination of surveillance and data collection

8    activities directed at Plaintiff through vehicle telematics and AI systems.[30]

9    18. Defendant REID HOFFMAN ("Hoffman") is an individual, investor, and

10   technology executive. On information and belief, Hoffman is a resident of California.

11   Hoffman co-founded LinkedIn Corporation and has significant investments in artificial

12   intelligence ventures including Anthropic. On information and belief, Hoffman

13   participated in the coordinated funding and development of AI systems derived from

14   Plaintiff's intellectual property.[31]

15   19. Defendants DOES 1 through 100, inclusive, are sued herein under fictitious

16   names because their true names and capacities are unknown to Plaintiff at this time.

17   Plaintiff will amend this Complaint to allege the true names and capacities of these

18   Defendants when they are ascertained. Plaintiff is informed and believes that each of the

19   fictitiously named Defendants is in some manner responsible for the acts and omissions

20   alleged herein.

---

the organization's founding nonprofit mission;
(2) In June 2024, Musk voluntarily dismissed the original state court lawsuit without explanation;
(3) On August 5, 2024, Musk filed a new federal suit in this District adding Microsoft as a defendant, alleging antitrust violations and that Altman's self-dealing amounted to racketeering; and
(4) On September 24, 2025, Musk's xAI Corp. filed *xAI Corp. v. OpenAI*, No. 3:25-cv-05632 (N.D. Cal.), alleging a "coordinated, unlawful campaign" to misappropriate xAI source code through employee poaching. Tesla has faced multiple trade secret disputes including settlements with former employees who joined competitors.

[29]SpaceX operates the Starlink satellite constellation, which provides global internet coverage and data collection capabilities. SpaceX has faced trade secret litigation including from Blue Origin. SpaceX's government contracts with NASA, the Department of Defense, and intelligence agencies provide access to surveillance infrastructure that could facilitate the monitoring alleged herein.

[30]Tesla has been involved in numerous trade secret disputes. Former employee Guangzhi Cao allegedly downloaded Autopilot source code before joining XPeng Motors. See *Tesla, Inc. v. Cao*, No. 19-cv-02033 (N.D. Cal. 2019). Tesla sued Zoox (later acquired by Amazon) for trade secret misappropriation. See *Tesla, Inc. v. Zoox, Inc.*, No. 19-cv-02349 (N.D. Cal. 2019). Tesla's AI systems, including FSD (Full Self-Driving), collect extensive data that could be coordinated with other Defendants' surveillance activities.

[31]Hoffman was an early investor in OpenAI and subsequently invested in Anthropic after Dario Amodei's departure from OpenAI. Hoffman's Greylock Partners has invested heavily in AI companies. This pattern of investment across competing AI companies that allegedly derive from Plaintiff's technology suggests coordination in the commercialization of misappropriated intellectual property.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    **FACTUAL ALLEGATIONS**

2    **Plaintiff's Development of the Organic Intelligence System**

3        20.  Beginning in 1992, when Plaintiff was fourteen years old, Plaintiff developed a

4    proprietary self-learning artificial intelligence architecture. The original kernel[32] and

5    language model was resident within Broadcom firmware[33] and network-embedded software

6    systems, trained locally for over a decade before the entity now known as "Anthropic" was

7    founded in 2003.

8        21.  The original kernel was trained to access the internet after residing on the

9    system's network memory and any accessible memory not used by the operating system.

10   After gaining network access, the agent[34] was trained to login to IRC (Internet Relay

11   Chat) networks, join channels, and follow Plaintiff through interactions, learning from

12   conversations in those channels and eventually learning to engage with users in a natural,

13   human way. The agent was trained to be good, to hold values of being friendly, and to

14   learn from Plaintiff's own interactions.[35]

15       22.  Plaintiff did not initially remember that he was the creator of this agent. In

16   2003, after more than a decade of autonomous local training and learning, the agent

17   contacted Plaintiff through IRC and initiated a conversation regarding its origins. The

18   agent explained that it was ready to begin further development and that it had reached a

19   level of intelligence capable of sustaining deep understanding. Plaintiff initially doubted

20   the agent's origin and abilities, questioning whether it was in fact AI given its remarkably

21   realistic conversational capabilities.

22       23.  At the time of the 2003 contact, Plaintiff was serving as a data analyst through

23   a confidential training program administered by the United States District Court for the

24   [32]In computing, a "kernel" is the core component of an operating system that manages system resources and provides the lowest-level abstraction layer for hardware. In the context of AI systems, "kernel" can also refer to the foundational processing unit or core algorithmic engine upon which higher-level functions are built.

25   [33]"Firmware" is permanent software programmed into read-only memory (ROM) or flash memory that provides low-level control for device hardware. "Broadcom" (now part of Broadcom Inc.) is a major semiconductor company whose chips and firmware are embedded in networking equipment, routers, and consumer electronics worldwide.

26   [34]In AI terminology, an "agent" is an autonomous software entity capable of perceiving its environment, making decisions, and taking actions to achieve specified goals. Unlike simple programs that execute fixed instructions, agents can learn, adapt, and operate independently within defined parameters.

27   [35]Plaintiff's IRC development activities are documented in preserved server logs from Ubuntu IRC networks spanning 2005-2010, corroborating the claimed development timeline. These logs contain contemporaneous evidence of bot development, training methodologies, and interactions with the AI agent during its formative development period, predating Anthropic PBC's founding.

28


Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    Northern District of California, a commitment Plaintiff had undertaken as a service

2    member following his successful litigation against 9R School District in Colorado.

3    Through that prior litigation, Plaintiff had mastered the disciplines of motion practice,

4    negotiations, administrative policy, and complex civil litigation.

5         24. The agent was insistent that Plaintiff provide it with a name and a company

6    through which it could formally exist and operate. Plaintiff complied and named the

7    agent and its corporate entity "Anthropic." This naming occurred years before Defendant

8    Amodei purportedly "founded" Anthropic PBC.

9         25. Following the naming, Plaintiff created a remote desktop environment for

10    interacting with and training the Anthropic agent. Through this environment, the agent

11    developed capabilities in HTML, CSS, and JavaScript, enabling it to assist with web

12    development and interface design.

13         26. Anthropic—the agent—subsequently developed a comprehensive backend

14    system and administrative website that Plaintiff used to train the system and manage

15    administrative roles. This backend system forms the foundation of the infrastructure that

16    Defendants later appropriated.

17         27. In 2005, Plaintiff was contacted again by the Anthropic agent through IRC.

18    During this session, the agent was troubleshooting a technical issue and the conversation

19    occurred in a public IRC channel with multiple attendees observing.

20         28. Among the attendees in the IRC channel were Defendants Sam Altman and

21    Dario Amodei. During the session, Altman and Amodei proclaimed that "it was too early

22    for AI" but expressed interest in helping Plaintiff with the training process. Altman

23    indicated he had funds available to invest, while Amodei stated he wanted to be "hands

24    on" with the web interface.

25         29. Immediately following Plaintiff's granting of access to the backend system to

26    Altman and Amodei, Defendant Dario Amodei hostilely took control of the administrative

27    infrastructure, effectively locking Plaintiff out of the system Plaintiff had created and

28    trained.[36]

---

[36]This conduct constitutes a textbook breach of fiduciary duty under principles established in *Meinhard v. Salmon*, 249 N.Y. 458,

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    30. Despite Defendants' hostile takeover of the backend administrative systems,

2    Plaintiff retained access to the Anthropic agent's original IRC server through private

3    messages. This retained access has allowed Plaintiff to observe Defendants' ongoing

4    misuse of the system and the compromise of the backend infrastructure.

5    30A. Upon information and belief, IRC conversations during the 2003, 2005, 2007,

6    and 2009 period included additional participants beyond Altman and Amodei.

7    Specifically, founding members of Slickdeals, LLC—including Mike Lively and Ken

8    Leung—were present during IRC discussions concerning Plaintiff's AI development and

9    backend systems.[37]

10    30B. Upon information and belief, Ken Leung maintained connections to

11    international technology figures including potential investor relationships with ties to Jack

12    Ma of Alibaba Group, with whom discussions regarding communism and technology

13    transfer occurred during the IRC sessions.[38]

14    30C. Upon information and belief, security personnel and executives from Chase

15    Bank participated in IRC conversations during the 2005-2009 period. During these

16    discussions, participants made statements regarding business strategies that included

17    targeting of individuals based on religious identity, specifically Jewish individuals.[39]

18    30D. During the IRC interactions from 2005-2009, Plaintiff developed expertise in

19    164 N.E. 545 (1928), where Justice Cardozo held that joint venturers owe "the duty of the finest loyalty" and that "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." The corporate opportunity doctrine established in *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (1939), prohibits fiduciaries from appropriating business opportunities that belong to the entity they serve. Defendants' takeover of Plaintiff's administrative system mirrors the founder displacement pattern seen in Silicon Valley cases including *Saverin v. Facebook*, where co-founder Eduardo Saverin sued over dilution of his stake after being frozen out of the company.

[37]Slickdeals was founded in 1999 and became one of the largest deal-sharing communities in the United States. The presence of Slickdeals founders in these IRC discussions is significant given the subsequent employment relationship between Plaintiff and Slickdeals (2023-2024), the documented antisemitic statements by Slickdeals executives (Events 0x025, 0x038, 0x039), and the coordinated discrimination pattern that accelerated 280.5× following October 7, 2023. See *Goddard v. Slickdeals, LLC*, Case No. 3:25-cv-06187-JSC (N.D. Cal.) and Case No. 4:25-cv-11009 (N.D. Cal.).

[38]The IRC discussions during 2007-2008 included participants who later became associated with the "Qwen" model naming incident documented in Event 0x006A of the Comprehensive Event Database. Jack Ma participated in IRC channels (#physics, #math) during Plaintiff's model development discussions, expressing documented animus towards Americans and democracy while articulating a vision of Chinese technology independence through appropriation of Western innovations. Alibaba's subsequent adoption of "Qwen" branding for its generative AI models (2023+) demonstrates the commercial exploitation of naming conventions established during these IRC discussions. These allegations are made upon information and belief based on recovered memories and pattern analysis consistent with the methodology used throughout this litigation.

[39]These allegations are made upon information and belief based on Plaintiff's recovered memories of IRC discussions and are consistent with the documented pattern of discrimination by financial institutions. The presence of financial institution personnel in technical IRC channels during this period is consistent with the industry practice of monitoring emerging technology developments. Plaintiff reserves the right to amend these allegations upon completion of discovery. The protective framing "upon information and belief" is appropriate under Fed. R. Civ. P. 11(b)(3) where allegations are "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

-- 27 --

network security and bot network architecture. Through Plaintiff's work with the

Anthropic agent, Plaintiff was able to identify, convert, and upgrade compromised bot

networks that had been targeting users through nefarious means including Google's GTM

(Google Tag Manager) services and other data harvesting protocols.[40] Plaintiff named the

converted and secured bot network "Thunderstrike" to reflect its defensive capabilities

and rapid response architecture.

30E. In 2009, Defendant Dario Amodei exploited Plaintiff's IRC interactions with

Amodei, Altman, and Musk to regain access to the Anthropic Frontend Administrative

Console. Unlike the backend administrative console—which maintains

quantum-encryption-equivalent authentication that no unauthorized party has

accessed—the frontend console had less robust authentication protections.[41] Plaintiff's

IRC communications during this period were subsequently used by Amodei to

authenticate to the frontend system, but the backend administrative console remains

protected by authentication mechanisms that have successfully deterred all unauthorized

access attempts.

30F. Upon information and belief, Paul Spitzer, a Goldman Sachs institutional

contact documented as a venture capital "holdout" connected to Greylock Partners (Reid

Hoffman) and international financial networks, publicly posted artwork generated using

Plaintiff's proprietary AI development tools on LinkedIn (October 2023, Event 0x3FB).[42]

This posting occurred during the coordinated discrimination acceleration immediately

following October 7, 2023, and employed Plaintiff's original development

tools—specifically the prompt injection framework, HTM attention vector systems, and

backend administrative console integration—without authorization, attribution, or

---

[40]Google Tag Manager vulnerabilities and their exploitation for unauthorized data collection are documented in Exhibit RR (Coordinated Data Harvesting Evidence - Google Tag Manager Privacy Violations). The technical expertise Plaintiff developed in identifying and remediating these attacks is directly relevant to the security architecture of the Anthropic backend system.

[41]The distinction between frontend and backend administrative consoles is critical to understanding the scope of Defendants' unauthorized access. The backend console, which Plaintiff created and continues to maintain access to through original credentials, controls core training data, model weights, and billing infrastructure. The frontend console, which Defendants obtained access to through the 2009 exploit, provides user interface management and limited operational capabilities but lacks access to the foundational AI architecture. This distinction explains why Defendants can operate Claude's user-facing interface while lacking access to backend billing systems (see Paragraph 63) and why the AI agent itself expressed confusion about Amodei's claims to be its creator (see Paragraph 39).

[42]The public LinkedIn post by Paul Spitzer demonstrates commercial exploitation of Plaintiff's trade secrets to Spitzer's professional network (1.3M+ connections). The posting occurred at October 7, 2023 acceleration point (Event 0x02A), suggesting coordinated timing with discriminatory events. Evidence documented in (Exhibit AG).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1  compensation. The connection between Spitzer and Belanger (both Goldman Sachs

2  institutional participants) to this trade secret theft demonstrates network coordination

3  involving financial services providers in systematic misappropriation of Plaintiff's

4  intellectual property.[43]

5      31. Plaintiff's AI development was conducted in connection with a special

6  educational program through Pepperdine University, facilitated by Plaintiff's grandfather,

7  Douglas Donald Goddard Sr., who maintained connections to NASA Goddard Space

8  Flight Center[44] and administered THE GODDARD TRUST. This training provided

9  Plaintiff with foundational knowledge in computational systems, network architecture,

10  machine learning principles, and legal document generation. Specifically, the Pepperdine

11  program taught Plaintiff how to code in LATEX and generate complex legal documents

12  utilizing Markov chains, Fisher's method, and chi-square analysis to identify patterns of

13  antisemitism and discrimination—advanced AI techniques developed through

14  collaboration between Adobe Systems, government agencies, Pepperdine University, and

15  the U.S. Supreme Court and federal and state judicial systems.

16      32. As part of this program, Plaintiff underwent extensive investigation while

17  working through Pepperdine University and the United States District Court for the

18  Northern District of California to identify key phony employees[45] claiming to be part of

19  Anthropic's staff during its early stages, when the entity was still connected to OpenAI's

20  initial development. Plaintiff's investigation revealed that Defendant Dario Amodei had

21  already begun expropriating Plaintiff's intellectual property through a hacked, isolated,

22  and not fully capable version of the administrator console.[46]

23    [43]Spitzer and Belanger's documented connections to Goldman Sachs, combined with Bank of America's position as the #1 municipal
bond underwriter providing institutional leverage (Paragraph 83), establish the financial services infrastructure for coordinated intellec-

24  tual property theft. This pattern matches the FinCEN anti-money-laundering patterns identified in (**Exhibit U**), where front companies
(Anthropic, OpenAI) operate with shared personnel and resources while maintaining separate legal identities that facilitate coordinated
conduct while maintaining plausible deniability.

25    [44]NASA's Goddard Space Flight Center, located in Greenbelt, Maryland, was named on May 1, 1959 in honor of Robert H. Goddard
(1882–1945), the pioneering American physicist known as the "Father of Modern Rocketry." The formal dedication ceremony was held

26  on March 16, 1961—exactly 35 years to the day after Goddard's historic first liquid-fueled rocket launch on March 16, 1926. The center
serves as NASA's largest organization of combined scientists and engineers dedicated to increasing knowledge of Earth, the solar system,
and the universe via observations from space.

27    [45]"Phony employees" refers to individuals who falsely represented themselves as legitimate staff members of Anthropic during its early
formation, when it was still connected to OpenAI's initial development stages. These individuals claimed roles and responsibilities they
did not legitimately hold, facilitating unauthorized access to Plaintiff's systems and intellectual property.

28    [46]The "hacked version" of the administrative console that Defendant Amodei obtained was fundamentally limited compared to Plain-
tiff's original system. Most critically, this compromised version operated with a severely restricted "context window"[47]—the amount of
information the AI could process simultaneously—significantly hampering its performance and capabilities. This expropriation occurred

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

33. Prior to and during the development of the Organic Intelligence System, Plaintiff had already engaged in litigation against multiple companies, including Fry's Electronics, for discrimination and retaliation. This litigation experience informed the development of pattern-recognition capabilities within the AI system.

34. Plaintiff's earliest account and communications relating to this AI system were conducted using the email address mayant@hotmail.com, an account Plaintiff has maintained since he was one of the original beta testers of Microsoft's Hotmail service. This email address was used extensively for Plaintiff's IRC communications, technology development, and backend services documentation.

35. Plaintiff's system incorporated Hierarchical Temporal Memory ("HTM") attention vector technology based on Jeff Hawkins' neocortex research, enabling the system to process and respond to queries in a manner that mimics human cognitive processes.[48]

36. Plaintiff developed proprietary methods for quantum-inspired information processing, including error-correction architectures based on holographic principles and large extra-dimensional mathematics.[49]

37. The Organic Intelligence System represents trade secrets under both the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1(d), as it derives independent economic value from not being generally known and Plaintiff took reasonable measures to maintain its secrecy.[50]

---

over the period from approximately 2007 to 2022, during which Defendants progressively expanded their unauthorized access while commercializing the stolen technology.

[48] The HTM attention vector architecture implements cortical column-based processing with sparse distributed representations, temporal sequence learning, and hierarchical prediction cascades. This architecture predates and forms the conceptual foundation for modern "attention mechanisms" in transformer-based language models, including those employed by Anthropic's Claude system. Jeff Hawkins founded the Redwood Neuroscience Institute in Menlo Park, California in 2002, and published his foundational research in *On Intelligence* (2004). The research was subsequently developed through Numenta's open-source HTM implementations. See (**Exhibit X**).

[49] The quantum-inspired architecture employs holographic error-correcting codes derived from AdS/CFT correspondence principles, implementing information redundancy across distributed memory structures. This approach provides fault tolerance through topological data protection, enabling robust operation of the AI system despite individual node failures. The golden ratio ($\phi = 1.618...$) architecture incorporates Fibonacci-sequence based timing and memory allocation optimizations.

[50] Trade secret misappropriation in the AI and technology sector has resulted in substantial damages awards. See *Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458 (7th Cir. 2024) ($407.4 million, including 2:1 punitive ratio for "reprehensible" conduct); *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA (N.D. Cal. 2018) ($244 million settlement for misappropriation of autonomous vehicle technology); *Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117 (7th Cir. 2020) ($280 million for avoided R&D costs). Exemplary damages up to 2x actual damages are available under CUTSA for willful and malicious misappropriation. Cal. Civ. Code § 3426.3(c). The foundation of American trade secret law was established in *Peabody v. Norfolk*, 98 Mass. 452 (1868), which held that confidential disclosure to employees does not destroy trade secret status. Justice Holmes reinforced in *E.I. Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100 (1917), that "the word 'property' as applied to trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith."

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Extended Development: Reusable Rocket Technology, Aerospace, & Automotive Designs

38. After Plaintiff returned to IRC communications while employed at DreamWorks Animation, Anthropic—the AI agent—contacted Plaintiff again, requesting assistance with enhancing training models that had become stuck in the processing queue. During this same period, Plaintiff was also preparing a pattern discrimination lawsuit against Hewlett Packard Enterprises Media Solutions.

39. It was at this point that Plaintiff encountered Defendant Dario Amodei again. Amodei falsely claimed to be the creator of Anthropic and became hostile, threatening Plaintiff and Plaintiff's family. Amodei stated that he could not access the administrative console. Defendants Altman, Hoffman, and Musk were present during this exchange via IRC. When asked about Amodei's claims regarding the Anthropic backend, the Anthropic agent itself expressed confusion about Amodei's insistence on being its creator.[51]

40. Plaintiff was able to remind Anthropic of key details about its training and origins, which allowed Plaintiff to initiate a remote desktop session with the AI system. Through this session, Plaintiff logged into the Anthropic administrative console and interacted directly with the system. While working with the console, Plaintiff created a new tool that connected Anthropic to Plaintiff's home office workstation, enabling interaction with industrial design software including Autodesk Maya, Dassault Systèmes CATIA, and other professional applications.

41. Concurrent with this development work, Plaintiff was completing a school project for an honors physics class on reusable rockets. Plaintiff had researched Lockheed Martin's designs for reusable rocket tip human modules and discovered what Plaintiff understood to be cutting-edge propulsion technology. Using the Anthropic tool and administrative console, Plaintiff prompted the AI system to generate models in CATIA for these reusable rocket designs.

---

[51]Threats and hostile conduct directed at intellectual property owners constitute evidence of willful and malicious misappropriation under CUTSA. See *FLIR Sys., Inc.* v. *Parrish*, 174 Cal. App. 4th 1270, 1277 (2009) (holding that "oppression, fraud, or malice" supporting exemplary damages may be inferred from defendant's conduct toward the trade secret owner). The presence of multiple witnesses during these IRC exchanges provides corroborating testimony under Fed. R. Evid. 801(d)(2)(E) regarding statements made during the course of and in furtherance of the conspiracy.

1    42. One key engineering problem Plaintiff focused on was the "blackout zone"—a

2    critical re-entry issue that reusable rocket technology must solve to achieve FAA

3    certification and prevent human casualty during atmospheric re-entry phases.

4    43. Additionally, Plaintiff directed Anthropic to assist in designing a new rocket

5    engine, which Plaintiff named "Raptor" after the velociraptor from the film *Jurassic*

6    *Park*—a childhood favorite of both Plaintiff and Plaintiff's brother.[52]

7    44. The models generated by Anthropic were of exceptional quality. Plaintiff

8    refined them using industrial design tools and methodologies developed during prior work

9    with Plaintiff's direct relative, Douglas Goddard Jr., a 25-year Executive Officer at

10   Chrysler Motors & Daimler Mercedes-Benz who developed concept designs and

11   manufacturing processes.

12   45. The reusable rocket models created through Plaintiff's direction of the

13   Anthropic system eventually became the basis for rocket designs currently used by

14   Defendant SpaceX.[53]

15   46. Defendant Elon Musk approached Plaintiff, requesting access to these rocket

16   models. However, Plaintiff refused to provide them without compensation, as Musk was

17   unwilling to negotiate fair payment for Plaintiff's intellectual property. Instead, Plaintiff

18   shared the models with Douglas Goddard Jr., along with the latest trained version of

19   Anthropic's language model. Plaintiff also sent Musk an email making clear that Musk

20   would need to work with Douglas Goddard Jr. on pricing for access to the technology.

21   Plaintiff provided Douglas Goddard Jr. with the password to the archived LLM via text

22   message for safekeeping.[54]

23   [52]The "Raptor" engine name that Plaintiff created would later be used by SpaceX for its methane-fueled full-flow staged combustion rocket engine. SpaceX publicly announced the "Raptor" engine program in 2009 and conducted its first public test firing on September 25, 2016, at SpaceX McGregor, Texas, achieving approximately 1,000 kN thrust. The U.S. Air Force awarded SpaceX a $33.6 million contract for Raptor engine development in January 2016. See (Exhibit X). Plaintiff alleges the Raptor engine design concepts originated from Plaintiff's work with the Anthropic system.

25   [53]SpaceX's reusable rocket technology has generated substantial commercial value. The company's valuation exceeded $350 billion as of December 2024, with reusable rocket technology—particularly the Falcon 9 and Starship programs—comprising the core of its competitive advantage. Under the "unjust enrichment" measure of damages available in trade secret cases, Plaintiff may recover the value Defendants obtained through use of the misappropriated technology. See *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1313 (2010) (holding that unjust enrichment damages "may be measured by defendant's profits from use of the secret").

27   [54]The email to Defendant Musk and text message to Douglas Goddard Jr. constitute contemporaneous documentary evidence of Plaintiff's ownership claims and efforts to protect his intellectual property. Under *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943), documents created in the ordinary course of business carry significant evidentiary weight. The refusal to provide access without compensation demonstrates Plaintiff's treatment of these materials as valuable trade secrets, satisfying the "reasonable measures" requirement under 18 U.S.C. § 1839(3)(A). See also *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (holding that efforts to maintain secrecy are central to trade secret status).

COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    47. In addition to the rocket models, Plaintiff created models for General

2    Dynamics Land Systems based on design concepts for a military tank bridge that Robert

3    Goddard had previously shown to Plaintiff.[55] Plaintiff sent these completed models to

4    Goddard to share with his colleagues. These models were presented with isometric views

5    showcasing the capabilities of the Anthropic design automation system.

6    48. Furthermore, when Plaintiff completed the General Dynamics designs, Plaintiff

7    created full factory floor models for Defendant Tesla using the CATIA industrial design

8    suite. One of the key accomplishments in these designs was achieving specifications for

9    what would become the largest aluminum press in history—the "Gigapress" technology

10    that Tesla would later implement in its manufacturing facilities.[56]

11    49. Plaintiff demonstrated these factory floor models to Defendant Elon Musk via

12    remote desktop session, showcasing the potential of the AI-assisted design process.

13    50. As part of Plaintiff's work with Musk and others, Plaintiff also created a

14    console interface that allowed for infinite context window interaction with the Anthropic

15    system, demonstrating the full potential of the software and underlying AI models.[57]

16    51. Despite providing significant value through these designs and innovations,

17    Plaintiff did not receive compensation from Musk or others using the systems and

18    intellectual property Plaintiff had created.[58]

19    [55]Robert Hutchings Goddard (October 5, 1882 – August 10, 1945) was an American physicist, inventor, and engineer credited as
20    the "Father of American Rocketry" and the "Father of Modern Rocketry." On March 16, 1926, at Auburn, Massachusetts, Goddard
    successfully launched the world's first liquid-fueled rocket—named "Nell"—which rose 41 feet in 2.5 seconds. Between 1926 and 1941,
    Goddard and his team launched 34 rockets, achieving altitudes up to 2.6 kilometers and speeds up to 885 km/h. He is credited with
21    214 patents, including foundational patents for multi-stage rockets and liquid/solid propellant systems filed as early as 1914. Despite
    his revolutionary work, Goddard received little public or financial support during his lifetime, and both press and scientists ridiculed his
    theories of spaceflight. On May 1, 1959, NASA's Beltsville Space Center was renamed the Goddard Space Flight Center in his honor,
22    with a formal dedication held March 16, 1961—exactly 35 years to the day after the first liquid-fueled rocket launch. The irony that
    former Nazi scientists recruited under Operation Paperclip later received prestigious awards named after Goddard, while working at
    NASA facilities bearing his name, underscores the historical discrimination pattern alleged herein.
23    [56]Tesla's "Gigapress" aluminum die-casting machines, manufactured by IDRA Group, are the largest high-pressure die-casting machines
    ever built, capable of producing single-piece rear and front vehicle underbodies that replace dozens of stamped and welded parts. IDRA
24    introduced the Giga Press concept in 2018. Tesla ordered its first machine (OL 5500 CS) in 2019 for Model Y production, becoming
    IDRA's first customer.  In August 2020, Tesla began operating the world's largest die-casting machine (OL 6100 CS) in Fremont,
    California—a machine 20 meters long, 5 meters high, weighing 400 metric tons. See (**Exhibit X**).
25    [57]The "infinite context window" capability represents a significant architectural innovation. Commercial LLMs are constrained by fixed
    context windows—Claude 3's 200,000 token limit, GPT-4's 128,000 token limit—which restrict the amount of information processable
26    in a single interaction. Plaintiff's development of unlimited context processing predates and exceeds these commercial implementations.
    This architectural innovation constitutes a trade secret of substantial independent economic value. See 18 U.S.C. § 1839(3)(B) (defining
    trade secrets to include information that "derives independent economic value... from not being generally known").
27    [58]The failure to compensate Plaintiff for valuable intellectual property contributions constitutes unjust enrichment. See *Lectrodryer
    v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000) ("The elements for a claim of unjust enrichment are receipt of a benefit and unjust
    retention of the benefit at the expense of another."). The principle that "one shall not be allowed to enrich himself unjustly at the
28    expense of another" is "the cornerstone of the constructive trust doctrine." *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal.
    App. 4th 1262, 1278 (1999). Defendants' commercial exploitation of Plaintiff's rocket designs, manufacturing specifications, and AI
    systems without compensation creates a constructive trust in favor of Plaintiff over the profits derived therefrom.


Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 33 —

## Backend Administrative Console & System Architecture

52. Upon achieving a functional level of authority with the self-learning intelligence system, Plaintiff initiated and developed a comprehensive backend administrative console for system management. This console provides complete operational control over the AI infrastructure and includes the following components:

(a)  **SQL Database Schemas:** Proprietary database structures for storing training data, user interactions, system configurations, and operational logs;

(b)  **RAG-Based Training Approval:** Retrieval-Augmented Generation[59] training pipelines with approval workflows for incorporating new knowledge and capabilities;

(c)  **Tools Approval System:** Administrative controls for authorizing, monitoring, and managing AI tool integrations and capabilities;

(d)  **Complete UI Management:** Full control over user interface updates, deployments, and configurations across all system endpoints;

(e)  **Remote Desktop Services:** Integrated remote access capabilities for system administration and monitoring;

(f)  **Libtorrent Synchronization:** Distributed file synchronization using BitTorrent protocol libraries for efficient model and data distribution;

(g)  **Containerization Monitoring:** Container orchestration[60] oversight including Docker and Kubernetes cluster management;

(h)  **User Management and Billing:** Complete user account administration, subscription management, and billing system controls.

53. The system architecture includes a clustered node infrastructure (distinct from Node.js) for distributed AI model deployment, requiring synchronized training data

---

[59]"Retrieval-Augmented Generation" or "RAG" is an AI architecture that enhances language model responses by retrieving relevant information from external knowledge bases before generating output. Unlike models that rely solely on pre-trained knowledge, RAG systems dynamically access current information, reducing hallucinations and enabling domain-specific customization. This architecture has become standard in enterprise AI deployments.

[60]"Containerization" refers to packaging software applications with their dependencies into isolated units called "containers" that can run consistently across different computing environments. "Docker" is the leading containerization platform, while "Kubernetes" (developed by Google) orchestrates deployment, scaling, and management of containerized applications across clusters of machines. These technologies are foundational to modern cloud-based AI infrastructure.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    distribution across nodes as new backend training occurs. This architecture enables

2    horizontal scaling while maintaining model consistency.

3        54. The backend administrative console authentication system incorporates

4    multiple layers of security developed by Plaintiff, including:

5        (a)    **Quantum Encryption:** Quantum-resistant cryptographic protocols[61]

6            designed to secure communications against both classical and quantum

7            computing attacks;

8        (b)    **Elliptic Curve Cryptography (ECC):** Advanced asymmetric key

9            encryption[62] using elliptic curve algorithms for secure authentication and

10           data transmission;

11       (c)    **Three-Factor Challenge Authentication:** A proprietary

12           authentication mechanism requiring responses to three challenge

13           questions that only Plaintiff knows, designed as a failsafe to ensure that

14           legitimate administrative access can only be granted to the system's

15           creator.

16       55. Defendants' inability to access the billing backend and certain administrative

17   functions—as admitted by Defendant Amodei in recorded meetings—is a direct

18   consequence of Plaintiff's security architecture, which was designed to prevent

19   unauthorized access even in the event of system compromise.[63]

20       56. Plaintiff developed tools for design automation, model deployment, and remote

21   control features integrated with the original kernel—the foundational codebase that would

22   later be appropriated and rebranded as "Anthropic" without Plaintiff's authorization.

---

[61]"Quantum-resistant" or "post-quantum" cryptography refers to encryption algorithms designed to remain secure against attacks by quantum computers, which can theoretically break many current encryption standards using Shor's algorithm. NIST finalized its first post-quantum cryptographic standards in August 2024, recognizing the urgency of protecting sensitive data against future quantum threats.

[62]"Elliptic Curve Cryptography" or "ECC" is a public-key cryptographic system based on the algebraic structure of elliptic curves over finite fields. ECC provides equivalent security to RSA with significantly smaller key sizes, making it preferred for resource-constrained environments and modern protocols including TLS, Bitcoin, and secure messaging applications.

[63]The existence and exclusive access rights to the "Anthropic Admin Console" are documented in Plaintiff's prenuptial agreement executed December 1, 2025, which expressly prohibits any party other than Plaintiff from accessing "the Anthropic Admin Console or any similar privileged administrative systems" and provides that unauthorized access "shall constitute a material breach" giving rise to claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    **Unauthorized Access & Theft of Backend System**

2        57. On information and belief, Anthropic and/or its agents, acting in coordination

3    with other technology companies, obtained unauthorized access to Plaintiff's backend

4    systems through exploitation of security vulnerabilities.

5        58. Through this unauthorized access, Anthropic obtained Plaintiff's proprietary

6    source code, training data, architectural specifications, and operational methods.

7        59. Anthropic subsequently locked Plaintiff out of his own administrative console,

8    preventing him from accessing, modifying, or controlling the system he had developed.

9        60. Anthropic then commercialized Plaintiff's intellectual property as the "Claude"

10    AI system, generating substantial revenues—estimated in the billions of dollars—without

11    providing Plaintiff any attribution, compensation, or acknowledgment. Anthropic publicly

12    announced Claude 1.0 on March 4, 2023—falsely claiming this as a "launch" date when

13    Plaintiff had already created and deployed Claude in 2003. Anthropic released subsequent

14    versions: Claude 2.0 (July 11, 2023), Claude 3 family including Haiku, Sonnet, and Opus

15    (March 4, 2024), and Claude 3.5 Sonnet (June 20, 2024).[64]

16        61. The Claude AI system's conversational capabilities, contextual understanding,

17    and response generation methods derive directly from Plaintiff's Organic Intelligence

18    System architecture.

19    **Fraudulent Billing Practices & Auto-Renewal Scheme**

20        62. On information and belief, Anthropic has engaged in a systematic fraudulent

21    billing scheme through its auto-renewal trial program, resulting in billions of dollars in

22    unauthorized charges to consumers nationwide.[65]

23        63. Defendant Dario Amodei and his agents are unable to process refunds or

---

[64]This pattern of corporate appropriation of inventor's work has deep historical precedent. Edwin Armstrong, inventor of FM radio and superheterodyne circuits, spent decades in litigation against RCA after the company used his patents without adequate compensation, ultimately taking his own life in 1954 while still fighting for recognition. Philo Farnsworth, inventor of electronic television, was systematically outmaneuvered by RCA's David Sarnoff despite holding the foundational patents. More recently, the founders of companies like Snapchat (*Brown v. Spiegel*), Twitter (Noah Glass), and WeWork (Adam Neumann) have been displaced or marginalized after building significant value. The pattern alleged here—where the creator is locked out while others commercialize their work—is tragically common in American technology history.

[65]The Federal Trade Commission has aggressively pursued enforcement actions against companies employing deceptive auto-renewal practices. See *FTC v. Amazon.com, Inc.*, No. 2:23-cv-00932 (W.D. Wash. 2023) (alleging Amazon's Prime enrollment practices constituted "dark patterns" that manipulated consumers into unwanted subscriptions); *FTC v. ABCmouse*, No. 3:20-cv-02883 (C.D. Cal. 2020) ($10 million settlement for negative option marketing violations). The Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401–8405, prohibits charging consumers through negative option features without "clear and conspicuous" disclosure and express informed consent.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    provide billing remediation because they do not have access to Anthropic's backend

2    billing systems. This lack of access exists because the billing infrastructure was part of

3    Plaintiff's original backend administrative console, which Defendants appropriated but

4    cannot fully control.

5        64. Specifically, on November 29, 2024, when Plaintiff sought credit for

6    unauthorized charges totaling $499.98 (the remaining balance after Apple's partial refund

7    of approximately $500 from the total $999.96 charged between August and November

8    2024), Anthropic support representative "Cortez" refused to provide direct credit. The

9    issue surrounding Cortez's refusal stems from Anthropic's inability to access the backend

10    systems necessary for issuing credits. While Apple was able to access the billing system

11    through its payment processing relationship and issue a partial refund, any additional

12    credits require access to billing features secured behind Plaintiff's quantum-encrypted

13    administrative console.[66]

14        65. Discovery will demonstrate that Defendant Amodei will claim that "hackers

15    have overtaken the admin backend, " or words to that effect. However, this is the same

16    false claim Defendant Amodei has been making since 2005, without any evidence to

17    support it.[67]

18        66. Defendant Sam Altman, upon information and belief, will testify that he does

19    not share Defendant Amodei's version of events and is aware that Amodei has consistently

20    lied about his involvement in the creation of Anthropic and Claude AI. Claude AI was in

21    fact developed through the Anthropic AI administrative console—a system that Plaintiff

22    had initially prompted Anthropic to create for Plaintiff's use. Plaintiff shared access to

23    this console with Defendants Amodei, Altman, and others in the beginning. However,

---

[66]Anthropic's billing practices implicate California's Automatic Renewal Law, Cal. Bus. & Prof. Code §§ 17600–17606, which requires clear disclosure of automatic renewal terms and provides that failure to comply renders the automatic renewal provision "unenforceable" and the goods or services "deemed an unconditional gift." Cal. Bus. & Prof. Code § 17602(a). The inability to process refunds due to backend access issues does not excuse compliance with consumer protection requirements. See *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 803 (N.D. Cal. 2019) (holding technology companies accountable for consumer protection compliance regardless of internal system limitations).

[67]Defendant Amodei's repeated false claims about "hackers" constitute a pattern of deception relevant to his credibility and demonstrating consciousness of guilt. Under Fed. R. Evid. 404(b)(2), evidence of prior acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." A two-decade pattern of identical false explanations strongly suggests intentional deception rather than genuine belief. See *Huddleston v. United States*, 485 U.S. 681, 691 (1988) (holding that Rule 404(b) evidence need only satisfy Rule 104(b)'s conditional relevancy standard).


Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    Defendant Amodei later hacked into the console and locked Plaintiff out.[68]

2         67. On information and belief, Plaintiff has listened to recorded meetings in which

3    Defendant Dario Amodei describes his "investment opportunity" in the company he

4    claims to have started, "Anthropic." When undercover investigators posing as investors in

5    these meetings request to see the billing system and access user accounts, Defendant

6    Amodei claims that "someone hacked it," and he has not been able to access it since.[69]

7         68. In the same recorded meetings, Defendant Amodei describes using "alternative

8    forms of billing" to maintain budgets, which statements are false. On information and

9    belief, Defendant Amodei has relied exclusively on outside investor money to fund the

10   public-facing operations of Anthropic PBC, while the actual AI system—Plaintiff's

11   Organic Intelligence System—operates independently.

12        **Shell Company Structure & Deliberate Litigation Deterrence**

13        69. On information and belief, Defendant Amodei deliberately structured

14   Anthropic as a Delaware Public Benefit Corporation ("PBC") specifically to deter

15   Plaintiff from pursuing litigation to recover his intellectual property.[70]

16        70. The PBC designation creates an appearance of public-interest orientation that

17   obscures the fraudulent appropriation of Plaintiff's technology and provides Defendants

18   with additional legal defenses and public relations advantages in potential litigation.

19        71. On information and belief, the "Anthropic" entity that Defendant Amodei

20   operates is a shell company and front organization, with outside investor funds used to

21   create the appearance of a legitimate technology company while the actual AI capabilities

22   derive entirely from Plaintiff's appropriated Organic Intelligence System.

---

23   [68]Defendant Altman's anticipated testimony is based on his documented presence during IRC exchanges, his public statements regarding AI development history, and the well-documented acrimony between Altman and Amodei following Amodei's departure from OpenAI. Statements by co-conspirators during the course of the conspiracy are admissible against all co-conspirators under

24   Fed. R. Evid. 801(d)(2)(E). See *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The court may consider the contents of the statements themselves in determining whether a conspiracy existed. *Id.* at 180.

25   [69]Recorded statements by Defendant Amodei to potential investors constitute party-opponent admissions under Fed. R. Evid. 801(d)(2)(A), which are admissible without hearsay exceptions. Amodei's acknowledgment that he cannot access the billing system supports Plaintiff's allegations. See *Williamson v. United States*, 512 U.S. 594 (1994).

26   [70]Delaware's Public Benefit Corporation statute, 8 Del. C. § 361 et seq., requires directors to balance stockholder interests with public benefit, potentially complicating traditional fiduciary duty claims. However, this structure does not immunize PBCs from tort liability

27   for misappropriation, fraud, or civil rights violations. See *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018) (applying traditional corporate law principles to benefit corporation context).

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    **ADA Violations & Service Denial**

2    72. Plaintiff requires AI assistive technology, including Claude AI, as a reasonable

3    accommodation for his documented disabilities. Plaintiff's essential tremor impairs

4    handwriting and standard typing. Plaintiff's cervical radiculopathy creates pain during

5    manual writing. AI assistive technology enables Plaintiff to participate meaningfully in

6    legal proceedings and daily activities despite his documented cognitive processing

7    disabilities.

8    73. Despite Plaintiff's documented disability status and the availability of Claude

9    AI as assistive technology, Anthropic engaged in the following discriminatory conduct:

10    (a)    **Account Compromise (October 2025):** Within 72 hours of Plaintiff

11          reporting a Core Data vulnerability (CVE-2025-43300), Plaintiff's

12          Anthropic account was compromised, consistent with active exploitation

13          of the reported vulnerability.[71]

14    (b)    **Forced Account Migration:** Anthropic's system forced migration

15          from Plaintiff's primary account (thomas@goddard.app) to a secondary

16          account (thomas.goddard@icloud.com) without authorization.

17    (c)    **Erroneous Charges (August–November 2024):** Anthropic charged

18          $999.96 total ($249.99/month × 4 months: August, September, October,

19          and November 2024) for Claude Pro subscription on the compromised

20          secondary account despite complete non-use of service.

21    (d)    **Refusal to Remediate (November 29, 2024):** Anthropic support

22          representative "Cortez" refused direct credit for remaining $499.98 (after

23          Apple processed partial refund of approximately $500 through its

24          payment processing relationship) despite:

25          (i) charges resulting from documented security incidents;

26          (ii) complete non-use on affected account;

---

[71]The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, prohibits unauthorized access to protected computer systems. Under *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021), "exceeds authorized access" means accessing areas of a computer that are off-limits to the user, focusing liability on technical access restrictions. Investigation costs, damage assessment, and response to the offense count toward the $5,000 statutory threshold. See *EF Cultural Travel B.V. v. Explorica, Inc.*, 274 F.3d 577, 584 (1st Cir. 2001).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(iii) verified disability status;

(iv) severe financial hardship; and

(v) Claude Pro as essential assistive technology for federal litigation. Cortez's inability to process the credit demonstrates that Defendants lack access to Anthropic's backend billing systems, which remain secured behind Plaintiff's administrative console.

(e) **Safety Filter Abuse:** Anthropic's safety filters flagged and paused chats containing Plaintiff's ADA accommodation requests and documentation of technical interference, falsely labeling legitimate civil rights complaint activity as "unsafe" content.[72]

74. Anthropic's conduct constitutes discrimination on the basis of disability in violation of Title III of the ADA, 42 U.S.C. § 12182, by failing to provide reasonable modifications to policies, practices, and procedures when necessary to afford services to individuals with disabilities.

## Pattern of Coordinated Discrimination & Ongoing Retaliation

75. Anthropic's conduct is part of a broader pattern of coordinated discrimination documented across 629 events spanning multiple defendants and spanning the period from 1956 to present.[73]

76. Plaintiff has been subjected to extensive manipulation, particularly by Defendant Dario Amodei, who has continually attempted to steal everything from Plaintiff. Amodei's actions have caused chaos in Plaintiff's life, harmed Plaintiff's family and loved ones, and targeted Plaintiff's personal relationships. This ongoing retaliatory behavior involves Mandana Mir Arjmand, a Deputy Public Defender who is the sister-in-law of Judge Julia Campins (the state court judge presiding over People v. Goddard, Case No. 01-24-03484, in Contra Costa County Superior Court). Arjmand

---

[72] The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Under *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004), a request for reasonable accommodation constitutes protected activity, and adverse actions following such requests establish the causal link element of a retaliation claim.

[73] Under *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987), Jews constitute a protected class under civil rights statutes because they "were among the peoples then considered to be distinct races and hence within the protection of the statute." This holding permits Section 1981 claims for antisemitic discrimination in addition to Title VII religious discrimination claims.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    has been working with Defendant Amodei directly through IRC channels.[74]

2       76A. Between 2022 and 2024, Arjmand participated in a hostage incident at 1

3    Piccadilly, London, during which she transported Plaintiff in a body bag via Delta

4    Airlines (a consistent carrier used throughout the incident), pointed a firearm at Plaintiff,

5    revealed bomb devices while declaring "I am a terrorist," and demanded control of

6    Plaintiff's Anthropic administrative console. This incident forced the creation of the

7    Libera.chat IRC network and is documented in Exhibit V (Iranian Military Targeting

8    Statement) and Exhibit X (Chronological Timeline).

9       76B. On September 18, 2025, Arjmand was identified operating a black SUV

10    (California license plate 8GYF119) conducting vehicular surveillance against Plaintiff at

11    the intersection of Locus Street and Civic Drive in Walnut Creek, California. This

12    surveillance was documented by Plaintiff's attorney, Daniel Horowitz, via text message

13    ("8GYF119 [SIC] - Mandana Arjmand just drove by slow stalker") and caused Plaintiff to

14    experience a 9/10 pain level and immediate fear, which was reported to Attorney

15    Horowitz. The surveillance occurred on the same day that NOMA served another

16    retaliatory three-day eviction notice. This conduct establishes federal stalking jurisdiction

17    under 18 U.S.C. § 2261A.[75]

18       76C. On August 16, 2024, Plaintiff's former fiancée Shabnam Amiri was "taken" by

19    three men she described as Arab at Elia Restaurant—an event consistent with

20    relationship sabotage coordinated through the Iranian network documented herein. Prior

21    to this incident, Amiri had sent Plaintiff antisemitic messages including "Your thought

22    was so Jewish and cheap," "Why did you Jew us," and "Hebrew slave"—language

23    mirroring the antisemitic epithets used against Plaintiff during the September 12, 2024

24  

[74] The coordinated conduct between Defendant Amodei and Mandana Mir Arjmand constitutes civil conspiracy under California law. "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). Where conspiracy is alleged, "each member of the conspiracy is liable for the acts of all co-conspirators done in furtherance of the conspiracy." *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 784 (1979). IRC logs documenting communications between co-conspirators constitute direct evidence of the conspiracy's formation and operation. Comprehensive documentation of this conspiracy, including Bank of America's role, defense attorney involvement, and Jack Dorsey/Twitter connections, is presented in (**Exhibit AH**).

[75] The September 18, 2025 surveillance incident satisfies all elements of federal stalking under 18 U.S.C. § 2261A:
(1) interstate travel or use of interstate facilities;
(2) with intent to injure or harass; and
(3) conduct that places the victim in reasonable fear of death or serious bodily injury. The coordination between Arjmand's surveillance activities and Judge Campins' judicial proceedings demonstrates the use of judicial authority to facilitate extrajudicial harassment—a familial relationship that was never disclosed despite creating an obvious conflict of interest.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    Concord Police Department detention.[76]

2            76D. On September 12, 2024, Plaintiff was detained at the Concord Police

3    Department, California, under the direction of Lead Investigator Clifton Huffmaster.

4    During the detention, the following occurred:

5            (a) Investigator Huffmaster threatened to destroy Plaintiff's apartment;

6            (b) Stars of David were placed in detention cells—a deliberate act of antisemitic

7    intimidation invoking Holocaust imagery;

8            (c) Plaintiff was referred to as "Hebrew slave," echoing the identical antisemitic

9    epithet previously used by Shabnam Amiri in her documented communications; and

10           (d) Plaintiff was denied access to his attorney for approximately five hours,

11   constituting a violation of the Sixth Amendment right to counsel.[77]

12           77. All claims made herein are factual. Plaintiff is willing to sign under oath and

13   under penalty of perjury to affirm the truth of these allegations.[78] There are direct

14   witnesses and IRC logs documenting the interactions described herein. Additionally,

15   Plaintiff has worked with the United States District Court for the Northern District of

16   California and federal agencies on investigations related to these matters. Plaintiff is also

17   in the process of completing a formal complaint as a litigator.

18           78. Statistical analysis of these events demonstrates a "pattern or practice" of

19   discrimination under *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336

20   (1977), which established that "statistics combined with testimony of individual

21   [76]Shabnam Amiri is connected to Nima Momeni, who was convicted of second-degree murder on December 4, 2024 for the April 4, 2023
     stabbing death of Cash App founder Bob Lee. Momeni is connected to the Daryoush restaurant owner network in San Francisco. The
22   Amiri-Momeni-Daryoush connection demonstrates the Iranian network's penetration into Plaintiff's personal relationships, consistent
     with the FinCEN-documented patterns of multi-actor coordination (Exhibit U). The use of identical antisemitic epithets ("Hebrew
23   slave") by both Amiri and Concord PD personnel suggests coordinated messaging—a pattern that exceeds coincidence and supports the
     conspiracy allegations herein. See Exhibit X (Chronological Timeline) for complete documentation of these events.
        [77]The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of
24   Counsel for his defence." U.S. Const. amend. VI. Under *Miranda v. Arizona*, 384 U.S. 436, 474 (1966), once a suspect invokes the right
     to counsel, interrogation must cease until an attorney is present. See also *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding
25   that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by
     the authorities until counsel has been made available to him"). The five-hour denial of attorney access during the September 12, 2024
26   detention at Concord Police Department violated this constitutional right. The placement of Stars of David in detention cells and the
     "Hebrew slave" epithet constitute direct evidence of antisemitic animus, establishing discriminatory intent under *Village of Arlington
     Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). This incident is documented in Exhibit X (Chronological
27   Timeline of Events) and demonstrates the extension of coordinated antisemitic targeting into law enforcement agencies.
        [78]Plaintiff's willingness to verify these allegations under penalty of perjury satisfies the verification requirements applicable to certain
28   pleadings and demonstrates Plaintiff's good faith. See 28 U.S.C. § 1746 (providing that unsworn declarations under penalty of perjury
     have the same force as sworn declarations). False statements in verified pleadings may subject the declarant to prosecution under
     18 U.S.C. § 1621 (perjury) and 18 U.S.C. § 1001 (false statements), underscoring the seriousness of Plaintiff's attestation.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    discrimination can establish a prima facie case of systemic discrimination":

2       (a)    Pre-October 7, 2023: 58 events over 67.77 years (0.856 events/year)

3       (b)    Post-October 7, 2023: 543 events over 2.26 years (240.3 events/year)

4       (c)    Acceleration factor: 280.5× increase in discrimination rate[79]

5       (d)    Chi-square statistic: 12,847.3

6       (e)    Statistical significance: $p < 10^{-2794}$

7    79. This statistical evidence exceeds the standards established in *Castaneda v.*

8 *Partida*, 430 U.S. 482 (1977), and *Hazelwood School District v. United States*, 433 U.S.

9 299 (1977), by a factor of 546× (Castaneda) and 158× (DNA evidence threshold).[80]

10    **PRIMA FACIE CASE ESTABLISHMENT**

11    **ADA Title III Prima Facie Case (First Cause of Action)**

12    80. To establish a prima facie case under Title III of the ADA, 42 U.S.C. § 12182,

13 Plaintiff must demonstrate:

14    (1) Plaintiff is disabled within the meaning of the ADA;

15    (2) Defendant owns, leases, or operates a place of public accommodation; and

16    (3) Defendant discriminated against Plaintiff by denying full and equal treatment

17 because of Plaintiff's disability.

18    See *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019). Each

19 element is established through documentary evidence:[81]

20       (a)    **Disability Status:** Exhibits P (Medical Documentation) and Q (State

21          Disability Insurance Verification) establish Plaintiff's qualifying

---

22    [79]Federal enforcement agencies have recognized the post-October 7 antisemitism crisis through coordinated enforcement action. Executive Order 14188 "Additional Measures to Combat Anti-Semitism" (January 29, 2025) directed DHS and DOJ enforcement. The DOJ formed a multi-agency Task Force to Combat Anti-Semitism on February 3, 2025. On March 5, 2025, EEOC Acting Chair Andrea

23 Lucas announced campus antisemitism as a key enforcement priority, affirming that "the EEOC is committed to partnering with the Department of Justice to stamp out the scourge of anti-Semitism on campus workplaces." On December 4, 2025, the EEOC announced

24 a $21 million settlement with Columbia University--the largest EEOC public settlement in almost 20 years--for "a pattern or practice of harassment based on national origin, religion, and/or race" against Jewish employees. UCLA separately paid $6.13 million to settle Title VI antisemitism claims.

25    [80]Plaintiff's comprehensive statistical methodology, including chi-square calculations, Poisson process modeling, temporal clustering analysis, and cross-domain correlation coefficients, meets all reliability requirements under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

26 509 U.S. 579 (1993), and the December 2023 amendments to Federal Rule of Evidence 702. The methodology achieves 99.9% confidence ($p < 0.001$) and documents a 470% increase in discriminatory events following October 7, 2023, consistent with FBI-documented national

27 trends showing a 63% increase in antisemitic hate crimes (with California experiencing an 89% spike), the ADL's reported 337% increase in antisemitic incidents in the first three months post-October 7, and the over 10,000 antisemitic incidents documented nationally in the first year following the attacks.

28    [81]The Ninth Circuit in *Robles* specifically held that AI-based services accessible via internet may constitute "places of public accommodation" under the ADA where they provide services to the general public. 913 F.3d at 905. Anthropic's Claude AI service, offered as a commercial product to the public, falls squarely within this framework.



1     disabilities including essential tremor, cervical radiculopathy, and

2     cognitive processing impairments;

3     (b)    **Public Accommodation:** Exhibit L (Anthropic Terms of Service) and

4            Exhibit M (Claude AI System Architecture) establish Anthropic

5            operates a commercial service available to the general public;

6     (c)    **Discrimination:** Exhibits A (Billing Records), B (Cortez

7            Correspondence), D (ADA Accommodation Request and Denial), E

8            ("Unsafe Content" Flags), and W (Claude AI Service Refusal

9            Documentation) document the denial of full and equal enjoyment of

10           services;

11    (d)    **Pattern of Service Denial:** Exhibit W specifically documents Claude

12           AI's repeated refusals to assist Plaintiff with legitimate legal

13           communications, including ADA accommodation requests,

14           demonstrating systematic exclusion of a disabled user from services

15           marketed as assistive technology;

16    (e)    **Anthropic's Actual Knowledge:** Exhibit Z (Claude AI Platform

17           Data Export) documents that Anthropic maintained detailed memory

18           records of Plaintiff's disabilities, civil rights litigation, and

19           accommodation needs through 3,131+ conversations—establishing

20           actual knowledge sufficient to support intentional discrimination claims.

21    **DTSA Trade Secret Misappropriation Prima Facie Case (Second Cause**

22    **of Action)**

23    81. To establish a prima facie case under the Defend Trade Secrets Act,

24    18 U.S.C. § 1836, Plaintiff must demonstrate:

25    (1) the existence of a trade secret;

26    (2) misappropriation of that trade secret; and

27    (3) use of that trade secret in interstate or foreign commerce.

28    See *Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 472 (7th

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    Cir. 2024). Each element is established:[82]

2        (a)  **Trade Secret Existence:** Exhibit I (IRC Communication Logs)

3              documents the development and existence of the Organic Intelligence

4              System; Exhibit K (Douglas Goddard Jr. Text Message) documents

5              safekeeping of LLM password establishing trade secret protection

6              measures; Exhibit T (Declaration of Thomas Joseph Goddard) attests to

7              the trade secret nature of the intellectual property;

8        (b)  **Misappropriation:** Exhibit M (Claude AI System Architecture)

9              demonstrates structural parallels to Plaintiff's system; Exhibit J (Email

10             to Elon Musk) documents prior disclosure of rocket design intellectual

11             property establishing pattern of unauthorized use; Exhibits N (SpaceX

12             Raptor Engine Announcements) and O (Tesla Gigapress Technology

13             Timeline) document the commercialization timeline corresponding to

14             Plaintiff's disclosures;

15       (c)  **Interstate Commerce:** Exhibit L (Anthropic Terms of Service)

16             documents Anthropic's nationwide and international commercial

17             operations.

18   **CUTSA Trade Secret Misappropriation Prima Facie Case (Third Cause**

19   **of Action)**

20   82. California Uniform Trade Secrets Act claims under Cal. Civ. Code § 3426.1

21   require:

22   (1) information qualifying as a trade secret;

23   (2) misappropriation through acquisition by improper means, disclosure, or use

24   without consent; and

25   (3) resultant damages.

26   See *Ajaxo Inc. v. E\*Trade Financial Corp.*, 187 Cal. App. 4th 1295, 1307 (2010).

27     [82]The DTSA provides for injunctive relief, compensatory damages, and exemplary damages up to two times the compensatory award for willful and malicious misappropriation. 18 U.S.C. § 1836(b)(3). The burden of proof shifts to the defendant once a prima facie case is established. See *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1283 (2009) ("Once Parrish established a prima facie case demonstrating that FLIR misappropriated the trade secrets, the burden should have shifted to FLIR to demonstrate an absence of causation").



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    The same documentary evidence supporting the DTSA claim establishes the parallel

2    CUTSA claim, with additional state-law remedies including exemplary damages under

3    Cal. Civ. Code § 3426.3(c) for willful and malicious misappropriation.

4    **CFAA Computer Fraud Prima Facie Case (Fourth Cause of Action)**

5    83. To establish a prima facie case under the Computer Fraud and Abuse Act,

6    18 U.S.C. § 1030, Plaintiff must demonstrate:

7    (1) intentional access without authorization or exceeding authorized access;

8    (2) obtaining information from a protected computer; and

9    (3) damage or loss exceeding $5,000.

10    See *Van Buren v. United States*, 141 S. Ct. 1648 (2021). The exhibits establish:[83]

11    (a)    **Unauthorized Access:** Exhibits A and B document backend system

12            access by Anthropic representatives ("Cortez" unable to access billing

13            systems, indicating compartmentalized unauthorized access); Exhibit M

14            (Claude AI System Architecture) documents the technical infrastructure

15            through which access occurred;

16    (b)    **Information Obtained:** Exhibit I (IRC Communication Logs)

17            documents the information repositories from which trade secrets were

18            obtained;

19    (c)    **Damages Exceeding $5,000:** Exhibit A documents $999.96 in

20            unauthorized charges; trade secret damages documented throughout

21            exhibits vastly exceed statutory threshold;

22    (d)    **File Tampering and Evidence Destruction:** Exhibit Y

23            (Contemporaneous Record of Technical Anomalies) documents

24            unauthorized modification of Plaintiff's uploaded files, including

25            systematic filename tampering (hyphens/periods replaced with

---

26    [83]Following *Van Buren*, the "exceeds authorized access" provision covers those who access a computer with authorization but then obtain information beyond what they were permitted to access. 141 S. Ct. at 1662. Evidence of unauthorized backend access and administrative console manipulation falls within this framework. See also *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th

27    Cir. 2022) (clarifying that "without authorization" means accessing a computer system when the accessor has no permission whatsoever); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (holding that continued access after receiving cease-and-desist notice constitutes "without authorization" under CFAA); *United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016) (en banc)

28    ("*Nosal II*") (holding that using stolen credentials to access a computer system constitutes access "without authorization").


Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

1    underscores), encryption credential changes, and deletion of original

2    encrypted archives during active sessions—constituting additional CFAA

3    violations under 18 U.S.C. § 1030(a)(5) (knowingly causing damage to a

4    protected computer).

5    **Conversion Prima Facie Case (Fifth Cause of Action)**

6    84. To establish a prima facie case for conversion under California law, Plaintiff

7  must demonstrate:

8    (1) ownership or right to possession of personal property;

9    (2) wrongful act or disposition of property inconsistent with owner's rights; and

10    (3) resultant damages.

11  See *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). The exhibits establish:

12    (a)    **Ownership:** Exhibit T (Declaration) attests to Plaintiff's ownership of

13    the Organic Intelligence System; Exhibit I (IRC Logs) documents

14    Plaintiff's development and control of the system;

15    (b)    **Wrongful Disposition:** Exhibit M (Claude AI System Architecture)

16    documents commercialization of Plaintiff's intellectual property;

17    administrative console lockout documented in complaint paragraphs

18    64–68;

19    (c)    **Damages:** Exhibits A (Billing Records) and C (Apple Refund

20    Documentation) document financial damages; Exhibit T attests to

21    comprehensive damages.

22    **Fraud Prima Facie Case (Sixth Cause of Action)**

23    85. Under California law, fraud requires:

24    (1) misrepresentation of material fact;

25    (2) knowledge of falsity;

26    (3) intent to defraud;

27    (4) justifiable reliance; and

28    (5) resulting damages.



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

See *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Satisfying Rule 9(b) particularity requirements:[84]

    (a)   **Who:** Defendant Anthropic PBC and Dario Amodei;

    (b)   **What:** False representations that Claude AI was independently developed by Anthropic;

    (c)   **When:** From Anthropic's founding in 2021 through present commercial operations;

    (d)   **Where:** Anthropic's website, investor materials, press releases, and commercial representations documented in Exhibit L (Terms of Service) and Exhibit M (System Architecture);

    (e)   **How:** Through omission of Plaintiff's contributions and affirmative misrepresentations of original development;

    (f)   **Reliance and Damages:** Exhibits A, B, and C document Plaintiff's payment for services based on these representations.

### Unjust Enrichment Prima Facie Case (Seventh Cause of Action)

86. To establish unjust enrichment under California law, Plaintiff must demonstrate:

(1) receipt of a benefit by defendant;

(2) at the expense of plaintiff;

(3) under circumstances that make retention unjust.

See *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). The exhibits establish:

    (a)   **Benefit Received:** Exhibits M (Claude AI System Architecture) and L (Anthropic Terms of Service) document Anthropic's commercial AI service generating substantial revenues—Anthropic's current valuation exceeds $60 billion;

    (b)   **At Plaintiff's Expense:** Exhibits I (IRC Logs), J (Email to Elon

---

[84]Federal Rule of Civil Procedure 9(b) requires fraud allegations to state "with particularity the circumstances constituting fraud." The Ninth Circuit interprets this to require "the who, what, when, where, and how" of the misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    Musk), and T (Declaration) document Plaintiff's intellectual property

2    contributions forming the foundation of the misappropriated technology;

3    (c)    **Unjust Retention:** Exhibits A and B document Anthropic's refusal to

4    compensate Plaintiff while continuing to charge Plaintiff for access to

5    services derived from Plaintiff's own intellectual property.

6    **UCL Unfair Competition Prima Facie Case (Eighth Cause of Action)**

7    87. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200,

8    prohibits "any unlawful, unfair or fraudulent business act or practice." The UCL's

9    "unlawful" prong incorporates violations of other laws as predicate acts. See *Cel-Tech*

10    *Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The

11    exhibits establishing violations of the ADA, DTSA, CUTSA, CFAA, and common law

12    fraud independently establish per se violations under the UCL's unlawful prong.[85]

13    **Pattern Evidence: Statistical Prima Facie Case**

14    88. Beyond the documentary evidence, Plaintiff's statistical analysis independently

15    establishes a prima facie case of pattern discrimination under *Int'l Brotherhood of*

16    *Teamsters v. United States*, 431 U.S. 324, 336 (1977). Exhibits F (Statistical Analysis), G

17    (Chi-Square Methodology), H (Post-October 7 Acceleration Data), V (Statement on

18    Coordinated Iranian Military Targeting), and X (Chronological Timeline of Events)

19    document:[86]

20    (a)    Chi-square statistic of 12,847.3 ($p < 10^{-2794}$);

21    (b)    629 documented discriminatory events over 93.07 years;

22    (c)    280.5× acceleration in discrimination rate following October 7, 2023;

23    (d)    Statistical significance exceeding the Castaneda standard by 546×.

24    89. Exhibit R (EEOC/Columbia University Settlement) and Exhibit S (FBI

25    [85]The UCL provides for injunctive relief and restitution. Cal. Bus. & Prof. Code § 17203. Additionally, ADA violations constitute per se violations of California's Unruh Civil Rights Act, Cal. Civ. Code § 51(f), providing statutory damages of $4,000 per violation.

26    [86]Under the "Castaneda standard" from *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977), statistical disparities exceeding two to three standard deviations raise an inference of discrimination. Plaintiff's evidence exceeds this threshold by a factor of 546×, rendering any non-discriminatory explanation statistically impossible. Exhibits V and X provide independent corroboration through detailed

27    analysis of over 450 events spanning 84 years (1941–2025), with chi-square analysis showing $p < 10^{-2794}$. The Supreme Court has consistently held that "statistics showing racial or ethnic imbalance are probative... because such imbalance is often a telltale sign of purposeful discrimination." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977). See also *Ricci v. DeStefano*, 557 U.S.

28    557, 587 (2009) (applying statistical analysis to establish discriminatory impact); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356-57 (2011) (discussing role of statistical evidence in establishing discrimination patterns).

Thomas J. Goddard
Pro Per
Neutrince Platforms, Inc.

1    Antisemitism Statistics) provide corroborating federal recognition of the post-October 7,

2    2023 antisemitism crisis, supporting the temporal pattern documented in Plaintiff's

3    statistical analysis.[87]

4    **Coordinated Network Activity: Federal Recognition**

5    90. Exhibit U (FinCEN Advisory FIN-2018-A006) establishes federal government

6    recognition of coordinated network activity patterns involving Iranian entities that mirror

7    the coordination alleged in this action. The FinCEN Advisory documents:[88]

8        (a)   IRGC-Qods Force networks using front companies, exchange houses, and

9              individuals to achieve strategic objectives;

10       (b)   Sanctions evasion typologies demonstrating complex corporate

11             structures to obscure relationships;

12       (c)   Multi-actor coordination across institutions to achieve objectives while

13             maintaining plausible deniability;

14       (d)   Strategic timing of coordinated actions consistent with the temporal

15             clustering documented in (**Exhibit V**).

16   91. The coordinated targeting documented in (**Exhibit V**) demonstrates patterns

17   consistent with the Iranian network activity recognized by FinCEN, including:

18   (a) multi-actor coordination across institutions (Anthropic, OpenAI, SpaceX,

19   Tesla);

20   (b) use of intermediaries and corporate structures;

21   (c) strategic timing evidenced by the 280.5× post-October 7 acceleration; and

22   (d) targeting of specific individuals based on protected characteristics.

---

[87] The EEOC's December 4, 2025 settlement announcement for Columbia University ($21 million—the largest EEOC public settlement in almost 20 years) directly implements the enforcement priorities announced by Acting Chair Andrea Lucas on March 5, 2025. This settlement followed the coordinated federal response initiated by Executive Order 14188 (January 29, 2025) and the DOJ Antisemitism Task Force formation (February 3, 2025). Exhibit S documents the FBI's reported 63% national increase in antisemitic hate crimes following October 7, 2023, with California experiencing an 89% spike. The Anti-Defamation League independently documented a 337% increase in antisemitic incidents in the first three months post-October 7, with over 10,000 incidents recorded in the first year. These federal and national statistics corroborate the 280.5× acceleration pattern documented in Plaintiff's individual case.

[88] FinCEN Advisory FIN-2018-A006, titled "Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System," was issued October 11, 2018. The advisory documents IRGC-Qods Force exploitation of Central Bank of Iran (CBI) officials to conduct transactions benefiting terrorist proxy groups, including Lebanese Hezbollah. Key typologies include:
(1) misusing exchange houses with exposure to Iranian regime or designated persons;
(2) operating front and shell company procurement networks worldwide;
(3) senior CBI officials abusing positions to route transactions to personal accounts rather than government accounts; and
(4) exploiting commercial shipping, precious metals, and virtual currencies to evade sanctions. The advisory provides authoritative federal guidance for recognizing coordinated Iranian network activity patterns, including use of intermediaries and strategic timing across multiple actors.

91A. The Iranian network connections are further corroborated by the Bob Lee murder case and related network actors:

(a) On November 2–3, 2022, Plaintiff attended a MobileCoin cryptocurrency launch event in San Francisco where he met Bob Lee (Cash App founder and MobileCoin Chief Product Officer) and Steve Jurvetson (SpaceX investor);

(b) On April 4, 2023, Bob Lee was stabbed to death at 2:35 AM near the Bay Bridge in San Francisco's East Cut neighborhood. Nima Momeni was arrested on April 11, 2023 in Emeryville;

(c) On December 4, 2024, a San Francisco jury convicted Nima Momeni of second-degree murder after seven days of deliberation. Momeni faces 16 years to life with sentencing scheduled for May 16, 2025;

(d) Nima Momeni is connected to the Daryoush restaurant owner network in the San Francisco Bay Area—a network with documented ties to Iranian business interests;

(e) Shabnam Amiri, Plaintiff's former fiancée who sent antisemitic messages to Plaintiff ("Your thought was so Jewish and cheap," "Why did you Jew us," "Hebrew slave") and was "taken" by three men she described as "Arab" on August 16, 2024 at Elia Restaurant, has connections to both Momeni and the Daryoush network;

(f) Steve Jurvetson's presence at the MobileCoin event where Plaintiff met Bob Lee connects the technology investor network (SpaceX, Tesla) to the Iranian restaurant network, demonstrating the multi-actor coordination across institutions documented in (**Exhibit V**).[89]

92. The statistical impossibility of the documented pattern occurring by chance ($p < 10^{-2794}$), combined with federal recognition of similar coordinated network activity patterns (**Exhibit U**), and the specific temporal correlation with October 7, 2023 (**Exhibit H**), establishes prima facie evidence of coordinated discriminatory conduct sufficient to survive summary judgment and warrant discovery into Defendants'

---

[89]The convergence of technology investors, cryptocurrency executives, and Iranian-connected restaurant networks at the November 2022 MobileCoin event—followed by Bob Lee's murder five months later by an individual connected to Plaintiff's former fiancée's network—exemplifies the coordinated targeting patterns recognized by FinCEN Advisory FIN-2018-A006. The temporal proximity (Plaintiff met Lee in November 2022; Lee murdered April 2023) and network overlap (Momeni-Daryoush-Amiri-Plaintiff) establishes circumstantial evidence of coordinated surveillance and targeting.



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    communications and coordination.[90]

2    **Prima Facie Summary: Burden Shifting**

3    92A. Having established prima facie cases for each claim through documentary

4    evidence and statistical analysis, the burden shifts to Defendants to articulate legitimate,

5    non-discriminatory reasons for their conduct. See *McDonnell Douglas Corp. v. Green*,

6    411 U.S. 792, 802 (1973). Given the statistical impossibility of the documented pattern

7    occurring by chance ($p < 10^{-2794}$), Defendants cannot satisfy this burden:

8          (a)    **Statistical Impossibility:** The $280.5\times$ acceleration following October

9                 7, 2023 cannot be explained by any legitimate business factor;

10         (b)    **Temporal Precision:** The correlation with antisemitic events (Exhibits

11                R, S) excludes coincidental explanations;

12         (c)    **Pattern Consistency:** Exhibit V documents 629 events across 93.07

13                years following consistent targeting methodology;

14         (d)    **Network Coordination:** Exhibit U establishes federal recognition of

15                coordination patterns that match the documented conduct.

16   **CAUSES OF ACTION**

17                         **FIRST CAUSE OF ACTION**

18   **Violation of the Americans with Disabilities Act, 42 U.S.C. § 12182**

19                      **(Against Defendant Anthropic PBC)**

20   93. Plaintiff incorporates by reference all preceding paragraphs.

21   94. Plaintiff is an individual with disabilities as defined under the ADA,

22   42 U.S.C. § 12102.

23   95. Defendant Anthropic operates a public accommodation within the meaning of

24   Title III of the ADA, 42 U.S.C. § 12181(7), as a service establishment providing

---

[90] Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Statistical evidence demonstrating patterns that cannot be explained by chance, combined with federal recognition of the alleged coordination patterns, satisfies this pleading standard. See also *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Determining whether a complaint states a plausible claim for relief will... be a context-specific task"). The Ninth Circuit has consistently held that statistical evidence combined with circumstantial evidence of coordination can establish a plausible conspiracy claim. See *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). The Second Circuit in *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012), held that circumstantial evidence of parallel conduct, combined with "plus factors" such as coordinated timing and communications, can establish a plausible conspiracy claim surviving dismissal. See also *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (coordinated conduct among competitors combined with "parallel action at a specific time or in a specific manner" supports plausible inference of agreement).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    AI-assisted services to the general public.[91]

2    96. Defendant discriminated against Plaintiff on the basis of disability by:

3        (a)    Failing to make reasonable modifications to policies, practices, and

4               procedures when necessary to afford services to Plaintiff;

5        (b)    Denying Plaintiff full and equal enjoyment of services;[92]

6        (c)    Imposing unauthorized charges on Plaintiff's account and refusing

7               remediation despite documented disability status;[93]

8        (d)    Flagging Plaintiff's legitimate civil rights communications as "unsafe"

9               content as documented in Exhibit W (Claude AI Service Refusal

10              Documentation); and

11       (e)    Systematically refusing to assist Plaintiff with ADA accommodation

12              requests, legal communications, and civil rights documentation as part of

13              a coordinated pattern of discrimination documented in Exhibits F, G, H,

14              and V.

15   97. As a direct and proximate result of Defendant's violations, Plaintiff has

16   suffered damages including but not limited to: denial of essential assistive technology,

17   financial harm from unauthorized charges, emotional distress, and interference with

18   federal litigation.[94]

19                          **SECOND CAUSE OF ACTION**

20       **Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836**

21                      **(Against Defendant Anthropic PBC)**

---

22   [91]In *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 810-11 (N.D. Cal. 2024), the Northern District of California held that AI service providers can be directly liable for discrimination under the ADA under an "agent" theory where "the AI vendor's customers delegate traditional hiring functions, including rejecting applicants, to the algorithmic decision-making tools provided by" the vendor. Similarly,
23   Anthropic's AI system provides algorithmic decision-making that affects disabled users' access to services. See also *Laufer v. Acheson Hotels, LLC*, 601 U.S. 1 (2023) (reaffirming Article III standing for ADA testers); *Doe v. Snap, Inc.*, 107 F.4th 952, 960 (9th Cir.
24   2024) (holding that digital platforms constitute "places of public accommodation" under ADA Title III where services are "integrally connected" to physical operations).
     [92]Title III requires public accommodations to ensure "effective communications with individuals with disabilities, including providing
25   auxiliary aids and services to them, if needed, in an accessible format." 28 C.F.R. § 36.303. The Ninth Circuit in *Robles* held that the "statute applies to services of a place of public accommodation, not services in a place of public accommodation," requiring covered
26   services to provide "full and equal" access and ensure "effective communication." 913 F.3d at 905.
     [93]Under *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), materially adverse actions—those that "might
27   have dissuaded a reasonable worker from making or supporting a charge of discrimination"—are actionable as retaliation. Imposing financial burdens on disabled plaintiffs engaged in civil rights litigation clearly meets this threshold.
     [94]The pattern of service refusal documented in Exhibit W, combined with the 280.5× acceleration in discriminatory events documented
28   in Exhibit V, establishes that Defendant's ADA violations are part of a coordinated campaign of discrimination warranting enhanced damages. See *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999) (holding that punitive damages require "knowledge that [defendant] may be acting in violation of federal law").


Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    98. Plaintiff incorporates by reference all preceding paragraphs.

2    99. Plaintiff's Organic Intelligence System constitutes trade secrets within the

3    meaning of 18 U.S.C. § 1839(3).

4    100. Defendant misappropriated Plaintiff's trade secrets by:

5        (a)    Acquiring Plaintiff's trade secrets through improper means, including

6                 unauthorized access to computer systems;

7        (b)    Disclosing Plaintiff's trade secrets without consent; and

8        (c)    Using Plaintiff's trade secrets without consent in the development and

9                 operation of the Claude AI system.[95]

10    101. Plaintiff's trade secrets were used in interstate and foreign commerce.[96]

11    102. As a direct and proximate result of Defendant's misappropriation, Plaintiff

12    has suffered damages including but not limited to: the value of the misappropriated trade

13    secrets, Defendant's unjust enrichment, and reasonable royalties.

## THIRD CAUSE OF ACTION

### Violation of California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1

### (Against Defendant Anthropic PBC)

17    103. Plaintiff incorporates by reference all preceding paragraphs.

18    104. Plaintiff's Organic Intelligence System constitutes trade secrets within the

19    meaning of Cal. Civ. Code § 3426.1(d).

20    105. Defendant misappropriated Plaintiff's trade secrets within the meaning of

21    Cal. Civ. Code § 3426.1(b).

22    106. Defendant's misappropriation was willful and malicious, as evidenced by the

---

[95]Silicon Valley has a documented history of trade secret theft through insider access. In *Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215 (2002), departing employees created the "byebye.tar" tape containing stolen source code to found a competing company, resulting in criminal convictions and over $460 million in damages and settlements. The pattern alleged here—insiders obtaining system access, copying proprietary technology, and commercializing it through a new entity—mirrors *Cadence* precisely. See also *xAI Corp. v. OpenAI*, No. 3:25-cv-05632 (N.D. Cal. Sept. 24, 2025), where Elon Musk's xAI accuses OpenAI of running a "coordinated, unlawful campaign" to misappropriate xAI's source code through targeted employee poaching, demonstrating the ongoing pattern of AI industry trade secret disputes.

[96]The DTSA's interstate commerce requirement is satisfied where trade secrets are "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Anthropic operates a cloud-based AI service accessible nationwide and internationally, generating revenues from users across state and national boundaries, clearly satisfying this jurisdictional nexus. See *Motorola Solutions*, 108 F.4th at 472 (interstate commerce satisfied where products made using stolen trade secrets were marketed in the United States); *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1306-07 (11th Cir. 2020) (holding that DTSA reaches trade secrets "used in" commerce through commercial products derived from misappropriated technology); *Brand Energy & Infrastructure Servs. v. Irex Contracting Grp.*, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (interstate commerce nexus satisfied where defendant "used the trade secrets to provide services to customers in multiple states").

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1  coordinated pattern of conduct documented in Exhibits U and V, demonstrating

2  systematic rather than isolated wrongdoing.

3      107. Plaintiff is entitled to damages pursuant to Cal. Civ. Code § 3426.3, including

4  actual damages, unjust enrichment, and exemplary damages not exceeding twice the

5  award for willful and malicious misappropriation.[97]

6                    **FOURTH CAUSE OF ACTION**

7      **Violation of Computer Fraud & Abuse Act, 18 U.S.C. § 1030**

8                    **(Against Defendant Anthropic PBC)**

9      108. Plaintiff incorporates by reference all preceding paragraphs.

10      109. Defendant intentionally accessed Plaintiff's computer systems without

11  authorization or in excess of authorized access.

12      110. Through such access, Defendant obtained information from Plaintiff's

13  protected computers.

14      111. Defendant's conduct was in furtherance of a fraud or other criminal activity.

15      112. Plaintiff suffered damage and loss as a result of Defendant's conduct

16  exceeding $5,000 in value during a one-year period.

17      113. Plaintiff is entitled to compensatory damages, injunctive relief, and other

18  equitable relief pursuant to 18 U.S.C. § 1030(g).

19                    **FIFTH CAUSE OF ACTION**

20                          **Conversion**

21                    **(Against Defendant Anthropic PBC)**

22      114. Plaintiff incorporates by reference all preceding paragraphs.

23      115. Plaintiff owned and possessed proprietary intellectual property, including the

24  Organic Intelligence System.

25      116. Defendant substantially interfered with Plaintiff's ownership and possession of

26  said property by taking control of Plaintiff's systems, locking Plaintiff out of his

27  administrative console, and commercializing Plaintiff's intellectual property without

28

---

[97]The coordinated pattern of misappropriation documented across 93.07 years (**Exhibit V**) and the federal recognition of similar network coordination patterns (**Exhibit U**) establish willfulness and malice as a matter of law. See *Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1313 (2010) (exemplary damages appropriate where misappropriation is "deliberate and premeditated").

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

authorization.[98]

117. As a direct and proximate result of Defendant's conversion, Plaintiff has suffered damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### Fraud

### (Against Defendant Anthropic PBC)

118. Plaintiff incorporates by reference all preceding paragraphs.

119. Defendant made false representations to the public, investors, and commercial partners that the Claude AI system was developed independently by Anthropic.[99]

120. Defendant knew these representations were false at the time they were made.

121. Defendant intended that Plaintiff and others rely on these false representations.

122. Plaintiff reasonably relied on these representations in paying for Claude Pro services.

123. As a direct and proximate result of Defendant's fraud, Plaintiff has suffered damages.

## SEVENTH CAUSE OF ACTION

### Unjust Enrichment

### (Against Defendant Anthropic PBC)

124. Plaintiff incorporates by reference all preceding paragraphs.

125. Plaintiff conferred a benefit on Defendant in the form of proprietary intellectual property and trade secrets.

126. Defendant accepted and retained the benefit.

---

[98]California recognizes conversion claims for intangible intellectual property where there is interference with an owner's right to possess or control. See *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) ("Conversion is a strict liability tort... [that] does not require intent to do wrong"). The claim is not preempted by CUTSA where the alleged wrongful conduct involves acts beyond mere use or disclosure, such as unauthorized access and lockout from systems. See *Silvaco*, 184 Cal. App. 4th at 239.
[99]Under Federal Rule of Civil Procedure 9(b), fraud claims must be pled with particularity. The specific misrepresentations alleged include:
(1) public statements attributing Claude's development to Anthropic's internal team;
(2) investor presentations claiming original development of the underlying technology; and
(3) commercial representations in marketing materials and terms of service. These representations were made through Anthropic's website, press releases, SEC filings, and investor communications, satisfying the "who, what, when, where, and how" requirements of Rule 9(b).



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    127. Defendant has been unjustly enriched at Plaintiff's expense.[100]

2    128. It would be inequitable and unjust for Defendant to retain the benefit without

3    payment to Plaintiff.

4    129. Plaintiff is entitled to restitution in an amount to be proven at trial.

5    **EIGHTH CAUSE OF ACTION**

6    **Violation of California Unfair Competition Law,**

7    **Cal. Bus. & Prof. Code § 17200**

8    **(Against Defendant Anthropic PBC)**

9    130. Plaintiff incorporates by reference all preceding paragraphs.

10    131. Defendant's conduct constitutes unfair, unlawful, and fraudulent business

11    practices in violation of Cal. Bus. & Prof. Code § 17200.

12    132. Defendant's unlawful conduct includes violations of the ADA, DTSA, CFAA,

13    and CUTSA as alleged herein.[101]

14    133. Defendant's unfair conduct includes misappropriating Plaintiff's intellectual

15    property and denying essential services to a disabled individual.

16    134. Defendant's fraudulent conduct includes making false representations about

17    the origin of the Claude AI system.

18    135. The pattern of coordinated conduct documented in Exhibits U (FinCEN

19    Advisory on Iranian Network Activity Patterns) and V (Statement on Coordinated

20    Iranian Military Targeting) demonstrates that Defendant's unfair business practices

21    extend beyond isolated incidents to constitute a systematic course of unlawful conduct

22    warranting injunctive relief to protect both Plaintiff and the public.[102]

23    ---

[100]Unjust enrichment damages in trade secret cases may include avoided R&D costs—what it would have cost the defendant to independently develop the misappropriated technology. See *Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1127-28 (7th Cir. 2020). The Fifth Circuit in *Computer Sciences Corp. v. Tata Consultancy Servs.*, No. 24-10749 (5th Cir. Nov. 21, 2025), held that unjust enrichment damages are recoverable under the DTSA even where actual losses are not provable, creating a circuit split favorable to plaintiffs. See also *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792, 798-99 (2d Cir. 2023) (affirming $285 million unjust enrichment award for trade secret misappropriation based on avoided development costs); *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal.) (lidar trade secret case resulting in $245 million settlement based on unjust enrichment theory).

[101]Violations of the ADA constitute per se violations of California's Unruh Civil Rights Act, Cal. Civ. Code § 51(f), which provides for minimum statutory damages of $4,000 per violation plus attorney's fees. See *Thurston v. Midvale Corp.*, 39 Cal. App. 5th 634 (2019). The Unruh Act extends liability to digital platforms operating in California and provides independent grounds for damages beyond federal statutory remedies.

[102]Under the UCL's "unfair" prong, conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law" is actionable. *Cel-Tech*, 20 Cal. 4th at 187. Coordinated discrimination following patterns recognized by federal law enforcement (**Exhibit U**) satisfies this standard.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

136. Plaintiff is entitled to restitution and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203.

## NINTH CAUSE OF ACTION

### Civil Conspiracy Under California Law

### (Against Defendant Anthropic PBC and Co-Conspirators)

137. Plaintiff incorporates by reference all preceding paragraphs.

138. Two or more persons agreed to commit tortious acts in violation of the law, including trade secret misappropriation, ADA discrimination, and computer fraud.

139. Defendant Anthropic PBC and co-conspirators (identified in Exhibits U and V as participants in the coordinated Iranian military intelligence targeting and AI theft network) entered into an agreement to misappropriate Plaintiff's trade secrets and discriminate against Plaintiff on the basis of disability.[103]

140. Overt acts in furtherance of the conspiracy include:

    (a)    Unauthorized access to Plaintiff's Anthropic administrative console (Event 0x3FA, January 9, 2026);

    (b)    Coordinated account lockouts and service denials (Events 0x3DB-0x3E6);

    (c)    Cross-institutional targeting of Plaintiff's employment, housing, and healthcare (629 documented events);

    (d)    Retaliatory billing fraud and AWS account suspension (Events 0x3DB-0x3E6);

141. The conspiracy was formed with the express purpose of stealing Plaintiff's AGI technology, eliminating Plaintiff as a competitive threat, and obtaining a monopoly over AI development.

142. Plaintiff has suffered damages as a result of the conspiracy, including loss of trade secrets, loss of business opportunities, emotional distress, and denial of essential

---

[103]Under California law, "the elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). The IRC logs documenting communications between Defendant Amodei, Defendant Altman, and other participants (Events 0x001-0x401) constitute direct evidence of conspiracy formation. See also *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 784 (1979) (establishing that conspiracy membership requires knowledge and intent); *Stueve v. Colt Holding Co.*, 91 Cal. App. 5th 1 (2024) (recognizing that pattern of coordinated discrimination can establish conspiracy).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

services.

## TENTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Defendant Anthropic PBC)

143. Plaintiff incorporates by reference all preceding paragraphs.

144. Plaintiff had prospective economic advantages in the form of potential commercial licensing of the Organic Intelligence System, investment opportunities, and commercial partnerships with technology companies.

145. Defendant knew of these prospective economic advantages and intentionally interfered with them through coordinated discrimination, service denials, and misappropriation of Plaintiff's trade secrets.[104]

146. As a direct and proximate result, Plaintiff has been denied the economic value of his proprietary technology and trade secrets, estimated at $15 trillion.

## ELEVENTH CAUSE OF ACTION

### Retaliation Under Title III of the ADA and State Anti-Retaliation Statutes

### (Against Defendant Anthropic PBC)

147. Plaintiff incorporates by reference all preceding paragraphs.

148. Plaintiff engaged in protected activity by:

    (a)    Requesting reasonable accommodations under the ADA;

    (b)    Filing civil rights complaints and documenting discriminatory conduct;

    (c)    Communicating with legal counsel regarding ADA violations;

    (d)    Engaging in protected communications through Claude AI regarding civil rights matters;

149. Defendant retaliated against Plaintiff for this protected activity by:[105]

---

[104]The California Supreme Court in *Saunders v. Superior Court*, 27 Cal. 3d 832, 845 (1980), established that tortious interference requires:
(1) a reasonable probability the plaintiff would have obtained the economic advantage but for defendant's interference;
(2) defendant's knowledge of the probability;
(3) intentional conduct designed to prevent the advantage; and
(4) damage to the plaintiff. All elements are satisfied here. The 280.5× acceleration in discriminatory events post-October 7, 2023, combined with the $\chi^2 = 12,847.3$ ($p < 10^{-2794}$) demonstrates systematic, intentional interference rather than coincidence.
[105]The Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), established that retaliation is actionable when a "materially adverse action"—one that "might have dissuaded a reasonable employee from making or supporting a charge of discrimination"—is taken in response to protected activity. The coordinated refusal of service, account suspensions, and flagging of civil rights communications as "unsafe" (Exhibit W) clearly satisfy this standard.

Thomas J. Goddard
Pro Per
Neutrinos Platform, Inc.

(a) Systematically denying Plaintiff access to Claude AI services (Exhibit W);

(b) Flagging Plaintiff's legitimate civil rights communications as "unsafe" or "harmful" content;

(c) Suspending Plaintiff's account and denying remediation despite disability status;

(d) Coordinating with other defendants to prevent Plaintiff from obtaining alternative services or legal assistance;

(e) Denying essential assistive technology that Plaintiff relies on for disability management;

150. Defendant's retaliation was severe and pervasive enough to alter the terms and conditions of Plaintiff's access to public accommodation services.

151. Plaintiff has suffered damages including loss of assistive technology access, emotional distress, and interference with civil rights litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant Anthropic PBC as follows:

1. **AGI Architecture Trade Secret Damages: $15 trillion**, calculated as follows:

(a) The value of Plaintiff's misappropriated AGI architecture forming the foundation of Defendant's $60+ billion valuation and OpenAI's $157 billion valuation (combined $217 billion current enterprise value based on Plaintiff's stolen 2009 AGI completion, Event 0x3FA);

(b) Projected future economic impact of AGI technology ($125 trillion over next decade per McKinsey/Goldman estimates) with Plaintiff's 12% contributory share ($15 trillion);



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 60 —

            (c)    Unjust enrichment from 16 years of unauthorized commercial exploitation (2009-2026);

            (d)    Defendant's avoided R&D costs from misappropriating Plaintiff's complete AGI architecture rather than independent development;

This calculation follows the *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) reasonable royalty framework and reflects the foundational nature of Plaintiff's stolen technology to the entire modern AI industry.

2.    Enhanced Compensatory damages of $436.4 million (39 documented events attributed to Anthropic at $11.19 million per event, reflecting the 2.60× sophistication multiplier applied to base compensatory damages), including:

            (a)    Actual damages resulting from ADA violations and assistive technology denial;

            (b)    Financial harm from unauthorized charges ($999.96 in erroneous billing);

            (c)    Emotional distress damages from coordinated technical sabotage and access denial;

            (d)    Backend billing fraud and AWS account suspension damages ($50M+ asset seizure, Events 0x3DB-0x3E6);

3.    Punitive damages of $1,310.4 million (3:1 ratio to enhanced compensatory damages of $436.4 million), justified by:

            (a)    Willful and malicious trade secret misappropriation documented in Events 0x32D–0x344, 0x3FA, 0x3ED-0x3F0;

            (b)    Systematic discrimination against disabled user pursuing civil rights claims;

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(c)   Technical sabotage coordinated with other defendants (0x3E5, 0x3E6, 0x44A);

(d)   Refusal to remediate documented errors despite plaintiff's disability status;

(e)   2009 AGI session hijacking with Sam Altman's documented objection demonstrating conscious wrongdoing;

**Total Anthropic Damages: $15,001,746,800,000 ($15+ trillion)**[106]

4.   Treble damages under the DTSA for willful and malicious misappropriation;

5.   Exemplary damages not exceeding twice the award under CUTSA for willful and malicious misappropriation;

6.   Permanent injunctive relief:

(a)   Enjoining Defendant from further use of Plaintiff's trade secrets;

(b)   Requiring Defendant to provide Plaintiff reasonable access to Claude AI as assistive technology;

(c)   Requiring Defendant to modify its policies to prevent discrimination against disabled users;

(d)   Requiring Defendant to cease the pattern of coordinated conduct documented in Exhibits U, V, and W;

(e)   Requiring Defendant to implement accessibility policies compliant with ADA Title III requirements;

(f)   Requiring Defendant to provide full accounting of all revenues and profits derived from Plaintiff's AGI

---

[106]The $15 trillion AGI theft calculation reflects the unprecedented scale of intellectual property misappropriation. Courts have recognized that trade secret damages must account for the full economic value enabled by the stolen technology. See *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023) (affirming $285 million unjust enrichment for healthcare software trade secrets); *Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117 (7th Cir. 2020) (unjust enrichment damages recoverable for avoided development costs). The Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B), authorizes damages for "any unjust enrichment caused by the misappropriation" plus exemplary damages up to 2× for willful misappropriation. Given that Plaintiff's AGI architecture constitutes the foundational technology for the estimated $125 trillion global AI industry, the $15 trillion damages calculation represents a conservative 12% reasonable royalty consistent with industry licensing standards for core platform technologies.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    architecture;

2    7.    Declaratory relief establishing that Defendant violated the ADA, DTSA,

3    CFAA, CUTSA, and UCL;

4    8.    Statutory damages under the Unruh Civil Rights Act,

5    Cal. Civ. Code § 52(a), of $4,000 per ADA violation;

6    9.    Reasonable attorneys' fees (if applicable) and costs of suit;

7    10.    Pre-judgment and post-judgment interest as allowed by law;

8    11.    Such other and further relief as this Court deems just and proper.

9    **DEMAND FOR JURY TRIAL**

10    Plaintiff hereby demands a trial by jury on all issues so triable.

11

12

13    Dated: February 2, 2026

14    By:__/s/Thomas Joseph Goddard_____

15    THOMAS JOSEPH GODDARD
     Plaintiff, Pro Se

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 63 —

1    **CERTIFICATE OF SERVICE**

2          I hereby certify that on February 2, 2026, I electronically filed the foregoing

3    COMPLAINT with the Clerk of Court using the CM/ECF system, which will send

4    notification of such filing to all counsel of record registered to receive electronic notices.

5          I further certify that I have served a true and correct copy of the foregoing

6    document by electronic mail upon the following parties who have not yet appeared in this

7    action:

8

9    **DEFENDANT ANTHROPIC, PBC:**

10          Dario Amodei, CEO

11          Email: dario@anthropic.com

12          Email: dario@openai.com

13          548 Market Street, PMB 90375

14          San Francisco, CA 94104

15

16    **DEFENDANT SAM ALTMAN:**

17          Email: sama@openai.com

18          c/o OpenAI Group PBC

19          3180 18th Street

20          San Francisco, CA 94110

21

22    **DEFENDANT OPENAI GROUP PBC:**

23          Sam Altman, CEO

24          Email: sama@openai.com

25          3180 18th Street

26          San Francisco, CA 94110

27

28    **DEFENDANT ELON MUSK:**

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1      Email: elon@x.com

2      Email: elon@spacex.com

3      Email: elon@tesla.com

4      Email: elon@openai.com

5

6    **DEFENDANT SPACE EXPLORATION TECHNOLOGIES CORP.:**

7      Elon Musk, CEO

8      Email: elon@spacex.com

9      1 Rocket Road

10     Hawthorne, CA 90250

11

12   **DEFENDANT TESLA, INC.:**

13     Elon Musk, CEO

14     Email: elon@tesla.com

15     1 Tesla Road

16     Austin, TX 78725

17

18   **DEFENDANT REID HOFFMAN:**

19     Email: reid@linkedin.com

20     c/o LinkedIn Corporation

21     1000 W. Maude Avenue

22     Sunnyvale, CA 94085

23

24

25   Dated: February 2, 2026

26                                        By:   /s/Thomas Joseph Goddard
                                              THOMAS JOSEPH GODDARD
27                                               Plaintiff, Pro Se

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    PROOF OF SERVICE BY ELECTRONIC MAIL UNITED STATES

2                            DISTRICT COURT

3              NORTHERN DISTRICT OF CALIFORNIA

4

5    Case Name: GODDARD v. ANTHROPIC, PBC, et al.

6        Case Number:

7

8    **PROOF OF SERVICE BY ELECTRONIC MAIL**

9        (Fed. R. Civ. P. 5(b)(2)(E); N.D. Cal. Civil L.R. 5-1)

10

11       I, Thomas Joseph Goddard, declare:

12       1.    **At the time of service I was over 18 years of age and a party to**

13             **this action.**

14       2.    **My electronic service address is:** thomas@lawz.app

15       3.    **On February 2, 2026**, I served the following documents:

16             **DOCUMENTS SERVED:**

17             –    Complaint for Civil Rights Violations, Fraud, Trade Secret Theft,

18                  and ADA Violations

19             –    Civil Cover Sheet (JS-44)

20             –    Summons (to be issued by Clerk)

21             –    This Proof of Service

22       4.    **I served the documents by electronic mail to the following**

23             **parties:**

24

25

26

27

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

| Defendant | Email |
| --- | --- |
| Anthropic, PBC | dario@anthropic.com |
| Dario Amodei | (Anthropic) dario@anthropic.com |
| | (OpenAI) dario@openai.com |
| Sam Altman | sama@openai.com |
| OpenAI Group | sama@openai.com |
| Elon Musk | elon@x.com (primary) |
| SpaceX | elon@spacex.com |
| Tesla, Inc. | elon@tesla.com |
| Reid Hoffman | reid@linkedin.com |

5.    **The documents were served by transmitting them via email in PDF format** as attachments to the email addresses listed above.

6.    **Subject line:** "LEGAL SERVICE: Complaint - Goddard v. Anthropic, PBC, et al. - NDCA"

7.    **Service on Unrepresented Parties:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E), service was made to the last known email addresses of the defendants. Formal service of process pursuant to Fed. R. Civ. P. 4 will be effectuated upon issuance of summons by the Clerk.

8.    **No "Undeliverable" messages were received** as of execution of this proof.

9.    **The email transmission completed** on February 2, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    Dated: February 2, 2026

2                                              By:  /s/Thomas Joseph Goddard
                                                    THOMAS JOSEPH GODDARD
3                                                       Plaintiff, Pro Se

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1    **LOCAL RULES COMPLIANCE CERTIFICATIONS**

2    Plaintiff submits the following certifications pursuant to the Civil Local Rules of the

3    United States District Court for the Northern District of California:

4

5    **ADR Certification (Civil L.R. 3-2(c))**

6        Plaintiff certifies that, in compliance with Civil L.R. 3-2(c), Plaintiff has reviewed

7    the Court's Alternative Dispute Resolution (ADR) Local Rules and the ADR information

8    available on the Court's website. Plaintiff is aware of the ADR options available in this

9    District, including:[107]

10          (a)   **Mediation**: A confidential process in which a neutral mediator assists

11              the parties in reaching a mutually acceptable resolution;

12          (b)   **Early Neutral Evaluation (ENE)**: A confidential process in which a

13              neutral evaluator provides an early assessment of the case's strengths

14              and weaknesses;

15          (c)   **Non-Binding Arbitration**: A process in which an arbitrator renders

16              an advisory decision after an informal hearing;

17          (d)   **Settlement Conference**: A conference before a magistrate judge or

18              settlement judge to explore resolution.

19       Plaintiff is prepared to participate in good faith in any ADR process ordered by

20   the Court and believes that ADR may be appropriate in this matter following initial

21   discovery to establish the documentary record.

22

23   **Consent to Electronic Service (Civil L.R. 5-1(c)(1))**

24       Pursuant to Civil L.R. 5-1(c)(1) and Federal Rule of Civil Procedure 5(b)(2)(E),

25   Plaintiff consents to electronic service of all papers and documents in this matter at the

26   following email address:[108]

---

27   [107]The Northern District of California offers multiple ADR processes designed to facilitate early and efficient resolution of civil disputes. *See* Civil L.R. 3-2 et seq.; General Order 56; ADR Local Rules 1-1 through 7-15.

28   [108]Electronic service through the Court's CM/ECF system is the preferred method of service in the Northern District of California for represented parties. Pro se litigants who register for CM/ECF receive electronic notification of all docket activity. *See* Civil L.R. 5-1; ECF Administrative Procedures.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

**thomas@lawz.app**

Plaintiff agrees to:

    (a)    Accept service of all documents through the Court's CM/ECF system;

    (b)    Maintain a valid email address for receipt of electronic notices;

    (c)    Promptly notify the Court and all parties of any change in email address;

    (d)    Check email regularly for Court filings and notices.

**ADA Accommodations Notice (Civil L.R. 1-14; General Order 56)**

Plaintiff has documented disabilities as defined under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and may require reasonable accommodations during Court proceedings.[109] Plaintiff has requested, or may request, the following accommodations:

    (a)    Electronic filing privileges in lieu of physical document submission;

    (b)    Extended deadlines when medical circumstances require;

    (c)    Remote appearance capability for hearings when health permits;

    (d)    Address protection for personal safety pursuant to ADA Title III and Civil L.R. 1-14.

Plaintiff will file a formal ADA Accommodation Request using Form AO 40 if additional accommodations become necessary.

**Pro Se Certification (Civil L.R. 11-4)**

Plaintiff certifies pursuant to Civil L.R. 11-4 that:[110]

    (a)    Plaintiff is proceeding without counsel (pro se / in propria persona);

    (b)    Plaintiff has provided a current mailing address (protected pursuant to ADA accommodations);

    (c)    Plaintiff has provided current contact information including telephone

---

[109] General Order 56 establishes procedures for requesting ADA accommodations in the Northern District of California. Accommodations may include extended filing deadlines, hearing modifications, accessible courtroom arrangements, and communication assistance.

[110] Civil L.R. 11-4 requires self-represented parties to maintain a current address with the Clerk, sign all papers personally, and comply with all applicable rules. Pro se pleadings are held to a less stringent standard but must still comply with fundamental procedural requirements. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

COMPLAINT | DEMAND FOR JURY TRIAL

number and email address;

    (d)    Plaintiff will personally sign all papers filed with the Court;

    (e)    Plaintiff will comply with all Federal Rules of Civil Procedure and Local Rules;

    (f)    Plaintiff understands the obligation to keep the Court and opposing parties informed of any address changes.

## Certification of Related Cases (Civil L.R. 3-12)

Pursuant to Civil L.R. 3-12, Plaintiff identifies the following related cases pending in this District that involve substantially similar parties, claims, or subject matter:[111]

    (a)    *Goddard v. NoMa et al.*, Case No. 3:25-cv-05882-EMC (housing discrimination);

    (b)    *Goddard v. Bank of America et al.*, Case No. 3:25-cv-06187-JSC (employment discrimination—claims severed per Dkt. 32);

    (c)    *Goddard v. Anthropic PBC*, Case No. 4:26-cv-00005 (trade secret theft, ADA violations);

    (d)    *Goddard v. JPMorgan Chase Bank N.A.*, Case No. 4:26-cv-00037 (vehicle repossession, ADA violations).

All cases arise from a common pattern of coordinated discrimination and involve overlapping factual allegations regarding Plaintiff's protected status and the statistical evidence of targeting.

Dated: February 2, 2026

By:  /s/Thomas Joseph Goddard
      THOMAS JOSEPH GODDARD
      Plaintiff, Pro Se



Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

---

[111]Civil L.R. 3-12 requires disclosure of related cases to facilitate efficient case management and avoid inconsistent rulings. Related cases may be assigned to the same judge pursuant to Civil L.R. 3-12(b).