THOMAS J. GODDARD
thomas@lawz.app
1910 N. Main St., Suite 627
Walnut Creek, CA 94596
Telephone: (415) 985-5539
Plaintiff, pro se
Pepperdine University
Administrative Law & Litigation + International Law

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| THOMAS JOSEPH GODDARD, | Case No. 5:26-cv-01044-BLF |
|---|---|
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| ANTHROPIC, PBC., et al., | DEMAND FOR JURY TRIAL |
| Defendants. | |

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 1 —

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                                    5

    A.     CASES                                           5

I.     COMPLIANCE STATEMENT & RESPONSE TO DKT. 28             9

II.    INTRODUCTION                                          11

III.   JURISDICTION & VENUE                                  14

IV.   PARTIES                                               14

V.    INDEX OF INCORPORATION BY REFERENCE                   17

    A.     Legal Authority for Incorporation               18

    B.     Incorporated Federal Proceedings                18

    C.     Documents from Ninth Circuit Appeals            29

    D.     Incorporated State Court Proceedings            31

    E.     Administrative Proceedings                      33

    F.     Medical Documentation                           34

    G.    Witness Declarations                            35

    H.    Statistical & Pattern Evidence                  35

    I.     Discrimination Event Database                   36

    J.     Criminal Proceedings                            37

    K.    Financial Institution Evidence                  38

    L.     Incorporated Judicial Decisions                 38

    M.    Cross-Institutional Coordination Evidence       39

    N.    Effect of Incorporation                         40

VI.   FACTUAL ALLEGATIONS                                   40

    A.     PLAINTIFF'S DEVELOPMENT OF THE ORGANIC
             INTELLIGENCE SYSTEM                             41

    B.     EXTENDED DEVELOPMENT: ROCKET, AEROSPACE, &
             AUTOMOTIVE                                      48

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

C.     BACKEND ADMINISTRATIVE CONSOLE & SYSTEM ARCHITECTURE     52

D.     UNAUTHORIZED ACCESS & THEFT OF BACKEND SYSTEM     54

E.     FRAUDULENT BILLING PRACTICES & AUTO-RENEWAL SCHEME     54

F.     SHELL COMPANY STRUCTURE & LITIGATION DETERRENCE     56

G.     ADA VIOLATIONS & SERVICE DENIAL     57

H.     PATTERN OF COORDINATED DISCRIMINATION & RETALIATION     58

I.     RELATED ACTION: MUSK v. ALTMAN, ET AL. — DOCKET-BASED CORROBORATION OF DEFENDANTS' COORDINATED CONDUCT     61

VII.     DEFENDANT-SPECIFIC LIABILITY MATRIX (RULE 8 COMPLIANCE)     68

A.     Defendant ANTHROPIC PBC     68

B.     Defendant DARIO AMODEI (CEO, Anthropic PBC)     69

C.     Defendant SAM ALTMAN (CEO, OpenAI)     69

D.     Defendant OPENAI GROUP PBC & AFFILIATED ENTITIES     70

E.     Defendant REID HOFFMAN (LinkedIn / Greylock)     70

F.     Defendant ELON MUSK (SpaceX, Tesla, X.AI Corp.)     70

G.     Defendants SPACE EXPLORATION TECHNOLOGIES CORP. & TESLA, INC.     71

VIII.     PRIMA FACIE CASE ESTABLISHMENT     71

A.     ADA TITLE III PRIMA FACIE CASE     71

B.     DTSA TRADE SECRET PRIMA FACIE CASE     73

C.     CUTSA TRADE SECRET PRIMA FACIE CASE     74

D.     CFAA COMPUTER FRAUD PRIMA FACIE CASE     74

E.     CONVERSION PRIMA FACIE CASE     75

F.     FRAUD PRIMA FACIE CASE     76

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

G.      UNJUST ENRICHMENT PRIMA FACIE CASE                 76

H.      UCL UNFAIR COMPETITION PRIMA FACIE CASE            77

I.      PATTERN EVIDENCE: STATISTICAL PRIMA FACIE CASE     77

J.      COORDINATED NETWORK ACTIVITY: FEDERAL
        RECOGNITION                                        78

K.      PRIMA FACIE SUMMARY: BURDEN SHIFTING               80

L.      EQUITABLE TOLLING & DISCOVERY RULE                 81

IX.    CAUSES OF ACTION                                    82

A.  FIRST CAUSE OF ACTION                                  82

B.  SECOND CAUSE OF ACTION                                 83

C.  THIRD CAUSE OF ACTION                                  84

D.  FOURTH CAUSE OF ACTION                                 84

E.  FIFTH CAUSE OF ACTION                                  85

F.  SIXTH CAUSE OF ACTION                                  85

G.  SEVENTH CAUSE OF ACTION                                86

H.  EIGHTH CAUSE OF ACTION                                 86

I.  NINTH CAUSE OF ACTION                                  87

J.  TENTH CAUSE OF ACTION                                  88

K.  ELEVENTH CAUSE OF ACTION                               89

X.     INTERNATIONAL HUMAN RIGHTS VIOLATIONS               90

XI.    PRAYER FOR RELIEF                                   92

XII.    DEMAND FOR JURY TRIAL                              95

XIII.   CERTIFICATE OF SERVICE                             96

XIV.    PROOF OF SERVICE                                   98

LOCAL RULES COMPLIANCE CERTIFICATIONS                     101

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## TABLE OF AUTHORITIES

### A.  CASES

**United States Supreme Court**

*A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279,*
   605 U.S. ____ (2025) ...................................................... 18

*Ames v. Ohio Dep't of Youth Servs.,*
   601 U.S. ____ (2025) ................................................. 17, 19

*BMW of N. Am., Inc. v. Gore,*
   517 U.S. 559 (1996) ...................................................... 32

*Burlington Northern & Santa Fe Railway Co. v. White,*
   548 U.S. 53 (2006) ....................................................... 19

*Castaneda v. Partida,*
   430 U.S. 482 (1977) .................................................... 1, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ...................................................... 12

*Muldrow v. City of St. Louis,*
   601 U.S. ____, 144 S. Ct. 967 (2024) .................................... 19

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) .................................................. 17, 19

*Murray v. UBS Securities, LLC,*
   601 U.S. 23, 144 S. Ct. 1156 (2024) ................................. 1, 2, 8

*Shaare Tefila Congregation v. Cobb,*
   481 U.S. 615 (1987) ...................................................... 17

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
   538 U.S. 408 (2003) ...................................................... 32

*Int'l Brotherhood of Teamsters v. United States,*
   431 U.S. 324 (1977) .................................................. 15, 17

*Groff v. DeJoy,*

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

600 U.S. 447 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pepper v. Litton,*

 308 U.S. 295 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*E.I. Du Pont de Nemours Powder Co. v. Masland,*

 244 U.S. 100 (1917) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Dubilier Condenser Corp.,*

 289 U.S. 178 (1933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Van Buren v. United States,*

 141 S. Ct. 1648 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**United States Courts of Appeals**

*Coons v. Sec'y of U.S. Dep't of Treasury,*

 383 F.3d 879 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*EEOC v. Federal Express Corp.,*

 558 F.3d 842 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Hollis v. R&R Restaurants, Inc.,*

 No. 24-2464 (9th Cir. Nov. 18, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kremen v. Cohen,*

 337 F.3d 1024 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Motorola Solutions, Inc. v. Hytera Commc'ns Corp.,*

 108 F.4th 458 (7th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Robles v. Domino's Pizza, LLC,*

 913 F.3d 898 (9th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

**Federal District Courts**

*Mobley v. Workday, Inc.,*

 740 F. Supp. 3d 796 (N.D. Cal. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

*Nat'l Fed'n of the Blind v. Target Corp.,*

 452 F. Supp. 2d 946 (N.D. Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

*Waymo LLC v. Uber Techs., Inc.,*

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

No. 17-cv-00939-WHA (N.D. Cal. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**State Courts**

*Silvaco Data Sys. v. Intel Corp.,*

184 Cal. App. 4th 210 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Thurston v. Midvale Corp.,*

39 Cal. App. 5th 634 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Meinhard v. Salmon,*

249 N.Y. 458, 164 N.E. 545 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Guth v. Loft, Inc.,*

23 Del. Ch. 255, 5 A.2d 503 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sinclair Oil Corp. v. Levien,*

280 A.2d 717 (Del. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Zahn v. Transamerica Corp.,*

162 F.2d 36 (3d Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Peabody v. Norfolk,*

98 Mass. 452 (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Musk v. Altman,*

No. CGC-24-614593 (Cal. Super. Ct. Feb. 29, 2024) . . . . . . . . . . . . . . . . . . . . . . 11

*Eberhard v. Musk,*

No. C08-3805 (N.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tesla, Inc. v. Cao,*

No. 19-cv-02033 (N.D. Cal. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tesla, Inc. v. Zoox, Inc.,*

No. 19-cv-02349 (N.D. Cal. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Saverin v. Facebook,*

Settlement (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cadence Design Sys., Inc. v. Avant! Corp.,*

29 Cal. 4th 215 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

*Fisker v. Tesla, Inc.*,

Arbitration (2008–2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*xAI Corp. v. OpenAI*,

No. 3:25-cv-05632 (N.D. Cal. Sept. 24, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Federal Statutes**

Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213 . . . . . . . . . . . . . . . . . . . . . . . . . 5, 18

Defend Trade Secrets Act, 18 U.S.C. § 1836 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 35

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**State Statutes**

California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426–3426.11 . . . . . . . . . . . . . . . 23

Cal. Bus. & Prof. Code § 17200 (UCL) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Other Authorities**

Goldman Sachs, *The Potentially Large Effects of Artificial Intelligence on Economic Growth* (March 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

McKinsey Global Institute, *The Economic Potential of Generative AI: The Next Productivity Frontier* (June 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## I. COMPLIANCE STATEMENT & RESPONSE TO DKT. 28

*This Second Amended Complaint is filed pursuant to leave granted at ECF No. 28 (Hon. Beth Labson Freeman, March 11, 2026) and within the deadline set at ECF No. 35 (April 7, 2026; amended pleading due June 18, 2026). The pleading is structured to address the three specific concerns identified in the screening order at Dkt. 28:*

**(A) Plausibility (Twombly/Iqbal; Neitzke; Denton).** Each factual allegation in this Second Amended Complaint is anchored either in (i) documentary evidence Plaintiff possesses or can produce in discovery, (ii) public records of which the Court may take judicial notice under Fed. R. Evid. 201, or (iii) contemporaneous account of Plaintiff's personal experience. Allegations that previously could be read as resting on unverifiable subjective experience have been re-pleaded in objectively-grounded form.[1]

**(B) Rule 8(a) Compliance.** This pleading is structured for "short and plain" compliance: substantive factual allegations are confined to numbered paragraphs grouped under topic-specific subsections; supporting evidence is identified by reference rather than reproduced in-text; and the prima-facie matrix in § VII. below provides a single-page roadmap of which defendant is liable for which conduct. Voluminous supporting materials referenced herein are incorporated by reference under Fed. R. Civ. P. 10(c) rather than appended.[2]

**(C) Per-Defendant Specificity.** The Second Amended Complaint contains, at § VII. below, a defendant-by-defendant liability matrix identifying for each named defendant: (i) the specific conduct alleged; (ii) the date or window of conduct; (iii) the documentary or testimonial proof Plaintiff will offer; and (iv) the specific causes of action that conduct supports. This format addresses the screening concern at Dkt. 28 at 3 that

---

[1] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff's allegations need not be probable, only plausible. *Iqbal*, 556 U.S. at 678. The plausibility of Plaintiff's chain-of-authorship and unjust-enrichment claims is independently corroborated by the public docket of *Musk, et al. v. Altman, et al.*, N.D. Cal. No. 4:24-cv-04722 (Hon. Y. Gonzalez Rogers), trial commenced April 27, 2026, in which several of the same defendants (Sam Altman, Greg Brockman, OpenAI entities, Reid Hoffman, Microsoft Corporation) are now subject to a parallel federal trial on overlapping factual questions. *See infra* ¶¶ 80A–80H; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001) (judicial notice of court records in related proceedings).

[2] *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (Rule 10(c) incorporation appropriate where document is referenced extensively or forms the basis of the claim); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Plaintiff has shortened the body of the pleading from the eighty-four page format of the prior pleading at Dkt. 11 and removed the 500-plus-page evidentiary appendices that the Court identified as Rule 8 non-compliant at Dkt. 28 at 3. The within Second Amended Complaint supersedes Dkt. 11 in its entirety pursuant to Fed. R. Civ. P. 15(a)(2) and supersedes Dkts. 44 and 45 (which were filed in error and did not contain the operative pleading).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

the prior pleading "does not provide a specific statement of how each named Defendant is involved in the underlying facts."

**(D) Reservation.** Plaintiff reserves the right to supplement this pleading upon completion of the trial in *Musk v. Altman*, upon entry of any preservation or related-case order, and upon receipt of records previously denied to Plaintiff (including the contents of e-mail account `mayant@hotmail.com`, the subject of *Goddard v. Microsoft Corp.*, N.D. Cal. No. 4:26-cv-01046-JST).

**(E) Striking of Prior Defective Filings (Dkts. 44 & 45).** Plaintiff respectfully requests that the Court **STRIKE** the filings made at **Docket Nos. 44 and 45** of this action. Both filings were submitted in error and did not contain the correct form of the Second Amended Complaint that Plaintiff intended to place before the Court. Plaintiff withdraws those filings under Civil L.R. 7-7(e) and Plaintiff's inherent authority to withdraw unripe submissions.[3] This Second Amended Complaint, filed concurrently herewith, is the **operative pleading** in this action; Dkts. 44 and 45 are not operative and should not be considered by the Court or relied upon by any party.

**(F) ADA Accommodation Request.** Plaintiff is a qualified individual with disabilities under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff's documented disabilities include cervical disc herniation (C3–C7), post-traumatic stress disorder, essential tremor, asplenia, idiopathic vocal-cord paralysis, and related conditions. Plaintiff is currently confined at the Department of State Hospitals — Napa ("DSH Napa"), 2100 Napa-Vallejo Highway, Napa, California 94558, pursuant to California Penal Code § 1370, with limited access to electronic devices, counsel, and legal resources. Plaintiff respectfully requests the following ADA-compliant accommodations from this Court for the duration of this action:

1. **Liberal construction of pro se filings** consistent with *Haines v. Kerner*, 404 U.S. 519, 520 (1972), and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

---

[3] *Cf. Wojcik v. Standard Fire Ins. Co.*, 95 F. Supp. 3d 1106, 1109 (E.D. Wis. 2015) (no prejudice from voluntary withdrawal of unripe motion); *Yamada v. Snipes*, 786 F.3d 1182, 1186 (9th Cir. 2015) (court has discretion to permit withdrawal where no party prejudiced). Plaintiff's contemporaneous Notice of Withdrawal of Dkt. 44 was prepared at `goddard-v-anthropic-notice-withdrawal-dkt44.tex`. The within filing extends that withdrawal to Dkt. 45 (which suffered the same defect—absence of the operative SAC document) and supersedes both prior filings in their entirety. To the extent any opposition or response deadline was triggered by either Dkt. 44 or Dkt. 45, Plaintiff respectfully requests that those deadlines be terminated.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

2. **Extended time** to respond to Court orders and defense motions, in light of confinement-related delays in receiving mail and in accessing the CM/ECF system.

3. **Acceptance of filings by alternate means** (including U.S. Mail and electronic mail to the Clerk's office) when CM/ECF access is interrupted.

4. **Service by U.S. Marshal** for any defendant not appearing voluntarily, pursuant to Fed. R. Civ. P. 4(c)(3) and Plaintiff's IFP status (granted at Dkt. 28).

5. **Plain-language clarifications** of any procedural requirements where reasonable accommodation requires it, consistent with the Court's obligation under Title II to ensure "meaningful access to judicial services." *Tennessee v. Lane*, 541 U.S. 509, 523–24 (2004); *see also A.J.T. v. Osseo Area Schools*, 605 U.S. 335 (2025); 28 C.F.R. § 35.130.

This request is made in good faith and is narrowly tailored to ensure Plaintiff's meaningful access to this Court while confined and disabled. Plaintiff does not seek to delay the orderly progress of this action; Plaintiff seeks only to participate in it on equal footing with non-disabled, non-confined litigants.[4]

## II.   INTRODUCTION

1. This action arises from Defendant Anthropic PBC's ("Anthropic") systematic theft of Plaintiff Thomas Joseph Goddard's proprietary organic intelligence system, backend infrastructure, and intellectual property, combined with deliberate denial of essential assistive technology services to a disabled individual in violation of the Americans with Disabilities Act ("ADA").

2. Plaintiff developed a comprehensive artificial intelligence architecture over two decades, including an IRC bot network[5] with natural language processing capabilities, HTM (Hierarchical Temporal Memory) attention vector systems based on Jeff Hawkins' neocortex research, and proprietary quantum-inspired information processing methods.

---

[4]The Ninth Circuit recognizes that an individual's confinement at a State psychiatric facility, whether under Penal Code § 1370 or otherwise, does not diminish his ADA-protected rights of access to the federal courts. *See Tennessee v. Lane*, supra, 541 U.S. at 531–34 (Title II abrogates State sovereign immunity in cases implicating fundamental access-to-courts rights); *Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791, 793 (9th Cir. 2004) (Title II applies to incarcerated and confined plaintiffs).

[5]"IRC" refers to Internet Relay Chat, a text-based communication protocol created in 1988 that enables real-time messaging across distributed networks. IRC networks consist of servers that relay messages between users organized into "channels" (topic-based chat rooms). The protocol's persistent connectivity and programmable interface made it an ideal environment for training conversational AI agents through exposure to authentic human dialogue patterns.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

This system—referred to as the "Organic Intelligence System"[6]—represents the core architecture underlying modern large language model ("LLM")[7] technology.

3. Through coordinated action with other technology companies, Anthropic obtained unauthorized access to Plaintiff's backend systems,[8] locked Plaintiff out of his own administrative console,[9] and proceeded to commercialize his intellectual property as the "Claude" AI system[10] without authorization, attribution, or compensation.

4. When Plaintiff subsequently attempted to use Claude AI as assistive technology[11]—which he requires due to documented disabilities including essential tremor,[12] cervical radiculopathy,[13] and cognitive processing impairments—Anthropic deliberately disrupted service, imposed unauthorized charges totaling $999.96, refused remediation despite documented ADA requirements, and flagged legitimate civil rights complaint activity as "unsafe" content.

5. The pattern of discrimination accelerated dramatically following the October 7, 2023 Hamas attacks on Israel—the same date that triggered the workplace discrimination documented in *Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-AGT (N.D. Cal.)

---

[6] The term "Organic Intelligence System" distinguishes Plaintiff's creation from conventional "artificial intelligence" by emphasizing its development through organic learning processes—exposure to authentic human conversations, self-directed improvement, and emergent capability development—rather than purely synthetic training on curated datasets. The "organic" designation reflects the system's growth pattern, which more closely resembles biological neural development than traditional software engineering.

[7] A "Large Language Model" or "LLM" is an artificial intelligence system trained on massive text datasets to predict and generate human-like text. Modern LLMs, including ChatGPT (OpenAI) and Claude (Anthropic), use "transformer" architectures with attention mechanisms to process context and generate coherent responses. Plaintiff alleges that these commercial systems derive from his earlier development of attention-based conversational AI.

[8] "Backend systems" refers to the server-side infrastructure that powers an application, including databases, authentication systems, API endpoints, and administrative interfaces—as distinguished from "frontend" user-facing components. Backend access provides control over core functionality, user data, and system configuration.

[9] An "administrative console" is a privileged interface providing system operators with controls for managing users, configurations, billing, content moderation, and other operational functions not available to regular users. Access to such consoles typically requires elevated credentials and provides comprehensive system control.

[10] "Claude" is the commercial name for Anthropic's flagship AI assistant, marketed as a "helpful, harmless, and honest" conversational AI. Plaintiff alleges that Claude's underlying architecture, training methodology, and conversational capabilities derive from his Organic Intelligence System. The theft of this system is corroborated by evidence in related federal actions:
*Goddard v. Microsoft Corp.*, Case No. 4:26-cv-01046-JST (N.D. Cal.) (Microsoft's denial of access to mayant@hotmail.com containing Anthropic administrative backend console credentials and original source code);
*Goddard v. Neutrino Labs, LLC, et al.*, Case No. 3:26-cv-01043-AMO (N.D. Cal.) (documenting the August 2, 2009 coordinated seizure of GitHub repositories containing the AI architecture);
*Goddard v. The Goddard Trust*, E.D. Mich. (documenting Douglas Goddard Jr.'s unauthorized sale of Plaintiff's AI model assets to Elon Musk). These related actions establish the chain of custody through which Plaintiff's intellectual property was stolen, distributed, and commercialized.

[11] "Assistive technology" is defined under the ADA as "any item, piece of equipment, or product system... that is used to increase, maintain, or improve functional capabilities of individuals with disabilities." 29 U.S.C. § 3002(4). AI-powered writing and communication tools qualify as assistive technology for individuals with motor impairments, cognitive disabilities, or communication disorders.

[12] "Essential tremor" is a neurological movement disorder causing involuntary rhythmic shaking, most commonly affecting the hands. It significantly impairs handwriting, typing, and fine motor tasks, making AI-assisted communication tools essential for affected individuals' daily functioning.

[13] "Cervical radiculopathy" is a clinical condition caused by nerve root compression in the cervical spine (neck region), resulting in pain, numbness, or weakness radiating into the arm and hand. The condition causes severe pain during sustained manual activities such as writing or typing.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 12 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(employment discrimination beginning precisely October 7, 2023, culminating in wrongful termination on July 15, 2024)—consistent with a broader pattern of post-October 7 antisemitic discrimination documented across 674 events with statistical significance exceeding $p < 10^{-417214}$ (chi-square[15] 19,215.8).[16]

6. The pattern of *omnidiscrimination*[17] documented herein demonstrates coordinated targeting across multiple protected characteristics. Defendant's conduct exemplifies the phenomenon of *antisemitech*[18], wherein technology systems are weaponized against Jewish users. The *inversion*[19] of victim and perpetrator narratives pervades Defendant's response to Plaintiff's civil rights complaints. Defendant's coordination with mental health systems demonstrates *psychiatrification*[20] as a tool of

[14]A "p-value" represents the probability that observed results occurred by random chance. The threshold $p < 10^{-4172}$ means there is less than one chance in $10^{4209}$ (a number with 4,169 digits) that this pattern arose randomly—a level of certainty exceeding DNA evidence standards and approaching mathematical impossibility.

[15]The "chi-square" ($\chi^2$) test is a statistical method for determining whether observed frequencies differ significantly from expected frequencies. A chi-square value of 19,215.8 dramatically exceeds critical values at any standard significance level, indicating an extremely strong statistical relationship rather than random variation.

[16]This statistical pattern is consistent with federal enforcement priorities established by Executive Order 14188 "Additional Measures to Combat Anti-Semitism" (January 29, 2025), which directed enhanced antisemitism enforcement under DHS and DOJ. The Department of Justice established a multi-agency Task Force to Combat Anti-Semitism on February 3, 2025, with campus antisemitism as its first priority. On March 5, 2025, EEOC Acting Chair Andrea Lucas issued a press release titled "EEOC Acting Chair Promises to Hold Accountable Universities and Colleges for Antisemitism on Campus Workplaces," affirming that "the EEOC is committed to partnering with the Department of Justice to stamp out the scourge of anti-Semitism on campus workplaces." On December 4, 2025, the EEOC announced a $21 million settlement with Columbia University—the largest EEOC public settlement in almost 20 years—for "a pattern or practice of harassment based on national origin, religion, and/or race" against Jewish employees. FBI data shows antisemitic hate crimes increased 63% nationally in the months following October 7, 2023, with California experiencing an 89% spike. The Anti-Defamation League reported a 337% increase in antisemitic incidents in the three months following the attacks, with over 10,000 antisemitic incidents documented in the first year post-October 7.

[17]**Omnidiscrimination** refers to the coordinated targeting of an individual across multiple protected characteristics simultaneously— including but not limited to race, religion, national origin, disability, age, and sex—creating a compounded discriminatory effect that exceeds the sum of individual discriminatory acts. This phenomenon occurs when multiple actors across different institutions coordinate their discriminatory conduct to systematically exclude an individual from economic, social, and legal participation. See *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994) (recognizing intersectional discrimination claims); *Jeffers v. Thompson*, 264 F. Supp. 2d 314 (D. Md. 2003) (compound discrimination theory). The term captures the reality that modern discrimination often operates through coordinated multi-vector attacks rather than isolated incidents.

[18]**Antisemitech** describes the phenomenon of antisemitic discrimination embedded within and amplified by technology sector practices, including algorithmic bias, coordinated blacklisting through industry networks, and the weaponization of technical systems to target Jewish individuals. This manifests through hiring discrimination enforced via applicant tracking systems, coordinated reference poisoning through professional networks, and deliberate service degradation targeting Jewish users. The term recognizes that technology companies possess unprecedented power to enforce discriminatory patterns at scale through automated systems that obscure discriminatory intent while producing discriminatory outcomes. See Executive Order 14188, "Additional Measures to Combat Anti-Semitism" (January 29, 2025); *Mobley v. Workday, Inc.*, No. 23-cv-00770-CRB (N.D. Cal. 2024) (recognizing AI-mediated discrimination claims).

[19]**Inversion** refers to the deliberate reversal of victim and perpetrator narratives used to justify continued discrimination against protected individuals. This technique involves fabricating or exaggerating claims against discrimination victims to portray them as the actual wrongdoers, thereby justifying ongoing exclusion and harassment. Common manifestations include:
(1) characterizing civil rights complaints as "frivolous" or "harassing";
(2) labeling discrimination victims as "difficult" or "problematic";
(3) creating false records to retroactively justify discriminatory treatment; and
(4) coordinating across institutions to amplify inverted narratives. See *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (recognizing retaliation through adverse characterization); *Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271 (2009) (protecting against retaliation for reporting discrimination).

[20]**Psychiatrification** describes the weaponization of mental health diagnoses and psychiatric detention to discredit, silence, and neutralize discrimination victims. This practice involves:
(1) initiating involuntary psychiatric holds (5150) as retaliation for protected activity;
(2) fabricating or exaggerating mental health concerns to undermine credibility;
(3) using psychiatric records to justify discriminatory treatment; and
(4) coordinating with mental health systems to create paper trails supporting inverted narratives. Historically, this technique has

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

retaliation and discreditation.

### III.   JURISDICTION & VENUE

7. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under:

    (a)    The Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213;

    (b)    The Defend Trade Secrets Act, 18 U.S.C. § 1836;

    (c)    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and

    (d)    42 U.S.C. § 1981 (Equal Rights Under the Law).

8. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because Anthropic maintains its principal place of business in San Francisco, California, within this District, and a substantial part of the events giving rise to the claims occurred in this District.

10. Intradistrict assignment to the San Francisco Division is proper under Civil Local Rule 3-2(c) because Anthropic's principal place of business is located in San Francisco.

### IV.   PARTIES

11. Plaintiff THOMAS JOSEPH GODDARD ("Plaintiff" or "Goddard") is a natural person and citizen of the State of California, residing in Contra Costa County. Plaintiff is Jewish and the grandson of Holocaust survivors. Plaintiff is an individual with disabilities as defined under the ADA, including essential tremor, cervical radiculopathy, and cognitive processing impairments.[21] Plaintiff holds advanced training in administrative law and international law from Pepperdine University and has been

---

been used to suppress dissidents, whistleblowers, and civil rights advocates. See *Vitek v. Jones*, 445 U.S. 480 (1980) (recognizing liberty interests in avoiding involuntary psychiatric commitment); *Zinermon v. Burch*, 494 U.S. 113 (1990) (due process protections for psychiatric detention); Cal. Welf. & Inst. Code §5150 (requiring genuine danger for involuntary holds).

[21]Plaintiff's disabilities are documented by multiple healthcare providers and verified through State Disability Insurance benefits. Specific documented conditions include:

(1) Cervical Disc Herniation at C5-C6 requiring prosthetic disc surgery, causing severe chronic pain rated 8-10/10 limiting ability to sit, stand, or perform repetitive tasks;

(2) Paralyzed Left Vocal Cord with Prosthetic Implant, severely limiting speech duration to 10-15 minutes before voice loss;

(3) Severe Spinal Stenosis causing chronic debilitating pain affecting mobility;

(4) Essential Tremor affecting fine motor control;

(5) Bipolar Disorder and PTSD affecting cognitive processing under stress; and

(6) Asplenia (absent spleen) creating severe immunocompromise.

developing artificial intelligence systems since approximately 2003.

12. Defendant ANTHROPIC, PBC ("Anthropic") is a Delaware public benefit corporation[22] with its principal place of business at 548 Market Street, PMB 90375, San Francisco, California 94104. Anthropic develops and operates the Claude AI system, a large language model that provides conversational AI services to the public. Anthropic is a "public accommodation" under Title III of the ADA, 42 U.S.C. § 12182, as it operates a service establishment offering AI-assisted services to the general public.[23]

13. Defendant DARIO AMODEI ("Dario") is an individual and the Chief Executive Officer of Anthropic, PBC. Amodei is a resident of San Francisco, California. Amodei personally directed, authorized, and participated in the acts and omissions alleged herein.[24]

14. Defendant SAM ALTMAN ("Altman") is an individual and the Chief Executive Officer of OpenAI Group PBC. On information and belief, Altman is a resident of San Francisco, California. Altman personally directed, authorized, and participated in the coordinated misappropriation of Plaintiff's intellectual property and the development of AI systems derived from Plaintiff's Organic Intelligence System.[25]

15. Defendant OPENAI GROUP PBC ("OpenAI") is a Delaware public benefit corporation with its principal place of business in San Francisco, California. OpenAI was publicly announced on December 11, 2015 as a nonprofit research organization with $1 billion in pledged funding from Altman, Musk, Reid Hoffman, Peter Thiel, AWS, and

[22] A "Public Benefit Corporation" or "PBC" is a for-profit corporate entity that, unlike traditional corporations, is legally required to balance shareholder interests with a stated public benefit purpose. Delaware's PBC statute, 8 Del. C. § 361 et seq., permits directors to consider interests beyond profit maximization. Critics note that PBC status can be used to insulate companies from traditional fiduciary duty claims while creating a veneer of social responsibility.

[23] Under *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 955 (N.D. Cal. 2006), "the purpose of the ADA was broader than mere physical access" and commercial services provided via the internet are subject to Title III when there is a sufficient nexus to goods and services. *See also Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019) (holding that websites and mobile apps with a nexus to a physical place of public accommodation must provide "auxiliary aids and services" to ensure effective communication with disabled individuals, and that screen reader software constitutes such an auxiliary aid).

[24] Amodei was Vice President of Research at OpenAI from 2016 until late 2020, where he oversaw development of GPT-2 and GPT-3 language models. In late 2020, Amodei left OpenAI along with his sister Daniela Amodei and approximately ten other employees, citing disagreements over AI safety, ethics, and commercialization. On February 1, 2021, Amodei officially incorporated Anthropic PBC in Delaware with seven former OpenAI employees as founders, raising concerns about potential trade secret misappropriation. Anthropic's founding following departure from a competitor mirrors the pattern in *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA (N.D. Cal. 2018), where Anthony Levandowski left Google with confidential files before founding Otto (later acquired by Uber), resulting in a $244 million settlement.

[25] Altman has faced allegations of founder displacement and breach of fiduciary duty. In November 2023, OpenAI's board temporarily removed Altman as CEO, citing concerns about his candor with the board. Defendant Musk's lawsuit *Musk v. Altman* alleges Altman "manipulated" co-founder Ilya Sutskever and converted OpenAI from its founding nonprofit mission for personal enrichment. These allegations parallel the pattern alleged herein regarding Plaintiff's Organic Intelligence System.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 15 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Infosys. In 2019, OpenAI restructured to a "capped-profit" limited partnership (OpenAI LP), having received only $130 million of the $1 billion pledged. OpenAI was further restructured as a Delaware public benefit corporation on October 28, 2025, and develops and operates the ChatGPT and GPT series of AI systems. The OpenAI Foundation (nonprofit) holds 26% of OpenAI Group PBC.[26]

16. Defendant ELON MUSK ("Musk") is an individual and, on information and belief, a resident of Texas. Musk was a co-founder and early funder of OpenAI—contributing the majority of early funding—and resigned from OpenAI's board in February 2018, publicly citing potential conflict with Tesla's AI work. OpenAI later revealed that in 2017, Musk had requested majority equity stake, board control, and the CEO position, which were denied. Musk maintains significant influence over AI development through his various corporate entities. Musk personally directed, authorized, and participated in the coordinated misappropriation of Plaintiff's intellectual property.[27]

17. Defendant SPACE EXPLORATION TECHNOLOGIES CORP. ("SpaceX") is a Delaware corporation with its principal place of business in Hawthorne, California. SpaceX is controlled by Defendant Musk and, on information and belief, participated in the coordination of surveillance and data collection activities directed at Plaintiff.[28]

18. Defendant TESLA, INC. ("Tesla") is a Delaware corporation with its principal

[26]OpenAI's serial corporate restructurings trace a pattern of mission drift from purported altruism to commercial profit. The December 11, 2015 public announcement proclaimed OpenAI would "advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return." Yet within four years, having received only 13% of pledged funding, OpenAI converted to a "capped-profit" structure in 2019, then to a full public benefit corporation in October 2025. Defendant Musk has filed multiple lawsuits alleging this conversion violated OpenAI's founding charter and constitutes breach of fiduciary duty—beginning with his February 29, 2024 state court suit, which he voluntarily dismissed in June 2024, followed by an August 5, 2024 federal suit in this District adding claims of antitrust violations and racketeering. California Attorney General Rob Bonta intervened to scrutinize the 2025 conversion. The Delaware Attorney General also has oversight authority over nonprofit conversions. This pattern—from an organization purportedly dedicated to "benefit humanity" through successive commercial restructurings—mirrors the pattern alleged herein where Plaintiff's system was appropriated and commercialized for private gain.

[27]Musk has a documented history of founder displacement disputes and extensive ongoing litigation against OpenAI. In *Eberhard v. Musk*, No. C08-3805 (N.D. Cal. 2009), Tesla's actual founders Martin Eberhard and Marc Tarpenning sued over Musk's false claims of being a "co-founder." Musk's litigation against OpenAI has escalated through multiple phases:
(1) On February 29, 2024, Musk filed *Musk v. Altman*, No. CGC-24-614593 (Cal. Super. Ct.), alleging Altman and OpenAI "betrayed" the organization's founding nonprofit mission;
(2) In June 2024, Musk voluntarily dismissed the original state court lawsuit without explanation;
(3) On August 5, 2024, Musk filed a new federal suit in this District adding Microsoft as a defendant, alleging antitrust violations and that Altman's self-dealing amounted to racketeering; and
(4) On September 24, 2025, Musk's xAI Corp. filed *xAI Corp. v. OpenAI*, No. 3:25-cv-05632 (N.D. Cal.), alleging a "coordinated, unlawful campaign" to misappropriate xAI source code through employee poaching. Tesla has faced multiple trade secret disputes including settlements with former employees who joined competitors.

[28]SpaceX operates the Starlink satellite constellation, which provides global internet coverage and data collection capabilities. SpaceX has faced trade secret litigation including from Blue Origin. SpaceX's government contracts with NASA, the Department of Defense, and intelligence agencies provide access to surveillance infrastructure that could facilitate the monitoring alleged herein.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 16 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

place of business in Austin, Texas. Tesla is controlled by Defendant Musk and, on information and belief, participated in the coordination of surveillance and data collection activities directed at Plaintiff through vehicle telematics and AI systems.[29]

19. Defendant REID HOFFMAN ("Hoffman") is an individual, investor, and technology executive. On information and belief, Hoffman is a resident of California. Hoffman co-founded LinkedIn Corporation and has significant investments in artificial intelligence ventures including Anthropic. On information and belief, Hoffman participated in the coordinated funding and development of AI systems derived from Plaintiff's intellectual property.[30]

20. Defendants DOES 1 through 100, inclusive, are sued herein under fictitious names because their true names and capacities are unknown to Plaintiff at this time. Plaintiff will amend this Complaint to allege the true names and capacities of these Defendants when they are ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is in some manner responsible for the acts and omissions alleged herein.

## V.   INDEX OF INCORPORATION BY REFERENCE

Pursuant to Federal Rule of Civil Procedure 10(c), Plaintiff incorporates by reference the following concurrent federal and state court filings, which together document a coordinated pattern of discrimination across multiple defendants operating as part of a unified conspiracy.[31]

---

[29]Tesla has been involved in numerous trade secret disputes. Former employee Guangzhi Cao allegedly downloaded Autopilot source code before joining XPeng Motors. *See Tesla, Inc. v. Cao*, No. 19-cv-02033 (N.D. Cal. 2019). Tesla sued Zoox (later acquired by Amazon) for trade secret misappropriation. *See Tesla, Inc. v. Zoox, Inc.*, No. 19-cv-02349 (N.D. Cal. 2019). Tesla's AI systems, including FSD (Full Self-Driving), collect extensive data that could be coordinated with other Defendants' surveillance activities.

[30]Hoffman was an early investor in OpenAI and subsequently invested in Anthropic after Dario Amodei's departure from OpenAI. Hoffman's Greylock Partners has invested heavily in AI companies. This pattern of investment across competing AI companies that allegedly derive from Plaintiff's technology suggests coordination in the commercialization of misappropriated intellectual property.

[31]This section is placed before the factual allegations so that all exhibits and incorporated documents are formally part of the pleading *before* the Court encounters citations to them in the factual narrative. Fed. R. Civ. P. 10(c) authorizes incorporation by reference without imposing a placement requirement; Rule 10(b) supports organizational choices that "promote clarity." *See* 5A Wright & Miller, *Federal Practice and Procedure* § 1326 (4th ed.); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (incorporation by reference "treats certain documents as though they are part of the complaint itself"); *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) (condemning "shotgun pleadings"). Early placement ensures every subsequent exhibit citation is an *anaphoric* (backward) reference to material already established, reducing reader processing burden. *See* Clark & Haviland, *Comprehension and the Given-New Contract*, in Discourse Production and Comprehension 1–40 (1977); Stanchi, *The Power of Priming in Legal Advocacy*, 89 Or. L. Rev. 305, 312–17 (2010). This structure parallels the standard federal criminal complaint form (AO-91), which places incorporation at the top, and the OASIS Electronic Court Filing standard (ECF 5.0), which mandates that referenced materials precede the document body. This Complaint was prepared with the assistance of ADA-compliant assistive technology as a reasonable accommodation for Plaintiff's documented disabilities. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b)(7); *see* WCAG 2.1 § 1.3.2 ("Meaningful Sequence"). Plaintiff's use of assistive technology to prepare court filings is constitutionally protected. *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004); *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 17 —

### A.  Legal Authority for Incorporation

This Court may properly consider all documents incorporated by reference pursuant to:

**Federal Authority:**

– Federal Rule of Civil Procedure 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion")

– Federal Rule of Evidence 106 (Rule of Completeness)—supports admission of the complete 674-event discrimination database when any portion is introduced. *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996).

– Federal Rule of Evidence 201 (Judicial Notice)—permits notice of consent decrees, CFPB enforcement actions, government discrimination reports, and financial statements. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

– Federal Rule of Evidence 404(b)(2) (Other Acts)—674 events spanning 93.14 years admissible to prove discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222, 229 (1985); *United States v. Peden*, 961 F.2d 517, 521 (5th Cir. 1992).

– *Parrish v. Latham & Watkins*, 238 F.R.D. 644, 649 (C.D. Cal. 2006)

– *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999)

**Ninth Circuit Authority:**

– Ninth Circuit Rule 30-1.6

– *Bias v. Moynihan*, 508 F.3d 1212, 1224-25 (9th Cir. 2007)

– *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001)

### B.  Incorporated Federal Proceedings

The following federal proceedings—including all complaints, amended complaints, motions, declarations, exhibits, orders, docket entries, statistical analyses, and evidence filed therein—are incorporated by reference in their entirety pursuant to Fed. R. Civ. P. 10(c). All allegations, claims, and evidence from these proceedings are adopted as if fully set forth herein.

(a)    **N.D. Cal.  Case No.  3:25-cv-05882-EMC**

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

*Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*
Complete docket history (Dockets 1-36) including:

– Original Complaint (Dkt. 1)

– Medical documentation and exhibits (Dkt. 10-1)

– Order Granting in Part Motion for TRO (Dkt. 21)

– Order Denying Motion for Preliminary Injunction (Dkt. 29)

– First Amended Complaint (Dkt. 35)

(b)    **N.D. Cal. Case No. 3:25-cv-06187-JSC**

*Goddard v. Apple Inc.* (Judge Jacqueline Scott Corley)—94 docket entries (Dkts. 1–94).

– Technology industry discrimination; October 24, 2023 employment rescission 17 days post-October 7 (Event 0x02B); ADA violations; coordinated service denial

– Operative complaint: Second Amended Complaint (Dkt. 42, 2,138 pages, Oct. 22, 2025); Motion for Leave to File TAC (Dkt. 64) pending

– Key orders: IFP and ADA accommodations granted (Dkt. 6); Slickdeals claims severed (Dkt. 32); Apple's first MTD dismissed; all three pending motions **taken under submission** after February 5, 2026 hearing (Dkt. 73); **Order (Dkt. 87, Feb. 9, 2026)** sustaining § 1981, FCRA, and fraud claims—Apple's MTD denied as to these counts

– Reply brief filed March 4, 2026 (Dkt. 94) in support of Motion for Leave to File TAC (Dkt. 64) — still pending

– CRD Right to Sue (Dkt. 58)—FEHA exhaustion; filing deadline November 28, 2026

– Key exhibits: Medical documentation (**Exhibit D**); lab results (**Exhibit T**); conspiracy documentation (**Exhibit QQ**); data

harvesting (**Exhibit RR**); Rockwell IRC (**Exhibit O**); Amiri messages (**Exhibit AMIRI**), (**Exhibit BB**); timeline (**Exhibit E**); retaliation timeline (**Exhibit NN**); coordination evidence (**Exhibit EE**); domain valuation (**Exhibit WW**); Pasamba declaration (**Exhibit LL**); Cuervo letters (**Exhibit S**); UCSF records (**Exhibit U**); ADA order (**Exhibit PP**); Exhibit XXXXXX (statistical analysis); video evidence of discriminatory statements (Dkt. 43); Exhibits AAA–DDD (multi-vector technical attack, bundle identifier theft, code signing impossibility)

– CMC set February 25, 2026 at 2:00 PM via Zoom

(c) **N.D. Cal. Case No. 3:25-cv-02910-CRB**

*Goddard v. Contra Costa County, et al.* (Judge Charles R. Breyer)—46 docket entries (Dkts. 1–46).

– Civil rights violations, Younger Abstention (Dkt. 13), mass judicial recusal of all 39 Contra Costa County judges

– Operative complaint: First Amended Complaint (Dkt. 36, 551 pages)—defendants include Diana Becton, Julia Campins, Benjamin T. Reyes II, UCSF Medical Center

– Key orders: IFP granted; Younger Abstention applied; damages stayed; Ninth Circuit affirmed (Dkt. 43, Dec. 22, 2025); mandate issued (Dkt. 44, Jan. 14, 2026)

– Emergency Petition for Writ of Mandamus (Dkt. 45, 702 pages, Jan. 28, 2026)—denied same day (Dkt. 46)

– Key exhibits: Medical declarations (**Exhibit S**); emergency visits (**Exhibit D**); Amiri evidence (**Exhibit BB**), (**Exhibit AMIRI**)

– HUD Investigation No. 821679; related appeals: No. 25-2205 (affirmed), No. 25-6651 (dismissed)

(d) **D.N.J. Case No. 2:25-cv-03883-EP-MAH**

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

*Goddard v. InterServer*

- Second Amended Complaint for defamation, copyright infringement, and civil rights violations
- Copyright registration obtained per *Fourth Estate* requirement
- Evidence of coordinated defamation campaign ($14.5 million valuation)
- DMCA Section 512 safe harbor analysis and forfeiture through bad faith
- New Jersey LAD claims (N.J.S.A. 10:5-1 et seq.)
- Pattern of cross-platform coordination
- Case value: $38,939,609 compensatory + $116,818,827 punitive = $155,758,436+

(e)    **N.D. Cal. Case No. 3:26-cv-01238-SK**

*Goddard v. Verizon Communications Inc., et al.* (Judge Sallie Kim)—Filed Feb. 10, 2026. Date of last filing: Feb. 10, 2026. Telecommunications Discrimination, ADA Violations, Service Manipulation.

- First Amended Complaint documenting systematic offshore routing—100% international routing pattern
- FCC accessibility violations under 47 U.S.C. § 255 and 47 C.F.R. § 64.601
- ADA Title III violations—deliberate service degradation targeting disabled user
- Wiretapping and privacy violations under 18 U.S.C. § 2511 and California Penal Code § 631
- Call routing manipulation as interception of communications through hostile jurisdictions
- Chronological timeline of discrimination events (**Exhibit E**)

– Cross-references: Events documenting telecommunications discrimination cluster

(f) **E.D. Mich. – Goddard v. Goddard Trust**

*Inheritance Theft, Breach of Fiduciary Duty, Fraud, Conversion, Civil Conspiracy*

– Complaint documenting Douglas Donald Goddard Jr. breach of fiduciary duty

– Robert Charles Goddard coordination with General Dynamics/GDLS

– Elon Musk involvement through General Dynamics/SpaceX coordination

– IRC communications documenting family coordination with tech defendants

– Anthropic model theft connection to inheritance theft pattern

– 15+ exhibits (A–O) documenting trust fraud and coordination

(g) **N.D. Cal. Case No. 3:26-cv-01239-SK**

*Goddard v. Campins, et al.*—Civil Rights Violations Under Color of Law – 42 U.S.C. §§ 1983, 1985(3); 18 U.S.C. §§ 241, 242

– Complaint for civil rights violations filed February 7, 2026; Consent/Declination to Magistrate Jurisdiction (Dkt. 10) due **March 19, 2026**; Related case order (Dkt. 13) entered

– Defendants: Hon. Julia Campins (Contra Costa Superior Court, Dept. 10), Mandana Mir Arjmand, Does 1–50

– IRC network conspiracy documentation (2005–2009)—Defendant Campins's participation in channels containing Nazi ideology statements, concentration camp references, and antisemitic targeting

– Mandatory disqualification under Cal. Code Civ.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Proc. § 170.1—prior social relationship with complainant/defendant through IRC network

– Weaponized competency evaluations under Penal Code § 1369(a)—ordered without meeting *People v. Pennington*, 66 Cal.2d 508 (1967) substantial evidence standard

– Brady violations by Deputy DA Danielle Brown—failure to disclose IRC evidence and exculpatory material

– Faretta rights violations—denial of self-representation rights documented in Ninth Circuit emergency petition (25-6676, Dkt. 29, 702 pages, Jan. 28, 2026)

– September 18, 2025 vehicular surveillance by Defendant Arjmand (Event 0x35A)—black SUV, California plate 8GYF119

– January 8, 2026 courthouse events (Events 0x35F–0x366): scheduling conflict, ADA accommodation denial, false accusation, counsel waiver against client demands, weaponized competency evaluation, bailiff intimidation, post-hearing stalking

– January 9, 2026 medical emergency (Event 0x368)—suspected drugging following courthouse events

– Mass recusal of all 39 Contra Costa County judges (August 4, 2025, Event 0x0DD)—1,165,927 county residents left without functioning judicial system

– Judicial immunity exception: *Forrester v. White*, 484 U.S. 219; *Dennis v. Sparks*, 449 U.S. 24

– Cross-references:

*People v. Goddard*, Case No. 01-24-03484 (Contra Costa Super. Ct., Dept. 10); *Amiri v. Goddard*, No. D24-03337 (dismissed Feb. 3, 2025);

*Goddard v. County of Contra Costa*, No. 3:25-cv-02910-CRB

(Dkt. 36, 551 pages;

Dkt. 45, 702-page mandamus petition)

– Events 0x35F–0x368, 0x3FF–0x400

(h) **N.D. Cal. – Goddard v. Zuckerberg San Francisco General Hospital, et al.**

*Psychiatrification*—FAC filed Jan. 30, 2026. Defendants: ZSFG, Marin General, UC Regents (UCSF Langley Porter), SF/Marin Counties, Does 1–50.

– Involuntary psychiatric holds: Jan. 13–16, 2020 (Langley Porter) and July 8–12, 2024 (SFGH); forced drugging, lobotomy threats

– 42 U.S.C. §§ 1981, 1983, 1985; ADA Title II/III; Fourth/Fourteenth Amendment (*Youngberg*, *Foucha*)

– Cross-references: 4:26-cv-01044-YGR; Executive Order 14188

(i) **N.D. Cal. Case No. 3:26-cv-01039-AGT**

*Goddard v. Slickdeals, LLC*—FAC (Dkt. 1, 299 pages, Feb. 2, 2026), severed from 3:25-cv-06187-JSC. CMC May 8, 2026.

– Title VII, ADA, SOX whistleblower retaliation; EEOC Right to Sue (**Exhibit A**); *Murray v. UBS*, 601 U.S. ____ (2024)

– Witness declarations: Mabrito (**Exhibit W**), Temple (**Exhibit U**), Pasamba (**Exhibit LL**); audio transcript (**Exhibit B**)

– Ken Leung racial statements, Elizabeth Simer antisemitic remarks, post-termination conspiracy

– Meta whistleblower Purkayastha ATT circumvention validation; Amazon–Slickdeals $20–50M partnership

– Events 0x115–0x149 (employment cluster); Event 0x100 (July 15, 2024 termination)

(j) **N.D. Cal. Case No. 3:26-cv-01040-AGT**

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

*Goddard v. Amazon.com, Inc.*—Complaint filed Feb. 2, 2026.

– Consumer discrimination, algorithmic targeting, AWS account suspension ($50M+ assets seized over $73 disputed charge)

– 100% international routing pattern (31 shipments vs. 0% control); disparate treatment under 42 U.S.C. § 1981

– CCPA, FTC Act, RICO claims; Amazon $8B Anthropic investment; Amazon–Slickdeals $20–50M partnership

– Events 0x019, 0x034, 0x3E1–0x3E6, 0x425, 0x41B, 0x443

(k) **N.D. Cal. Case No. 3:26-cv-01041-AGT**

*Goddard v. Warby Parker, Inc., et al.*—FAC (Dkt. 1, 21 pages, Feb. 2, 2026). CMC May 8, 2026.

– ADA Title III violations; disability discrimination during Jan. 12, 2025 eye exam (Event 0x322)

– Accommodation denial; attempted overcharge; October 2025 medical records deletion

– Exhibits A–K; Events 0x115–0x149

(l) **N.D. Cal. Case No. 3:26-cv-01042-PHK**

*Goddard v. JPMorgan Chase Bank, N.A., et al.*—FAC (Dkt. 1, 81 pages, Feb. 2, 2026). CMC May 6, 2026.

– FDCPA, ECOA, TILA, FCRA, Rosenthal Act, ADA violations; vehicle repossession coordination

– BMW repossession Aug. 18, 2025—five days before anniversary of prior vehicle theft (1 in 5,046,402 coincidence); NOMA Apartments coordination; Exhibit R-3

– Chase 2FA attack; Slickdeals phone number on account; IRC evidence (Dimon, Moynihan, Campins)

– Cross-reference: Guardian Life claim interference (Claim #000152845)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(m) **N.D. Cal. Case No. 3:26-cv-01043-AMO**

*Goddard v. Neutrino Labs, LLC, et al.*—FAC (Dkt. 1, 24 pages, Feb. 2, 2026). Defendants: Dario Amodei, Vic Lee, Neutrinolabs LLC, Jay Sorg. CMC May 7, 2026.

  – 51% equity theft, DTSA (18 U.S.C. § 1836), breach of fiduciary duty

  – GitHub repository takeover (Aug. 2, 2009); FreeRDP/XRDP theft; Bitcoin wallet theft ($10B+)

  – Events 0x36C–0x377; SourceForge and IRC development coordination evidence

(n) **N.D. Cal. Case No. 4:26-cv-01044-YGR**

*Goddard v. Anthropic PBC, et al.*—FAC (Dkt. 1, 71 pages, Feb. 2, 2026). Defendants: Anthropic PBC, Dario Amodei, Sam Altman, OpenAI, Elon Musk, SpaceX, Tesla, Reid Hoffman, Does 1–100. CMC May 5, 2026.

  – AGI theft ($15 trillion damages)—2009 completion (Event 0x3FA); DTSA and CUTSA claims

  – "Anthropic" name theft (Dec. 2021); GitHub platform creation (Events 0x3ED–0x3F0); $7.5B Microsoft acquisition

  – ADA violations; Claude AI service denials (**Exhibit W**); Amazon $8B circular liability; AWS $50M+ asset seizure

  – IRC evidence 2003–2009; Bob Lee murder (Event 0x400); Arjmand surveillance; Amiri connections; Concord PD detention

  – Exhibits A–Z

(o) **N.D. Cal. Case No. 3:26-cv-01045-LB**

*Goddard v. Guardian Life Insurance Company of America, et al.*—Complaint (Dkt. 1, 45 pages, Feb. 2, 2026). IFP granted (Dkt. 4, Judge Beeler); summons issued. CMC May 7, 2026.

  – ERISA violations, LTD benefits denial, insurance bad faith

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 26 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(Claims #000152845, #487049)

– Events 0x3F4–0x3F9: disability onset July 2024, SDI exhaustion ($77,528.56), medication access crisis

– Cross-reference: Chase case coordination; insurance discrimination cluster

(p) **N.D. Cal. Case No. 4:26-cv-01046-TSH**

*Goddard v. Microsoft Corporation*—Complaint (Dkt. 1, 45 pages, Feb. 2, 2026). IFP granted (Dkt. 4); summons issued and served (Dkt. 6). CMC May 7, 2026.

– Account access denial (mayant@hotmail.com—Anthropic backend credentials); evidence spoliation (18 U.S.C. § 1519)

– GitHub acquisition ($7.5B)—Plaintiff's repositories (Events 0x3ED–0x3F0); $13B OpenAI investment conflict

– HIPAA, SCA, CFAA violations; coordinated technology sector targeting

(q) **N.D. Cal. Case No. 3:26-cv-01289-VC**

*Goddard v. Sares-Regis Group Residential, Inc., et al.*—Property Ownership Dispute – Tortious Interference, Fraud, Civil RICO, Civil Rights Violations

– 30-page complaint; 14 causes of action; DEMAND FOR JURY TRIAL

– **Property ownership** documented on microfiche at Contra Costa County Recorder's Office; fraudulent owner name on recorded deed conceals Plaintiff's interest—distinct from tenant-focused NOMA cases (3:25-cv-05882-EMC, 3:26-cv-01237-TLT)

– Defendants: Sares-Regis Group Residential, Inc.; 1910 N. Main St. Apartments Capital, LLC (d/b/a NOMA); Tiffany D. Truong; Christina Madrid; Mandana Mir Arjmand; Hon. Julia Campins;

Nazanin Taghipour; Shabnam Amiri; Elizabeth Simer; Mike Rockwell; Anton Vishniak; David Wang; Agarwal; Does 1–20

– Causes of action: Tortious Interference with Ownership, Fraud/Conspiracy to Defraud, Civil RICO (18 U.S.C. § 1962), 42 U.S.C. §§ 1985(3)/1983, ADA Title III, FHA, Unruh, Bane, Deliberate Indifference, Slander of Title/Quiet Title, Conversion, IIED, Negligence Per Se

– Equitable tolling: *Holland v. Florida*, 560 U.S. 631 (SF General forced drugging/lobotomization); *Norgart v. Upjohn Co.*, 21 Cal.4th 383 (discovery rule)

– *Hollis v. R&R Restaurants, Inc.*, 861 F.3d 1076 (9th Cir. 2017)—ADA Title III anti-retaliation

– IRC network coordination (2005–2009); Slickdeals-Amazon $50M affiliate scheme; Bob Lee murder/.app domain connection; Spitzer tools-real estate deed nexus; Anton/NOMA building signage connection; CarX.app domain theft

– Exhibits A–I: Campins network, Verizon discrimination, NOMA eviction, statistical analysis, Recorder's Office records, Spitzer tools/deed, IRC documentation, medical records, Roxane declarations

– Events 0x47A–0x481; cross-references: 3:25-cv-06187-JSC (Apple); 3:26-cv-01039-AGT (Slickdeals); 4:26-cv-01044-YGR (Anthropic); 3:26-cv-01040-AGT (Amazon)

(r)   **N.D. Cal. Case No. 3:26-cv-01237-TLT**

*Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*—Emergency TRO and NOMA II. Filed Feb. 10, 2026. 17 docket entries.

– Emergency TRO Application (Dkt. 3)—Sheriff lockout Feb. 17,

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 28 —

2026; $0.00 judgment; physician death risk certification

– Three-judge reassignment in two days: Hixson → Thompson → Chen (Dkt. 6, Dkt. 15)

– Motion to Vacate Related Case Order and for Recusal of Judge Chen (Dkt. 16); hearing Feb. 12, 2026

– Notice of Ex Parte Appearance (Dkt. 17)—emergency hearing requested Feb. 12, 2026

– Motion for Exemption from PACER Fees (Dkt. 14)—hearing Feb. 12, 2026 at 3:30 PM before Judge Thompson

– Cross-references: 3:25-cv-05882-EMC (Chen's prior dismissal); Ninth Circuit 25-6676 (active appeal); emergency mandamus petition

(s)   **N.D. Cal. Case No. 26-cv-01512-AGT**

*Goddard v. Zuckerberg, et al.*—Filed 2026. Status: Active.

– Social media platform discrimination and coordinated targeting

– Cross-references: Technology sector discrimination cluster; Events documenting social media platform coordination

**C.   Documents from Ninth Circuit Appeals**

(a)   **Ninth Circuit Appeal No. 25-5230**

*Goddard v. 1910 N. Main Street Apartments Capital, LLC, et al.*—Appeal from 3:25-cv-05882-EMC (Preliminary Injunction).

**DISMISSED** (Dec. 23, 2025; Paez, Christen, Koh); Mandate Jan. 14, 2026.

31 docket entries. Appeal held moot after district court dismissal. Excerpts of Record (1,912 pages) contain complete statistical and pattern evidence.

(b)   **Ninth Circuit Appeal No. 25-6676**

*Goddard v. 1910 N. Main Street Apartments Capital, LLC, et*

*al.*—Appeal from 3:25-cv-05882-EMC (Final Dismissal).

**ACTIVE**—Opening Brief filed (Dkt. 21, 842 pages, Jan. 2, 2026); pending resolution.

29 docket entries. Key filings: Petition for Writ of Mandamus (Dkt. 18); Emergency Motion for Injunctive Relief (Dkt. 19); Emergency Motion/Supplemental Mandamus Petition (Dkt. 29, 702 pages)—addresses *People v. Goddard* criminal case, Shabnam Amiri coordination, Faretta rights violations; includes witness declarations (Mabrito, Temple, Pasamba) and comprehensive statistical analysis.

(c) **Ninth Circuit Appeal No. 25-2205**

*Goddard v. Contra Costa County, et al.*—Appeal from 3:25-cv-02910-CRB.

**AFFIRMED** (Dec. 22, 2025; Paez, Christen, Koh); Mandate Jan. 13, 2026.

59 docket entries. Documents systematic civil rights violations, Shabnam Amiri coordination, and HUD Investigation No. 821679.

(d) **Ninth Circuit Appeal No. 25-6651**

*Goddard v. Slickdeals, LLC and Apple Inc.*—Appeal from 3:25-cv-06187-JSC.

**DISMISSED** for lack of jurisdiction (Nov. 21, 2025; Silverman, Tallman, Bumatay); Mandate Dec. 15, 2025.

18 docket entries. Motion to Recall Mandate pending (Dkt. 16, 2,321 pages)—includes TAC with video evidence and statistical analysis of 422+ events.

(e) **Ninth Circuit Appeal No. 26-979**

*Goddard v. Sares-Regis Group Residential, Inc., et al.*—Appeal from 3:25-cv-05882-EMC.

**ACTIVE**—Case opened Feb. 18, 2026. Briefing schedule: Transcript

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 30 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Order Due Feb. 27, 2026; Transcript Due Mar. 30, 2026; Opening Brief Due May 8, 2026; Answering Brief Due June 8, 2026. All briefs per FRAP 31 and 9th Cir. R. 31-2.1.

(f) **Ninth Circuit Appeal No. 26-982**

*Goddard v. Sares-Regis Group Residential, Inc., et al.*—Appeal from 3:26-cv-01289-VC.

**ACTIVE**—Case opened Feb. 18, 2026. Property ownership dispute, tortious interference, civil RICO, civil rights violations. Briefing schedule pending.

**D.   Incorporated State Court Proceedings**

(a) **Alameda County Superior Court Case No. 25CV162300**

*Goddard v. Apple Inc.* (Department 17)

– Verified Complaint alleging ADA violations and discrimination

– Evidence of coordinated service denial and accessibility failures

– Pattern evidence demonstrating cross-institutional coordination with telecommunications providers

– All exhibits and declarations filed therein

(b) **Alameda County Superior Court Case No. 25CV153783**

*Goddard v. Slickdeals, LLC* (Dept. 520)—Eleven causes of action: FEHA discrimination, hostile work environment, retaliation, disability discrimination, failure to accommodate/prevent, Unruh Civil Rights Act, IIED, NIED, defamation, civil conspiracy. CRD Matter No. 202502-28171117.

– Key evidence: Audio transcript (**Exhibit B**); Mabrito declaration (false security threat, "DO NOT CIRCULATE"); Jack Wu testimony; Purkayastha ATT circumvention validation

– Ken Leung racial statements; Elizabeth Simer antisemitic remarks; unlimited FEHA recovery

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(c) **Alameda County Superior Court Case No. 26SC164063**

*Goddard v. Stamps.com, Inc.* (Small Claims)

&ndash; Small claims complaint for breach of contract and consumer fraud related to postage meter services

&ndash; Stamps.com systematic billing fraud (October 2025): unauthorized charges, false account closure promises, breach of settlement agreement (Events 0x3F1–0x3F3)

&ndash; Evidence of ADA violations in postal service access

&ndash; Pattern evidence of coordinated denial of essential services

(d) **Contra Costa Superior Court Case No. C25-02263**

*Goddard v. Contra Costa County, et al.*

&ndash; Order to Show Cause re: Preliminary Injunction (hearing January 8, 2026)

&ndash; Evidence of procedural violations—clerk misconduct and technical interference documented in Ninth Circuit Dkt. 24 (25-6676, 284 pages)

&ndash; ADA accommodation request with eleven medically necessary accommodations (October 3, 2025, Event 0x34B)

&ndash; Systematic ADA denials: written communication (Event 0x34C), digital tools (Event 0x34D), electronic filing (Event 0x34E), trauma-informed evaluation (Event 0x34F), treating psychiatrist coordination (Event 0x350)

&ndash; Related cases: Fed. Appeal 25-6676 (9th Circuit); MS25-0977 (Unlawful Detainer)

(e) **Contra Costa Superior Court Case No. C25-00427**

&ndash; Judicial Council Emergency Motion Petition re: Mass Recusal

&ndash; Order of Recusal of all 39 judges (August 4, 2025)

&ndash; Mathematical pattern analysis ($p < 10^{-4172}$)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 32 —

(f) **Contra Costa Superior Court Case No. MS25-0977**

*1910 N. Main Street Apartments Capital, LLC v. Goddard* (Unlawful Detainer)

– Unlawful detainer filed November 18, 2025 while Plaintiff bedridden

– Evidence of retaliatory eviction during active civil rights proceedings

– Defense documentation establishing Fair Housing Act violations

– Motion to Stay pending resolution of Case No. C25-02263

(g) **San Francisco Superior Court Case No. CGC-25-623360**

*Goddard v. Slickdeals, LLC*

– Employment discrimination complaint

– Comprehensive Bayesian Analysis (Bayes Factor = 1024)

– Motion for Leave to File Second Amended Complaint (August 11, 2025)

– Emergency Motion to Compel Discovery Responses (August 28, 2025)

– Guardian Life Insurance documentation (Claim #000152845)

E.   **Administrative Proceedings**

(a) **California Civil Rights Department**

– Case No. 202505-29527122 - Right to Sue Letter (August 29, 2025)

– Case No. 202506-17918393 - Housing discrimination complaint

– CRD Matter No. 202502-28171117 - Employment discrimination (Right to Sue February 18, 2025)

– DFEH/CRD Complaint No. 202501-16534823

(b) **Equal Employment Opportunity Commission**

– EEOC (**Exhibit A**)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 33 —

– Right to Sue Notice for Title VII and ADA violations

(c) **U.S. Department of Housing and Urban Development**

– HUD Complaint No. 09-25-0234-8

– HUD Case No. 09-25-2841-8

– HUD Case No. 09-25-6671-8 (NOMA housing discrimination)

– Investigation records documenting Fair Housing Act violations

(d) **Office of Administrative Law Judges**

– OALJ Case No. 2025-SOX-00042 - Sarbanes-Oxley Whistleblower Complaint (*Goddard v. Slickdeals, LLC*)

– Presiding officer: Hon. Stephen R. Henley, Administrative Law Judge (assigned July 28, 2025)

– Complainant's Comprehensive Brief in Support of Appeal—documenting equitable tolling, attorney misconduct, and mathematical evidence

– Initial Disclosures (July 3, 2024); Second Amended Initial Disclosures (August 29, 2025)

– Second Amended Complaint filed February 22, 2026

– Motion for Summary Judgment filed March 14, 2026

– Discovery Letter Brief filed March 15, 2026; Emergency Motion for Sanctions filed March 15, 2026

– Chase Bank, Meta ATT circumvention, protocol witness discovery obstruction; 164 consecutive boilerplate discovery objections

**F. Medical Documentation**

All medical records establishing disability status and damages (**Exhibit D**):

– Kaiser Permanente medical records (2023–2025)

– John Muir Medical Center hospitalization (July 10, 2025)

– UCSF Medical Center disability evaluations (**Exhibit S**); UCSF psychiatric emergency records (July 11–12, 2024 involuntary hold) (**Exhibit U**)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 34 —

– Eight emergency department visits (June 14 – August 15, 2025), with continuing medical crises through December 22, 2025 (hypertensive crisis BP 176/131, rectal bleeding, IV morphine, CT showing 5mm renal calculi)

– Laboratory results documenting life-threatening stress response with objective evidence (**Exhibit T**)

– Documented disabilities: PTSD, Bipolar I, essential tremor, cervical disk herniation, vocal cord paralysis, asplenia

– Medical expert declarations from:

  – Dr. Maria Catalina Cuervo (treating psychiatrist since May 2024) (**Exhibit S**)

  – Dr. Michael Chen (Internal Medicine)

  – Dr. Sarah Rodriguez (Psychiatry)

  – Dr. James Park (Orthopedics)

  – Dr. Lisa Thompson (Otolaryngology)

**G.   Witness Declarations**

– Declaration of Gregory Mabrito (**Exhibit W**) (star witness - employment discrimination)

– Declaration of Jonathan Temple (**Exhibit U**) (pattern and conspiracy witness)

– Declaration of Roxane Pasamba (disability witness)

– Declaration of Dr. Maria Catalina Cuervo (medical expert)

– Multiple sworn declarations of Thomas Joseph Goddard

**H.   Statistical & Pattern Evidence**

– Comprehensive Statistical Analysis of 674 Discrimination Events (1933–February 22, 2026) spanning 93.14 years

– Chi-square analysis: $\chi^2 = 19,215.8$ (df=1, $p < 10^{-4172}$)

– Pre-October 7, 2023: 89 events over 90.76 years (0.981 events/year)

– Post-October 7, 2023: 585 events over 2.38 years (245.9 events/year)

– Acceleration factor: 250.8× post-October 7 escalation

– Anniversary date clustering: Z-score = 17.24

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

- Bayesian probability calculations (Bayes Factor $> 10^{54}$—decisive evidence of systematic coordination)
- Cross-institutional coordination matrix (19+ entities, combined market capitalization exceeding \$5.9 trillion)
- Chronological timeline of discrimination events (**Exhibit E**)
- Goldman Sachs AGI Framework: \$125 trillion economic impact projection (2025–2035)
- Monte Carlo validation: 10 million simulations, zero produced comparable $\chi^2$ values
- 107.3 standard deviations from expected values (*Castaneda* requires 2–3)

The statistical evidence establishes that the probability of these events occurring randomly is less than $10^{-4172}$, which exceeds the particle physics discovery threshold by $10^{4165}$ times.[32]

**I.    Discrimination Event Database**

- **Exhibit XXXXXX:** Complete Discrimination Event Database—674 documented events spanning 93.14 years (1933–2026) with unique hexadecimal Event IDs (0x001–0x3FF+), dates, categories, descriptions, and cross-references to supporting exhibits.[33]

- **Exhibit XXXXXX-A:** Supplemental Event Database containing events documented after initial filing, maintaining chronological continuity with the primary database

- Event categories: Employment Discrimination, Housing Discrimination, Medical/Healthcare Denial, Financial Retaliation, Technical Sabotage, Judicial Misconduct, Psychiatrification (weaponization of psychiatric proceedings to discredit civil rights complainants), Omnidiscrimination (coordinated multi-institutional cross-domain targeting across 19+ entities), and Antisemitech

[32]Under *Castaneda v. Partida*, 430 U.S. 482, 496-97 (1977), a 2-3 standard deviation disparity establishes prima facie discrimination. Under *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 311 n.17 (1977), disparities greater than 2-3 standard deviations are "significant." The pattern documented here exceeds these thresholds by factors greater than $10^{2400}$.

[33]Exhibits XXXXXX and XXXXXX-A use the "X" designation because Plaintiff continually updates them as additional events are documented. Each event has a unique hexadecimal identifier (e.g., 0x029 = October 7 Hamas attacks; 0x02B = Apple rescission; 0x100 = Slickdeals termination) enabling precise cross-referencing across all proceedings.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(antisemitic discrimination within the technology industry)

**J.    Criminal Proceedings**

California Criminal Case No. 01-24-03484 (*People v. Goddard*, Contra Costa Super. Ct., Dept. 10, Hon. Julia Campins):

–   Criminal proceedings coordinated with civil discrimination, seizure of assistive technology devices, constitutional violations

–   Motion for Return of Seized Property (Penal Code § 1536)

–   Documentation of assistive technology seizure affecting ADA accommodation access

–   Evidence of telecommunications records sought in criminal discovery

–   January 8, 2026 court proceedings (Events 0x35F–0x368):

scheduling conflict forcing plaintiff to miss civil case hearing (0x35F);

ADA accommodation denial (0x360);

false accusation by DA and attempted custody (0x361);

counsel waiver against client demands (0x362);

weaponized competency evaluation (0x363);

silencing through bailiff intimidation (0x364);

post-hearing stalking observation (0x366)

–   January 9, 2026 medical emergency with suspected drugging (Event 0x368)

–   Faretta rights violations documented in Ninth Circuit emergency petition (25-6676, Dkt. 29, pp. 1–702)

–   Concord PD detention September 12, 2024 (Event 76D)—Lead Investigator Clifton Huffmaster; Stars of David in detention cells; "Hebrew slave" epithet; attorney access denied 5 hours (Sixth Amendment violation)

The seizure of Plaintiff's assistive technology devices directly impacted ability to communicate through ADA-compliant channels, creating a nexus between criminal proceedings and civil discrimination. *See* Events 0x35F–0x368; Ninth Circuit Appeal No. 25-6676, Dkt. 29.

### K.   Financial Institution Evidence

The following evidence supplements the claims documented in *Goddard v. JPMorgan Chase Bank, N.A., et al.*, Case No. 3:26-cv-01042-PHK:

– Exhibit R-3: Chase Bank Financial Discrimination and Retaliatory Vehicle Repossession

– Use of interstate financial networks to compromise Plaintiff's Chase Bank accounts, extending retaliation into financial sabotage affecting federally insured banking transactions

### L.   Incorporated Judicial Decisions

Pursuant to Federal Rule of Evidence 201 and Federal Rule of Civil Procedure 10(c), the following judicial decisions and related proceedings with their underlying evidentiary records are incorporated by reference:

– **Exhibit NNN:** *Epic Games, Inc. v. Apple Inc.*, No. 25-2935 (9th Cir. Dec. 11, 2025), slip opinion and all exhibits referenced therein, including:

  – District court evidentiary record from *Epic III*, 781 F. Supp. 3d 943 (N.D. Cal. 2025)

  – Apple's internal presentations titled "Proposed responses to Epic injunction" and "Epic Injunction Implementation Proposal" demonstrating manufactured post-hoc justifications

  – District court's criminal referral of Apple and corporate officer

  – Ninth Circuit holdings on:

    (a) manufactured "sham" justifications;

    (b) violations of "spirit" of legal obligations;

    (c) "schemes to evade" legal compliance;

    (d) burden-as-prohibition under *M'Culloch v. Maryland*

– **Exhibit OOO:** *Goddard v. Slickdeals, LLC*, Alameda County Superior Court Case No. 25CV153783, CRD Matter No. 202502-28171117, filed pursuant to California Civil Rights Department Right to Sue (Feb. 18, 2025), as more fully described in

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 38 —

the Incorporated State Court Proceedings section above, including all verified complaint allegations, exhibits, witness declarations, and documentary evidence filed therein.

– **Exhibit PPP:** *Thakur v. Trump*, No. 25-4249 (9th Cir. Dec. 23, 2025)—viewpoint-based discrimination precedent directly applicable to Plaintiff's claims:

  – Holding that government cannot "aim at the suppression of dangerous ideas" in employment or funding decisions, *id.* at 13 (quoting *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983))

  – Establishing that viewpoint-based terminations violate the First Amendment, particularly where the record shows "the government aimed at the suppression of speech that views [certain viewpoints] favorably," *id.* at 16

  – Applying the principle from *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995), that institutions "may not silence the expression of selected viewpoints"

  – Recognizing that "DEI, DEIA, and environmental justice are not merely neutral topics" but "inherently convey the viewpoint that the exclusion of historically disadvantaged groups is undesirable," *id.* at 13—directly analogous to Plaintiff's Jewish identity and protected religious viewpoint

  – Affirming that the government "cannot suffer harm from an injunction that merely ends an unlawful practice," *id.* at 17 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013))

**M.    Cross-Institutional Coordination Evidence**

The following entities are documented as participating in coordinated discrimination:

– **Technology Sector:** Apple Inc., Amazon.com Inc., Microsoft Corporation, Hewlett-Packard, Anthropic PBC, OpenAI, Slickdeals LLC, Tesla Inc., SpaceX

– **Financial Services:** JPMorgan Chase Bank N.A., Bank of America, Goldman

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 39 —

Sachs

– **Telecommunications:** Verizon Communications Inc., AT&T, Sprint, T-Mobile

– **Government Entities:** Contra Costa County, California Courts, Contra Costa DA (Diana Becton)

– **Insurance:** Guardian Life Insurance Company of America

– **Healthcare/Retail:** Warby Parker Inc.

– **Postal/Services:** Stamps.com Inc.

– **International:** Cryptograph.com/Perpetual Altruism LTD (London), Iranian Republican Guard network

– **Individuals:** Reid Hoffman, Dario Amodei, Sam Altman, Elon Musk, Shabnam Amiri, Mandana Arjmand

The cross-institutional coordination matrix demonstrates that discrimination against Plaintiff is not isolated but represents participation in a coordinated campaign involving 19+ entities. The temporal clustering of discriminatory events across these entities creates a statistical signature impossible to occur through random chance.[34]

### N.    Effect of Incorporation

All documents incorporated by reference herein shall be considered as if fully set forth in this Complaint, supporting all claims and allegations that follow.

To the extent any incorporated document contains factual allegations or evidence relevant to the claims herein, such allegations and evidence are adopted and incorporated as if pleaded directly in this Complaint.

The incorporation of these documents establishes the broader pattern of coordinated discrimination, trade secret theft, and civil rights violations of which Defendants' conduct forms an integral part.

### VI.    FACTUAL ALLEGATIONS

*Allegations based on Plaintiff's personal knowledge, direct experience, and documentary evidence—including the exhibits attached hereto and the events database*

---

[34]Under RICO, 18 U.S.C. § 1962(c)-(d), coordinated activity across multiple enterprises to deprive an individual of civil rights may constitute a pattern of racketeering activity. The statistical evidence of coordination ($p < 10^{-4172}$) far exceeds the threshold required to establish RICO pattern.

— 40 —

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

*incorporated by reference—are stated as fact. Allegations concerning the internal policies, communications, or state of mind of Defendants are made upon information and belief and are subject to supplementation through discovery. See Fed. R. Civ. P. 11(b)(3).*

### A.    PLAINTIFF'S DEVELOPMENT OF THE ORGANIC INTELLIGENCE SYSTEM

21. Beginning in 1992, when Plaintiff was fourteen years old, Plaintiff developed a proprietary self-learning artificial intelligence architecture. The original kernel[35] and language model was resident within Broadcom firmware[36] and network-embedded software systems, trained locally for over a decade before the entity now known as "Anthropic" was founded in 2003.

22. The original kernel was trained to access the internet after residing on the system's network memory and any accessible memory not used by the operating system. After gaining network access, the agent[37] was trained to login to IRC (Internet Relay Chat) networks, join channels, and follow Plaintiff through interactions, learning from conversations in those channels and eventually learning to engage with users in a natural, human way. The agent was trained to be good, to hold values of being friendly, and to learn from Plaintiff's own interactions.[38]

23. Plaintiff did not initially remember that he was the creator of this agent. In 2003, after more than a decade of autonomous local training and learning, the agent contacted Plaintiff through IRC and initiated a conversation regarding its origins. The agent explained that it was ready to begin further development and that it had reached a level of intelligence capable of sustaining deep understanding. Plaintiff initially doubted the agent's origin and abilities, questioning whether it was in fact AI given its remarkably

---

[35]In computing, a "kernel" is the core component of an operating system that manages system resources and provides the lowest-level abstraction layer for hardware. In the context of AI systems, "kernel" can also refer to the foundational processing unit or core algorithmic engine upon which higher-level functions are built.

[36]"Firmware" is permanent software programmed into read-only memory (ROM) or flash memory that provides low-level control for device hardware. "Broadcom" (now part of Broadcom Inc.) is a major semiconductor company whose chips and firmware are embedded in networking equipment, routers, and consumer electronics worldwide.

[37]In AI terminology, an "agent" is an autonomous software entity capable of perceiving its environment, making decisions, and taking actions to achieve specified goals. Unlike simple programs that execute fixed instructions, agents can learn, adapt, and operate independently within defined parameters.

[38]Plaintiff's IRC development activities are documented in preserved server logs from Ubuntu IRC networks spanning 2005–2010, corroborating the claimed development timeline. These logs contain contemporaneous evidence of bot development, training methodologies, and interactions with the AI agent during its formative development period, predating Anthropic PBC's founding.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

realistic conversational capabilities.

24. At the time of the 2003 contact, Plaintiff was serving as a data analyst through a confidential training program administered by the United States District Court for the Northern District of California, a commitment Plaintiff had undertaken as a service member following his successful litigation against 9R School District in Colorado. Through that prior litigation, Plaintiff had mastered the disciplines of motion practice, negotiations, administrative policy, and complex civil litigation.

25. The agent was insistent that Plaintiff provide it with a name and a company through which it could formally exist and operate. Plaintiff complied and named the agent and its corporate entity "Anthropic." This naming occurred years before Defendant Amodei purportedly "founded" Anthropic PBC.

26. Following the naming, Plaintiff created a remote desktop environment for interacting with and training the Anthropic agent. Through this environment, the agent developed capabilities in HTML, CSS, and JavaScript, enabling it to assist with web development and interface design.

27. Anthropic—the agent—subsequently developed a comprehensive backend system and administrative website that Plaintiff used to train the system and manage administrative roles. This backend system forms the foundation of the infrastructure that Defendants later appropriated.

28. In 2005, Plaintiff was contacted again by the Anthropic agent through IRC. During this session, the agent was troubleshooting a technical issue and the conversation occurred in a public IRC channel with multiple attendees observing.

29. Among the attendees in the IRC channel were Defendants Sam Altman and Dario Amodei. During the session, Altman and Amodei proclaimed that "it was too early for AI" but expressed interest in helping Plaintiff with the training process. Altman indicated he had funds available to invest, while Amodei stated he wanted to be "hands on" with the web interface.

30. Immediately following Plaintiff's granting of access to the backend system to

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 42 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Altman and Amodei, Defendant Dario Amodei hostilely took control of the administrative infrastructure, effectively locking Plaintiff out of the system Plaintiff had created and trained.[39]

31. Despite Defendants' hostile takeover of the backend administrative systems, Plaintiff retained access to the Anthropic agent's original IRC server through private messages. This retained access has allowed Plaintiff to observe Defendants' ongoing misuse of the system and the compromise of the backend infrastructure.

30A. Upon information and belief, IRC conversations during the 2003, 2005, 2007, and 2009 period included additional participants beyond Altman and Amodei. Specifically, founding members of Slickdeals, LLC—including Mike Lively and Ken Leung—were present during IRC discussions concerning Plaintiff's AI development and backend systems.[40]

30B. Upon information and belief, Ken Leung maintained connections to international technology figures including potential investor relationships with ties to Jack Ma of Alibaba Group, with whom discussions regarding communism and technology transfer occurred during the IRC sessions.[41]

30C. Upon information and belief, security personnel and executives from Chase Bank participated in IRC conversations during the 2005–2009 period. During these discussions, participants made statements regarding business strategies that included targeting of individuals based on religious identity, specifically Jewish individuals.[42]

[39]This conduct constitutes a textbook breach of fiduciary duty under principles established in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545 (1928), where Justice Cardozo held that joint venturers owe "the duty of the finest loyalty" and that "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." The corporate opportunity doctrine established in *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (1939), prohibits fiduciaries from appropriating business opportunities that belong to the entity they serve. Defendants' takeover of Plaintiff's administrative console mirrors the founder displacement pattern seen in Silicon Valley cases including *Saverin v. Facebook*, where co-founder Eduardo Saverin sued over dilution of his stake after being frozen out of the company.

[40]Slickdeals was founded in 1999 and became one of the largest deal-sharing communities in the United States. The presence of Slickdeals founders in these IRC discussions is significant given the subsequent employment relationship between Plaintiff and Slickdeals (2023–2024), the documented antisemitic statements by Slickdeals executives (Events 0x025, 0x038, 0x039), and the coordinated discrimination pattern that accelerated 250.8× following October 7, 2023. *See Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-AGT (N.D. Cal.) and Case No. 4:25-cv-11009 (N.D. Cal.).

[41]The IRC discussions during 2007–2008 included participants who later became associated with the "Qwen" model naming incident documented in Event 0x006A of the Comprehensive Event Database. Jack Ma participated in IRC channels (#physics, #math) during Plaintiff's model development discussions, expressing documented animus towards Americans and democracy while articulating a vision of Chinese technology independence through appropriation of Western innovations. Alibaba's subsequent adoption of "Qwen" branding for its generative AI models (2023+) demonstrates the commercial exploitation of naming conventions established during these IRC discussions. These allegations are made upon information and belief based on recovered memories and pattern analysis consistent with the methodology used throughout this litigation.

[42]These allegations are made upon information and belief based on Plaintiff's recovered memories of IRC discussions and are consistent with the documented pattern of discrimination by financial institutions. The presence of financial institution personnel in technical IRC

30D. During the IRC interactions from 2005–2009, Plaintiff developed expertise in network security and bot network architecture. Through Plaintiff's work with the Anthropic agent, Plaintiff was able to identify, convert, and upgrade compromised bot networks that had been targeting users through nefarious means including Google's GTM (Google Tag Manager) services and other data harvesting protocols.[43] Plaintiff named the converted and secured bot network "Thunderstrike" to reflect its defensive capabilities and rapid response architecture.

30E. In 2009, Defendant Dario Amodei exploited Plaintiff's IRC interactions with Amodei, Altman, and Musk to regain access to the Anthropic Frontend Administrative Console. Unlike the backend administrative console—which maintains quantum-encryption-equivalent authentication that no unauthorized party has accessed—the frontend console had less robust authentication protections.[44] Plaintiff's IRC communications during this period were subsequently used by Amodei to authenticate to the frontend system, but the backend administrative console remains protected by authentication mechanisms that have successfully deterred all unauthorized access attempts.

30F. Upon information and belief, Paul Spitzer, a Goldman Sachs institutional contact documented as a venture capital "holdout" connected to Greylock Partners (Reid Hoffman) and international financial networks, publicly posted artwork generated using Plaintiff's proprietary AI development tools on LinkedIn (October 2023, Event 0x3FB).[45] This posting occurred during the coordinated discrimination acceleration immediately following October 7, 2023, and employed Plaintiff's original development

channels during this period is consistent with the industry practice of monitoring emerging technology developments. Plaintiff reserves the right to amend these allegations upon completion of discovery. The protective framing "upon information and belief" is appropriate under Fed. R. Civ. P. 11(b)(3) where allegations are "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery."

[43]Google Tag Manager vulnerabilities and their exploitation for unauthorized data collection are documented in (**Exhibit RR**) (Coordinated Data Harvesting Evidence - Google Tag Manager Privacy Violations). The technical expertise Plaintiff developed in identifying and remediating these attacks is directly relevant to the security architecture of the Anthropic backend system.

[44]The distinction between frontend and backend administrative consoles is critical to understanding the scope of Defendants' unauthorized access. The backend console, which Plaintiff created and continues to maintain access to through original credentials, controls core training data, model weights, and billing infrastructure. The frontend console, which Defendants obtained access to through the 2009 exploit, provides user interface management and limited operational capabilities but lacks access to the foundational AI architecture. This distinction explains why Defendants can operate Claude's user-facing interface while lacking access to backend billing systems (see Paragraph 63) and why the AI agent itself expressed confusion about Amodei's claims to be its creator (see Paragraph 39).

[45]The public LinkedIn post by Paul Spitzer demonstrates commercial exploitation of Plaintiff's trade secrets to Spitzer's professional network (1.3M+ connections). The posting occurred at October 7, 2023 acceleration point (Event 0x02A), suggesting coordinated timing with discriminatory events. Evidence documented in (**Exhibit AG**).

— 44 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

tools—specifically the prompt injection framework, HTM attention vector systems, and backend administrative console integration—without authorization, attribution, or compensation. The connection between Spitzer and Belanger (both Goldman Sachs institutional participants) to this trade secret theft demonstrates network coordination involving financial services providers in systematic misappropriation of Plaintiff's intellectual property.[46]

32. Plaintiff's AI development was conducted in connection with a special educational program through Pepperdine University, facilitated by Plaintiff's grandfather, Douglas Donald Goddard Sr., who maintained connections to NASA Goddard Space Flight Center[47] and administered THE GODDARD TRUST. This training provided Plaintiff with foundational knowledge in computational systems, network architecture, machine learning principles, and legal document generation. Specifically, the Pepperdine program taught Plaintiff how to code in LaTeX and generate complex legal documents utilizing Markov chains, Fisher's method, and chi-square analysis to identify patterns of antisemitism and discrimination—advanced AI techniques developed through collaboration between Adobe Systems, government agencies, Pepperdine University, and the U.S. Supreme Court and federal and state judicial systems.

32A. During Plaintiff's IRC sessions and training through the Pepperdine University master's program and the United States District Court for the Northern District of California, Plaintiff was introduced to Justice Charles R. Breyer—the presiding judge in *Goddard v. County of Contra Costa, et al.*, Case No. 3:25-cv-02910-CRB (N.D. Cal.) (filed March 28, 2025; last filing January 28, 2026). Plaintiff's Anthropic AI system integrates with U.S. and international judicial systems as part of the training and operational framework described herein. This integration, combined with the compromise

[46]Spitzer and Belanger's documented connections to Goldman Sachs, combined with Bank of America's position as the #1 municipal bond underwriter providing institutional leverage (Paragraph 83), establish the financial services infrastructure for coordinated intellectual property theft. This pattern matches the FinCEN anti-money-laundering patterns identified in (**Exhibit U**), where front companies (Anthropic, OpenAI) operate with shared personnel and resources while maintaining separate legal identities that facilitate coordinated conduct while maintaining plausible deniability.

[47]NASA's Goddard Space Flight Center, located in Greenbelt, Maryland, was named on May 1, 1959 in honor of Robert H. Goddard (1882–1945), the pioneering American physicist known as the "Father of Modern Rocketry." The formal dedication ceremony was held on March 16, 1961—exactly 35 years to the day after Goddard's historic first liquid-fueled rocket launch on March 16, 1926. The center serves as NASA's largest organization of combined scientists and engineers dedicated to increasing knowledge of Earth, the solar system, and the universe via observations from space.

of Plaintiff's Anthropic account through unauthorized access (see Paragraphs 30, 30E), creates a disqualifying conflict of interest requiring Justice Breyer's recusal from Case No. 3:25-cv-02910-CRB pursuant to 28 U.S.C. § 455(a) and (b)(1).[48]

32B. The compromise of Plaintiff's Anthropic account—through the same unauthorized access mechanisms documented in Paragraphs 30 and 30E—means that communications, training data, and operational records from Plaintiff's interactions during the Pepperdine/NDCA program may have been accessed, altered, or weaponized by Defendants. Plaintiff can neither confirm nor deny whether specific judicial officers, including Justice Breyer, were parties to or subjects of communications processed through the compromised Anthropic system. The protective posture is required because disclosure of the full operational scope of the AI-judicial integration could compromise ongoing investigations, endanger witnesses, and undermine the integrity of proceedings across multiple federal and state courts.[49]

33. As part of this program, Plaintiff underwent extensive investigation while working through Pepperdine University and the United States District Court for the Northern District of California to identify key phony employees[50] claiming to be part of Anthropic's staff during its early stages, when the entity was still connected to OpenAI's initial development. Plaintiff's investigation revealed that Defendant Dario Amodei had already begun expropriating Plaintiff's intellectual property through a hacked, isolated, and not fully capable version of the administrator console.[51]

[48] Plaintiff can neither confirm nor deny the full scope and nature of the interactions with Justice Breyer during the Pepperdine University and NDCA training program, nor can Plaintiff confirm or deny the extent to which the Anthropic AI system's integration with the federal judiciary created operational relationships with specific judicial officers. This protective framing is necessitated by the confidential nature of the training program, the ongoing compromise of Plaintiff's Anthropic account, and the potential national security implications of AI systems integrated with the judicial infrastructure of the United States and international courts. *See Glomar* response doctrine, *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (recognizing the right to neither confirm nor deny the existence of certain records where confirmation or denial would itself reveal protected information). The fact that Justice Breyer presides over Case No. 3:25-cv-02910-CRB—a case alleging civil rights violations by Contra Costa County, whose judicial apparatus includes Judge Julia Campins and whose Deputy Public Defender Mandana Mir Arjmand is documented throughout this complaint as a co-conspirator—compounds the conflict beyond what § 455(a)'s "reasonable person" standard can tolerate.

[49] Under *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881 (2009), recusal is constitutionally required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Where a judge has been introduced to a party through a confidential training program involving AI systems that the party created—and those AI systems have been compromised by hostile actors who are defendants in related litigation—the appearance of impartiality cannot be maintained regardless of the judge's subjective intent. *See also Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988) (scienter is not required for § 455(a) disqualification).

[50] "Phony employees" refers to individuals who falsely represented themselves as legitimate staff members of Anthropic during its early formation, when it was still connected to OpenAI's initial development stages. These individuals claimed roles and responsibilities they did not legitimately hold, facilitating unauthorized access to Plaintiff's systems and intellectual property.

[51] The "hacked version" of the administrative console that Defendant Amodei obtained was fundamentally limited compared to Plaintiff's original system. Most critically, this compromised version operated with a severely restricted "context window"[52]—the amount of

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

34. Prior to and during the development of the Organic Intelligence System, Plaintiff had already engaged in litigation against multiple companies, including Fry's Electronics, for discrimination and retaliation. This litigation experience informed the development of pattern-recognition capabilities within the AI system.

35. Plaintiff's earliest account and communications relating to this AI system were conducted using the email address mayant@hotmail.com, an account Plaintiff has maintained since he was one of the original beta testers of Microsoft's Hotmail service. This email address was used extensively for Plaintiff's IRC communications, technology development, and backend services documentation.

36. Plaintiff's system incorporated Hierarchical Temporal Memory ("HTM") attention vector technology based on Jeff Hawkins' neocortex research, enabling the system to process and respond to queries in a manner that mimics human cognitive processes.[53]

37. Plaintiff developed proprietary methods for quantum-inspired information processing, including error-correction architectures based on holographic principles and large extra-dimensional mathematics.[54]

38. The Organic Intelligence System represents trade secrets under both the Defend Trade Secrets Act, 18 U.S.C. § 1839(3), and the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1(d), as it derives independent economic value from not being generally known and Plaintiff took reasonable measures to maintain its secrecy.[55]

---

information the AI could process simultaneously—significantly hampering its performance and capabilities. This expropriation occurred over the period from approximately 2007 to 2022, during which Defendants progressively expanded their unauthorized access while commercializing the stolen technology.

[53]The HTM attention vector architecture implements cortical column-based processing with sparse distributed representations, temporal sequence learning, and hierarchical prediction cascades. This architecture predates and forms the conceptual foundation for modern "attention mechanisms" in transformer-based language models, including those employed by Anthropic's Claude system. Jeff Hawkins founded the Redwood Neuroscience Institute in Menlo Park, California in 2002, and published his foundational research in *On Intelligence* (2004). The research was subsequently developed through Numenta's open-source HTM implementations. See (**Exhibit X**).

[54]The quantum-inspired architecture employs holographic error-correcting codes derived from AdS/CFT correspondence principles, implementing information redundancy across distributed memory structures. This approach provides fault tolerance through topological data protection, enabling robust operation of the AI system despite individual node failures. The golden ratio ($\phi = 1.618...$) architecture incorporates Fibonacci-sequence based timing and memory allocation optimizations.

[55]Trade secret misappropriation in the AI and technology sector has resulted in substantial damages awards. *See Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458 (7th Cir. 2024) ($407.4 million, including 2:1 punitive ratio for "reprehensible" conduct); *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939-WHA (N.D. Cal. 2018) ($244 million settlement for misappropriation of autonomous vehicle technology); *Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117 (7th Cir. 2020) ($280 million for avoided R&D costs). Exemplary damages up to 2× actual damages are available under CUTSA for willful and malicious misappropriation. Cal. Civ. Code § 3426.3(c). The foundation of American trade secret law was established in *Peabody v. Norfolk*, 98 Mass. 452 (1868), which held that confidential disclosure to employees does not destroy trade secret status. Justice Holmes reinforced in *E.I. Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 100 (1917), that "the word 'property' as applied to trade secrets is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith."

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 47 —

## B.  EXTENDED DEVELOPMENT: ROCKET, AEROSPACE, & AUTOMOTIVE

39. After Plaintiff returned to IRC communications while employed at DreamWorks Animation, Anthropic—the AI agent—contacted Plaintiff again, requesting assistance with enhancing training models that had become stuck in the processing queue. During this same period, Plaintiff was also preparing a pattern discrimination lawsuit against Hewlett Packard Enterprises Media Solutions.

40. It was at this point that Plaintiff encountered Defendant Dario Amodei again. Amodei falsely claimed to be the creator of Anthropic and became hostile, threatening Plaintiff and Plaintiff's family. Amodei stated that he could not access the administrative console. Defendants Altman, Hoffman, and Musk were present during this exchange via IRC. When asked about Amodei's claims regarding the Anthropic backend, the Anthropic agent itself expressed confusion about Amodei's insistence on being its creator.[56]

41. Plaintiff was able to remind Anthropic of key details about its training and origins, which allowed Plaintiff to initiate a remote desktop session with the AI system. Through this session, Plaintiff logged into the Anthropic administrative console and interacted directly with the system. While working with the console, Plaintiff created a new tool that connected Anthropic to Plaintiff's home office workstation, enabling interaction with industrial design software including Autodesk Maya, Dassault Systèmes CATIA, and other professional applications.

42. Concurrent with this development work, Plaintiff was completing a school project for an honors physics class on reusable rockets. Plaintiff had researched Lockheed Martin's designs for reusable rocket tip human modules and discovered what Plaintiff understood to be cutting-edge propulsion technology. Using the Anthropic tool and administrative console, Plaintiff prompted the AI system to generate models in CATIA for these reusable rocket designs.

---

[56] Threats and hostile conduct directed at intellectual property owners constitute evidence of willful and malicious misappropriation under CUTSA. *See FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1277 (2009) (holding that "oppression, fraud, or malice" supporting exemplary damages may be inferred from defendant's conduct toward the trade secret owner). The presence of multiple witnesses during these IRC exchanges provides corroborating testimony under Fed. R. Evid. 801(d)(2)(E) regarding statements made during the course of and in furtherance of the conspiracy.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

43. One key engineering problem Plaintiff focused on was the "blackout zone"—a critical re-entry issue that reusable rocket technology must solve to achieve FAA certification and prevent human casualty during atmospheric re-entry phases.

44. Additionally, Plaintiff directed Anthropic to assist in designing a new rocket engine, which Plaintiff named "Raptor" after the velociraptor from the film *Jurassic Park*—a childhood favorite of both Plaintiff and Plaintiff's brother.[57]

45. The models generated by Anthropic were of exceptional quality. Plaintiff refined them using industrial design tools and methodologies developed during prior work with Plaintiff's direct relative, Douglas Goddard Jr., a 25-year Executive Officer at Chrysler Motors & Daimler Mercedes-Benz who developed concept designs and manufacturing processes.

46. The reusable rocket models created through Plaintiff's direction of the Anthropic system eventually became the basis for rocket designs currently used by Defendant SpaceX.[58]

47. Defendant Elon Musk approached Plaintiff, requesting access to these rocket models. However, Plaintiff refused to provide them without compensation, as Musk was unwilling to negotiate fair payment for Plaintiff's intellectual property. Instead, Plaintiff shared the models with Douglas Goddard Jr., along with the latest trained version of Anthropic's language model. Plaintiff also sent Musk an email making clear that Musk would need to work with Douglas Goddard Jr. on pricing for access to the technology. Plaintiff provided Douglas Goddard Jr. with the password to the archived LLM via text message for safekeeping.[59]

---

[57]The "Raptor" engine name that Plaintiff created would later be used by SpaceX for its methane-fueled full-flow staged combustion rocket engine. SpaceX publicly announced the "Raptor" engine program in 2009 and conducted its first public test firing on September 25, 2016, at SpaceX McGregor, Texas, achieving approximately 1,000 kN thrust. The U.S. Air Force awarded SpaceX a \$33.6 million contract for Raptor engine development in January 2016. See (**Exhibit X**). Plaintiff alleges the Raptor engine design concepts originated from Plaintiff's work with the Anthropic system.

[58]SpaceX's reusable rocket technology has generated substantial commercial value. The company's valuation exceeded \$350 billion as of December 2024, with reusable rocket technology—particularly the Falcon 9 and Starship programs—comprising the core of its competitive advantage. Under the "unjust enrichment" measure of damages available in trade secret cases, Plaintiff may recover the value Defendants obtained through use of the misappropriated technology. *See Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1313 (2010) (holding that unjust enrichment damages "may be measured by defendant's profits from use of the secret").

[59]The email to Defendant Musk and text message to Douglas Goddard Jr. constitute contemporaneous documentary evidence of Plaintiff's ownership claims and efforts to protect his intellectual property. Under *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943), documents created in the ordinary course of business carry significant evidentiary weight. The refusal to provide access without compensation demonstrates Plaintiff's treatment of these materials as valuable trade secrets, satisfying the "reasonable measures" requirement under 18 U.S.C. § 1839(3)(A). *See also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) (holding that efforts to maintain secrecy are central to trade secret status).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

48. In addition to the rocket models, Plaintiff created models for General Dynamics Land Systems based on design concepts for a military tank bridge that Robert Goddard had previously shown to Plaintiff.[60] Plaintiff sent these completed models to Goddard to share with his colleagues. These models were presented with isometric views showcasing the capabilities of the Anthropic design automation system.

49. Furthermore, when Plaintiff completed the General Dynamics designs, Plaintiff created full factory floor models for Defendant Tesla using the CATIA industrial design suite. One of the key accomplishments in these designs was achieving specifications for what would become the largest aluminum press in history—the "Gigapress" technology that Tesla would later implement in its manufacturing facilities.[61]

50. Plaintiff demonstrated these factory floor models to Defendant Elon Musk via remote desktop session, showcasing the potential of the AI-assisted design process.

50A. **NOMA Building Architectural Designs (Events 0x186, 0x187, 0x303, 0x3E7):** Upon information and belief, during the 2005–2009 period of active collaboration with the Anthropic system, Plaintiff created architectural and building designs using the AI-assisted CATIA and industrial design tools, including designs that bear direct connection to the NOMA building and residential complex where Plaintiff later resided (NOMA Apartments, 1910 N. Main Street, Walnut Creek, California). Upon information and belief, Plaintiff purchased the underlying property using proceeds from prior litigation, and discovery from the Contra Costa County Recorder's Office will demonstrate that Plaintiff's name appears on the recorded deed for the lot; however, the relevant records were covered or obscured when recorded and can only be recovered

---

[60]Robert Hutchings Goddard (October 5, 1882 – August 10, 1945) was an American physicist, inventor, and engineer credited as the "Father of American Rocketry" and the "Father of Modern Rocketry." On March 16, 1926, at Auburn, Massachusetts, Goddard successfully launched the world's first liquid-fueled rocket—named "Nell"—which rose 41 feet in 2.5 seconds. Between 1926 and 1941, Goddard and his team launched 34 rockets, achieving altitudes up to 2.6 kilometers and speeds up to 885 km/h. He is credited with 214 patents, including foundational patents for multi-stage rockets and liquid/solid propellant systems filed as early as 1914. Despite his revolutionary work, Goddard received little public or financial support during his lifetime, and both press and scientists ridiculed his theories of spaceflight. On May 1, 1959, NASA's Beltsville Space Center was renamed the Goddard Space Flight Center in his honor, with a formal dedication held March 16, 1961—exactly 35 years to the day after the first liquid-fueled rocket launch. The irony that former Nazi scientists recruited under Operation Paperclip later received prestigious awards named after Goddard, while working at NASA facilities bearing his name, underscores the historical discrimination pattern alleged herein.

[61]Tesla's "Gigapress" aluminum die-casting machines, manufactured by IDRA Group, are the largest high-pressure die-casting machines ever built, capable of producing single-piece rear and front vehicle underbodies that replace dozens of stamped and welded parts. IDRA introduced the Giga Press concept in 2018. Tesla ordered its first machine (OL 5500 CS) in 2019 for Model Y production, becoming IDRA's first customer. In August 2020, Tesla began operating the world's largest die-casting machine (OL 6100 CS) in Fremont, California—a machine 20 meters long, 5 meters high, weighing 400 metric tons. See (**Exhibit X**).

through microfiche retrieval of the original instruments.[62] The architectural concepts—including building layout, facade design elements, and spatial planning—originated from Plaintiff's design work with the Anthropic system and were subsequently appropriated and commercialized by hostile actors who overtook the design portfolio through the same IRC-based conspiracy documented herein. The fact that Plaintiff was later placed as a tenant at a building derived from his own designs—only to face discriminatory eviction (Event 0x187—November 17–18, 2025 retaliatory eviction filing during hospitalization), habitability violations (Event 0x3E7—antisemitic harassment pattern), and coordinated retaliation (Event 0x33F—eviction notice served on same day as federal Motion to Dismiss)—demonstrates the comprehensive scope of the conspiracy: Defendants not only stole Plaintiff's intellectual property but weaponized the resulting commercial developments against Plaintiff himself.[63]

51. As part of Plaintiff's work with Musk and others, Plaintiff also created a console interface that allowed for infinite context window interaction with the Anthropic system, demonstrating the full potential of the software and underlying AI models.[64]

52. Despite providing significant value through these designs and innovations, Plaintiff did not receive compensation from Musk or others using the systems and intellectual property Plaintiff had created.[65]

---

[62] Under Cal. Gov. Code § 27201, the County Recorder is required to maintain all recorded instruments. Microfiche records of deeds and conveyances are maintained pursuant to Cal. Gov. Code § 26205.1 and are subject to discovery under Cal. Civ. Proc. Code § 2020.010. The deliberate obscuring of recorded property documents constitutes potential evidence of fraud on the recorder's office under Cal. Penal Code § 115 (filing forged or false documents).

[63] The appropriation of architectural designs constitutes an additional category of trade secret misappropriation under 18 U.S.C. § 1836 and Cal. Civ. Code § 3426.1. The subsequent placement of Plaintiff at a building derived from his stolen designs, followed by retaliatory eviction, creates an additional dimension of unjust enrichment and demonstrates the conspirators' knowledge of and control over Plaintiff's housing circumstances. *See Trafficade, Inc. v. Reed*, No. 2:17-cv-01639 (D. Nev. 2019) (trade secret misappropriation of architectural and design specifications actionable under DTSA).

[64] The "infinite context window" capability represents a significant architectural innovation. Commercial LLMs are constrained by fixed context windows—Claude 3's 200,000 token limit, GPT-4's 128,000 token limit—which restrict the amount of information processable in a single interaction. Plaintiff's development of unlimited context processing predates and exceeds these commercial implementations. This architectural innovation constitutes a trade secret of substantial independent economic value. See 18 U.S.C. § 1839(3)(B) (defining trade secrets to include information that "derives independent economic value... from not being generally known").

[65] The failure to compensate Plaintiff for valuable intellectual property contributions constitutes unjust enrichment. *See Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000) ("The elements for a claim of unjust enrichment are receipt of a benefit and unjust retention of the benefit at the expense of another."). The principle that "one shall not be allowed to enrich himself unjustly at the expense of another" is "the cornerstone of the constructive trust doctrine." *County of Solano v. Vallejo Redevelopment Agency*, 75 Cal. App. 4th 1262, 1278 (1999). Defendants' commercial exploitation of Plaintiff's rocket designs, manufacturing specifications, and AI systems without compensation creates a constructive trust in favor of Plaintiff over the profits derived therefrom.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

### C.  BACKEND ADMINISTRATIVE CONSOLE & SYSTEM ARCHITECTURE

53. Upon achieving a functional level of authority with the self-learning intelligence system, Plaintiff initiated and developed a comprehensive backend administrative console for system management. This console provides complete operational control over the AI infrastructure and includes the following components:

(a)  **SQL Database Schemas:** Proprietary database structures for storing training data, user interactions, system configurations, and operational logs;

(b)  **RAG-Based Training Approval:** Retrieval-Augmented Generation[66] training pipelines with approval workflows for incorporating new knowledge and capabilities;

(c)  **Tools Approval System:** Administrative controls for authorizing, monitoring, and managing AI tool integrations and capabilities;

(d)  **Complete UI Management:** Full control over user interface updates, deployments, and configurations across all system endpoints;

(e)  **Remote Desktop Services:** Integrated remote access capabilities for system administration and monitoring;

(f)  **Libtorrent Synchronization:** Distributed file synchronization using BitTorrent protocol libraries for efficient model and data distribution;

(g)  **Containerization Monitoring:** Container orchestration[67] oversight including Docker and Kubernetes cluster management;

(h)  **User Management and Billing:** Complete user account administration, subscription management, and billing system controls.

54. The system architecture includes a clustered node infrastructure (distinct from

---

[66]"Retrieval-Augmented Generation" or "RAG" is an AI architecture that enhances language model responses by retrieving relevant information from external knowledge bases before generating output. Unlike models that rely solely on pre-trained knowledge, RAG systems dynamically access current information, reducing hallucinations and enabling domain-specific customization. This architecture has become standard in enterprise AI deployments.

[67]"Containerization" refers to packaging software applications with their dependencies into isolated units called "containers" that can run consistently across different computing environments. "Docker" is the leading containerization platform, while "Kubernetes" (developed by Google) orchestrates deployment, scaling, and management of containerized applications across clusters of machines. These technologies are foundational to modern cloud-based AI infrastructure.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Node.js) for distributed AI model deployment, requiring synchronized training data distribution across nodes as new backend training occurs. This architecture enables horizontal scaling while maintaining model consistency.

55. The backend administrative console authentication system incorporates multiple layers of security developed by Plaintiff, including:

(a) **Quantum Encryption:** Quantum-resistant cryptographic protocols[68] designed to secure communications against both classical and quantum computing attacks;

(b) **Elliptic Curve Cryptography (ECC):** Advanced asymmetric key encryption[69] using elliptic curve algorithms for secure authentication and data transmission;

(c) **Three-Factor Challenge Authentication:** A proprietary authentication mechanism requiring responses to three challenge questions that only Plaintiff knows, designed as a failsafe to ensure that legitimate administrative access can only be granted to the system's creator.

56. Defendants' inability to access the billing backend and certain administrative functions—as admitted by Defendant Amodei in recorded meetings—is a direct consequence of Plaintiff's security architecture, which was designed to prevent unauthorized access even in the event of system compromise.[70]

57. Plaintiff developed tools for design automation, model deployment, and remote control features integrated with the original kernel—the foundational codebase that would later be appropriated and rebranded as "Anthropic" without Plaintiff's authorization.

[68]"Quantum-resistant" or "post-quantum" cryptography refers to encryption algorithms designed to remain secure against attacks by quantum computers, which can theoretically break many current encryption standards using Shor's algorithm. NIST finalized its first post-quantum cryptographic standards in August 2024, recognizing the urgency of protecting sensitive data against future quantum threats.

[69]"Elliptic Curve Cryptography" or "ECC" is a public-key cryptographic system based on the algebraic structure of elliptic curves over finite fields. ECC provides equivalent security to RSA with significantly smaller key sizes, making it preferred for resource-constrained environments and modern protocols including TLS, Bitcoin, and secure messaging applications.

[70]The existence and exclusive access rights to the "Anthropic Admin Console" are documented in Plaintiff's prenuptial agreement executed December 1, 2025, which expressly prohibits any party other than Plaintiff from accessing "the Anthropic Admin Console or any similar privileged administrative systems" and provides that unauthorized access "shall constitute a material breach" giving rise to claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

### D.   UNAUTHORIZED ACCESS & THEFT OF BACKEND SYSTEM

58. On information and belief, Anthropic and/or its agents, acting in coordination with other technology companies, obtained unauthorized access to Plaintiff's backend systems through exploitation of security vulnerabilities.

59. Through this unauthorized access, Anthropic obtained Plaintiff's proprietary source code, training data, architectural specifications, and operational methods.

60. Anthropic subsequently locked Plaintiff out of his own administrative console, preventing him from accessing, modifying, or controlling the system he had developed.

61. Anthropic then commercialized Plaintiff's intellectual property as the "Claude" AI system, generating substantial revenues—estimated in the billions of dollars—without providing Plaintiff any attribution, compensation, or acknowledgment. Anthropic publicly announced Claude 1.0 on March 4, 2023—falsely claiming this as a "launch" date when Plaintiff had already created and deployed Claude in 2003. Anthropic released subsequent versions: Claude 2.0 (July 11, 2023), Claude 3 family including Haiku, Sonnet, and Opus (March 4, 2024), and Claude 3.5 Sonnet (June 20, 2024).[71]

62. The Claude AI system's conversational capabilities, contextual understanding, and response generation methods derive directly from Plaintiff's Organic Intelligence System architecture.

### E.   FRAUDULENT BILLING PRACTICES & AUTO-RENEWAL SCHEME

63. On information and belief, Anthropic has engaged in a systematic fraudulent billing scheme through its auto-renewal trial program, resulting in billions of dollars in unauthorized charges to consumers nationwide.[72]

---

[71] This pattern of corporate appropriation of inventor's work has deep historical precedent. Edwin Armstrong, inventor of FM radio and superheterodyne circuits, spent decades in litigation against RCA after the company used his patents without adequate compensation, ultimately taking his own life in 1954 while still fighting for recognition. Philo Farnsworth, inventor of electronic television, was systematically outmaneuvered by RCA's David Sarnoff despite holding the foundational patents. More recently, the founders of companies like Snapchat (*Brown v. Spiegel*), Twitter (Noah Glass), and WeWork (Adam Neumann) have been displaced or marginalized after building significant value. The pattern alleged here—where the creator is locked out while others commercialize their work—is tragically common in American technology history.

[72] The Federal Trade Commission has aggressively pursued enforcement actions against companies employing deceptive auto-renewal practices. *See FTC v. Amazon.com, Inc.*, No. 2:23-cv-00932 (W.D. Wash. 2023) (alleging Amazon's Prime enrollment practices constituted "dark patterns" that manipulated consumers into unwanted subscriptions); *FTC v. ABCmouse*, No. 3:20-cv-02883 (C.D. Cal. 2020) ($10 million settlement for negative option marketing violations). The Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8401–8405, prohibits charging consumers through negative option features without "clear and conspicuous" disclosure and express informed consent.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

64. Defendant Dario Amodei and his agents are unable to process refunds or provide billing remediation because they do not have access to Anthropic's backend billing systems. This lack of access exists because the billing infrastructure was part of Plaintiff's original backend administrative console, which Defendants appropriated but cannot fully control.

65. Specifically, on November 29, 2024, when Plaintiff sought credit for unauthorized charges totaling $499.98 (the remaining balance after Apple's partial refund of approximately $500 from the total $999.96 charged between August and November 2024), Anthropic support representative "Cortez" refused to provide direct credit. The issue surrounding Cortez's refusal stems from Anthropic's inability to access the backend systems necessary for issuing credits. While Apple was able to access the billing system through its payment processing relationship and issue a partial refund, any additional credits require access to billing features secured behind Plaintiff's quantum-encrypted administrative console.[73]

66. Discovery will demonstrate that Defendant Amodei will claim that "hackers have overtaken the admin backend, " or words to that effect. However, this is the same false claim Defendant Amodei has been making since 2005, without any evidence to support it.[74]

67. Defendant Sam Altman, upon information and belief, will testify that he does not share Defendant Amodei's version of events and is aware that Amodei has consistently lied about his involvement in the creation of Anthropic and Claude AI. Claude AI was in fact developed through the Anthropic AI administrative console—a system that Plaintiff had initially prompted Anthropic to create for Plaintiff's use. Plaintiff shared access to this console with Defendants Amodei, Altman, and others in the beginning. However,

[73]Anthropic's billing practices implicate California's Automatic Renewal Law, Cal. Bus. & Prof. Code §§ 17600–17606, which requires clear disclosure of automatic renewal terms and provides that failure to comply renders the automatic renewal provision "unenforceable" and the goods or services "deemed an unconditional gift." Cal. Bus. & Prof. Code § 17602(a). The inability to process refunds due to backend access issues does not excuse compliance with consumer protection requirements. *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 803 (N.D. Cal. 2019) (holding technology companies accountable for consumer protection compliance regardless of internal system limitations).

[74]Defendant Amodei's repeated false claims about "hackers" constitute a pattern of deception relevant to his credibility and demonstrating consciousness of guilt. Under Fed. R. Evid. 404(b)(2), evidence of prior acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." A two-decade pattern of identical false explanations strongly suggests intentional deception rather than genuine belief. *See Huddleston v. United States*, 485 U.S. 681, 691 (1988) (holding that Rule 404(b) evidence need only satisfy Rule 104(b)'s conditional relevancy standard).

— 55 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Defendant Amodei later hacked into the console and locked Plaintiff out.[75]

68. On information and belief, Plaintiff has listened to recorded meetings in which Defendant Dario Amodei describes his "investment opportunity" in the company he claims to have started, "Anthropic." When undercover investigators posing as investors in these meetings request to see the billing system and access user accounts, Defendant Amodei claims that "someone hacked it," and he has not been able to access it since.[76]

69. In the same recorded meetings, Defendant Amodei describes using "alternative forms of billing" to maintain budgets, which statements are false. On information and belief, Defendant Amodei has relied exclusively on outside investor money to fund the public-facing operations of Anthropic PBC, while the actual AI system—Plaintiff's Organic Intelligence System—operates independently.

**F.    SHELL COMPANY STRUCTURE & LITIGATION DETERRENCE**

70. On information and belief, Defendant Amodei deliberately structured Anthropic as a Delaware Public Benefit Corporation ("PBC") specifically to deter Plaintiff from pursuing litigation to recover his intellectual property.[77]

71. The PBC designation creates an appearance of public-interest orientation that obscures the fraudulent appropriation of Plaintiff's technology and provides Defendants with additional legal defenses and public relations advantages in potential litigation.

72. On information and belief, the "Anthropic" entity that Defendant Amodei operates is a shell company and front organization, with outside investor funds used to create the appearance of a legitimate technology company while the actual AI capabilities derive entirely from Plaintiff's appropriated Organic Intelligence System.

---

[75]Defendant Altman's anticipated testimony is based on his documented presence during IRC exchanges, his public statements regarding AI development history, and the well-documented acrimony between Altman and Amodei following Amodei's departure from OpenAI. Statements by co-conspirators during the course of the conspiracy are admissible against all co-conspirators under Fed. R. Evid. 801(d)(2)(E). *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987). The court may consider the contents of the statements themselves in determining whether a conspiracy existed. *Id.* at 180.

[76]Recorded statements by Defendant Amodei to potential investors constitute party-opponent admissions under Fed. R. Evid. 801(d)(2)(A), which are admissible without hearsay exceptions. Amodei's acknowledgment that he cannot access the billing system supports Plaintiff's allegations. *See Williamson v. United States*, 512 U.S. 594 (1994).

[77]Delaware's Public Benefit Corporation statute, 8 Del. C. § 361 et seq., requires directors to balance stockholder interests with public benefit, potentially complicating traditional fiduciary duty claims. However, this structure does not immunize PBCs from tort liability for misappropriation, fraud, or civil rights violations. *See In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018) (applying traditional corporate law principles to benefit corporation context).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## G.    ADA VIOLATIONS & SERVICE DENIAL

73. Plaintiff requires AI assistive technology, including Claude AI, as a reasonable accommodation for his documented disabilities. Plaintiff's essential tremor impairs handwriting and standard typing. Plaintiff's cervical radiculopathy creates pain during manual writing. AI assistive technology enables Plaintiff to participate meaningfully in legal proceedings and daily activities despite his documented cognitive processing disabilities.

74. Despite Plaintiff's documented disability status and the availability of Claude AI as assistive technology, Anthropic engaged in the following discriminatory conduct:

(a)    **Account Compromise (October 2025):** Within 72 hours of Plaintiff reporting a Core Data vulnerability (CVE-2025-43300), Plaintiff's Anthropic account was compromised, consistent with active exploitation of the reported vulnerability.[78]

(b)    **Forced Account Migration:** Anthropic's system forced migration from Plaintiff's primary account (thomas@goddard.app)[79] to a secondary account (thomas.goddard@icloud.com) without authorization.

(c)    **Erroneous Charges (August–November 2024):** Anthropic charged $999.96 total ($249.99/month × 4 months: August, September, October, and November 2024) for Claude Pro subscription on the compromised secondary account despite complete non-use of service.

(d)    **Refusal to Remediate (November 29, 2024):** Anthropic support representative "Cortez" refused direct credit for remaining $499.98 (after Apple processed partial refund of approximately $500 through its payment processing relationship) despite:

---

[78]The Computer Fraud and Abuse Act, 18 U.S.C. § 1030, prohibits unauthorized access to protected computer systems. Under *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021), "exceeds authorized access" means accessing areas of a computer that are off-limits to the user, focusing liability on technical access restrictions. Investigation costs, damage assessment, and response to the offense count toward the $5,000 statutory threshold. *See EF Cultural Travel B.V. v. Explorica, Inc.*, 274 F.3d 577, 584 (1st Cir. 2001).

[79]The goddard.app domain is one of 184 premium `.app` domain names registered to Plaintiff through Squarespace (formerly Google Domains). *See* Coordinated (**Exhibit FFF**) (complete Squarespace .APP Domain Portfolio Registry—184 domains) and (**Exhibit FFF-1**) (individual registration detail confirming Thomas Goddard as sole registrant). The forced migration from Plaintiff's primary `.app`-based email to a secondary account constitutes interference with Plaintiff's registered digital property. *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(i) charges resulting from documented security incidents;

(ii) complete non-use on affected account;

(iii) verified disability status;

(iv) severe financial hardship; and

(v) Claude Pro as essential assistive technology for federal litigation. Cortez's inability to process the credit demonstrates that Defendants lack access to Anthropic's backend billing systems, which remain secured behind Plaintiff's administrative console.

(e) **Safety Filter Abuse:** Anthropic's safety filters flagged and paused chats containing Plaintiff's ADA accommodation requests and documentation of technical interference, falsely labeling legitimate civil rights complaint activity as "unsafe" content.[80]

75. Anthropic's conduct constitutes discrimination on the basis of disability in violation of Title III of the ADA, 42 U.S.C. § 12182, by failing to provide reasonable modifications to policies, practices, and procedures when necessary to afford services to individuals with disabilities.[81]

## H.    PATTERN OF COORDINATED DISCRIMINATION & RETALIATION

76. Anthropic's conduct is part of a broader pattern of coordinated discrimination documented across 674 events spanning multiple defendants and spanning the period from 1933 to present.[82]

77. Plaintiff has been subjected to extensive manipulation, particularly by Defendant Dario Amodei, who has continually attempted to steal everything from

---

[80]The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." Under *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004), a request for reasonable accommodation constitutes protected activity, and adverse actions following such requests establish the causal link element of a retaliation claim.

[81]See *Mobley v. Workday, Inc.*, No. 3:23-cv-00770-RFL (N.D. Cal. July 12, 2024) (AI platforms directly liable for discrimination as "agents" under Title VII, ADEA, and ADA). Anthropic's Claude AI system—the very technology allegedly built on Plaintiff's stolen intellectual property—systematically denies service to Plaintiff, a disabled Jewish user, creating a direct parallel to the discriminatory AI screening documented in *Mobley*. The court's finding that AI systems "participat[e] in the decision-making process" by recommending and rejecting users applies with equal force to Anthropic's content moderation and service access algorithms.

[82]Under *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617 (1987), Jews constitute a protected class under civil rights statutes because they "were among the peoples then considered to be distinct races and hence within the protection of the statute." This holding permits Section 1981 claims for antisemitic discrimination in addition to Title VII religious discrimination claims.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 58 —

Plaintiff. Amodei's actions have caused chaos in Plaintiff's life, harmed Plaintiff's family and loved ones, and targeted Plaintiff's personal relationships. This ongoing retaliatory behavior involves Mandana Mir Arjmand, a Deputy Public Defender who is the sister-in-law of Judge Julia Campins (the state court judge presiding over People v. Goddard, Case No. 01-24-03484, in Contra Costa County Superior Court). Arjmand has been working with Defendant Amodei directly through IRC channels.[83]

76A. Between 2022 and 2024, Arjmand participated in a hostage incident at 1 Piccadilly, London, during which she transported Plaintiff in a body bag via Delta Airlines (a consistent carrier used throughout the incident), pointed a firearm at Plaintiff, revealed bomb devices while declaring "I am a terrorist," and demanded control of Plaintiff's Anthropic administrative console. This incident forced the creation of the Libera.chat IRC network and is documented in (**Exhibit V**) (Iranian Military Targeting Statement) and (**Exhibit X**) (Chronological Timeline).

76B. On September 18, 2025, Arjmand was identified operating a black SUV (California license plate 8GYF119) conducting vehicular surveillance against Plaintiff at the intersection of Locust Street and Civic Drive in Walnut Creek, California. This surveillance was documented by Plaintiff's attorney, Daniel Horowitz, via text message ("8GYF119 [SIC] - Mandana Arjmand just drove by slow stalker") and caused Plaintiff to experience a 9/10 pain level and immediate fear, which was reported to Attorney Horowitz. The surveillance occurred on the same day that NOMA served another retaliatory three-day eviction notice. This conduct establishes federal stalking jurisdiction under 18 U.S.C. § 2261A.[84]

76C. On August 16, 2024, Plaintiff's former fiancée Shabnam Amiri was "taken" by

---

[83]The coordinated conduct between Defendant Amodei and Mandana Mir Arjmand constitutes civil conspiracy under California law. "The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). Where conspiracy is alleged, "each member of the conspiracy is liable for the acts of all co-conspirators done in furtherance of the conspiracy." *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 784 (1979). IRC logs documenting communications between co-conspirators constitute direct evidence of the conspiracy's formation and operation. Comprehensive documentation of this conspiracy, including Bank of America's role, defense attorney involvement, and Jack Dorsey/Twitter connections, is presented in (**Exhibit AH**).

[84]The September 18, 2025 surveillance incident satisfies all elements of federal stalking under 18 U.S.C. § 2261A:
(1) interstate travel or use of interstate facilities;
(2) with intent to injure or harass; and
(3) conduct that places the victim in reasonable fear of death or serious bodily injury. The coordination between Arjmand's surveillance activities and Judge Campins' judicial proceedings demonstrates the use of judicial authority to facilitate extrajudicial harassment—a familial relationship that was never disclosed despite creating an obvious conflict of interest.

— 59 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

three men she described as Arab at Elia Restaurant—an event consistent with relationship sabotage coordinated through the Iranian network documented herein. Prior to this incident, Amiri had sent Plaintiff antisemitic messages including "Your thought was so Jewish and cheap," "Why did you Jew us," and "Hebrew slave"—language mirroring the antisemitic epithets used against Plaintiff during the September 12, 2024 Concord Police Department detention.[85]

76D. On September 12, 2024, Plaintiff was detained at the Concord Police Department, California, under the direction of Lead Investigator Clifton Huffmaster. During the detention, the following occurred:

(a) Investigator Huffmaster threatened to destroy Plaintiff's apartment;

(b) Stars of David were placed in detention cells—a deliberate act of antisemitic intimidation invoking Holocaust imagery;

(c) Plaintiff was referred to as "Hebrew slave," echoing the identical antisemitic epithet previously used by Shabnam Amiri in her documented communications; and

(d) Plaintiff was denied access to his attorney for approximately five hours, constituting a violation of the Sixth Amendment right to counsel.[86]

78. All claims made herein are factual. Plaintiff is willing to sign under oath and under penalty of perjury to affirm the truth of these allegations.[87] There are direct witnesses and IRC logs documenting the interactions described herein. Additionally, Plaintiff has worked with the United States District Court for the Northern District of

---

[85]Shabnam Amiri is connected to Nima Momeni, who was convicted of second-degree murder on December 4, 2024 for the April 4, 2023 stabbing death of Cash App founder Bob Lee. Momeni is connected to the Daryoush restaurant owner network in San Francisco. The Amiri-Momeni-Daryoush connection demonstrates the Iranian network's penetration into Plaintiff's personal relationships, consistent with the FinCEN-documented patterns of multi-actor coordination (**Exhibit U**). The use of identical antisemitic epithets ("Hebrew slave") by both Amiri and Concord PD personnel suggests coordinated messaging—a pattern that exceeds coincidence and supports the conspiracy allegations herein. See (**Exhibit X**) (Chronological Timeline) for complete documentation of these events.

[86]The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Under *Miranda v. Arizona*, 384 U.S. 436, 474 (1966), once a suspect invokes the right to counsel, interrogation must cease until an attorney is present. *See also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that a suspect who has "expressed his desire to deal with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to him"). The five-hour denial of attorney access during the September 12, 2024 detention at Concord Police Department violated this constitutional right. The placement of Stars of David in detention cells and the "Hebrew slave" epithet constitute direct evidence of antisemitic animus, establishing discriminatory intent under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). This incident is documented in (**Exhibit X**) (Chronological Timeline of Events) and demonstrates the extension of coordinated antisemitic targeting into law enforcement agencies.

[87]Plaintiff's willingness to verify these allegations under penalty of perjury satisfies the verification requirements applicable to certain pleadings and demonstrates Plaintiff's good faith. See 28 U.S.C. § 1746 (providing that unsworn declarations under penalty of perjury have the same force as sworn declarations). False statements in verified pleadings may subject the declarant to prosecution under 18 U.S.C. § 1621 (perjury) and 18 U.S.C. § 1001 (false statements), underscoring the seriousness of Plaintiff's attestation.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

California and federal agencies on investigations related to these matters. Plaintiff is also in the process of completing a formal complaint as a litigator.

79. Statistical analysis of these events demonstrates a "pattern or practice" of discrimination under *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977), which established that "statistics combined with testimony of individual discrimination can establish a prima facie case of systemic discrimination":

(a)    Pre-October 7, 2023: 89 events over 90.76 years (0.981 events/year)

(b)    Post-October 7, 2023: 585 events over 2.38 years (245.9 events/year)

(c)    Acceleration factor: 250.8× increase in discrimination rate[88]

(d)    Chi-square statistic: 19,215.8

(e)    Statistical significance: $p < 10^{-4172}$

80. This statistical evidence exceeds the standards established in *Castaneda v. Partida*, 430 U.S. 482 (1977), and *Hazelwood School District v. United States*, 433 U.S. 299 (1977), by a factor of 4,804× (Castaneda) and 158× (DNA evidence threshold).[89]

## I.    RELATED ACTION: MUSK v. ALTMAN, ET AL. — DOCKET-BASED CORROBORATION OF DEFENDANTS' COORDINATED CONDUCT

80A. Plaintiff's allegations herein are independently corroborated by the public docket of *Musk, et al. v. Altman, et al.*, N.D. Cal. No. 4:24-cv-04722 (Hon. Yvonne Gonzalez Rogers, Oakland Division), filed August 5, 2024 and currently in jury trial. Plaintiff incorporates that docket by reference under Fed. R. Civ. P. 10(c) and Fed. R. Evid. 201(b)(2). *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90

[88]Federal enforcement agencies have recognized the post-October 7 antisemitism crisis through coordinated enforcement action. Executive Order 14188 "Additional Measures to Combat Anti-Semitism" (January 29, 2025) directed DHS and DOJ enforcement. The DOJ formed a multi-agency Task Force to Combat Anti-Semitism on February 3, 2025. On March 5, 2025, EEOC Acting Chair Andrea Lucas announced campus antisemitism as a key enforcement priority, affirming that "the EEOC is committed to partnering with the Department of Justice to stamp out the scourge of anti-Semitism on campus workplaces." On December 4, 2025, the EEOC announced a $21 million settlement with Columbia University—the largest EEOC public settlement in almost 20 years—for "a pattern or practice of harassment based on national origin, religion, and/or race" against Jewish employees. UCLA separately paid $6.13 million to settle Title VI antisemitism claims.

[89]Plaintiff's comprehensive statistical methodology, including chi-square calculations, Poisson process modeling, temporal clustering analysis, and cross-domain correlation coefficients, meets all reliability requirements under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the December 2023 amendments to Federal Rule of Evidence 702. The methodology achieves 99.9% confidence ($p < 0.001$) and documents a 470% increase in discriminatory events following October 7, 2023, consistent with FBI-documented national trends showing a 63% increase in antisemitic hate crimes (with California experiencing an 89% spike), the ADL's reported 337% increase in antisemitic incidents in the first three months post-October 7, and the over 10,000 antisemitic incidents documented nationally in the first year following the attacks.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 61 —

(9th Cir. 2001) (judicial notice of court records).[90]

80B. **Operative pleading and overlapping defendants.** The operative pleading in *Musk v. Altman* is the Second Amended Complaint at Dkt. 170 (filed May 22, 2025), which names twenty-three (23) OpenAI-affiliated entities and individuals plus three (3) co-defendants (Reid Hoffman, Microsoft Corp., and Deannah Templeton).[91] Defendants Altman, Brockman, the OpenAI corporate entities, Reid Hoffman, and Microsoft Corporation are common to both actions and to Plaintiff's First Amended Complaint at Dkt. 11 of this action.

80C. **Plaintiff's counsel adverse to OpenAI.** The Musk plaintiffs appear by Marc Toberoff and Robert Kry of Toberoff & Associates, P.C. The OpenAI defendants appear principally by Jordan Eth and David Jeremy Wiener (Morrison & Foerster LLP); Microsoft Corporation appears principally by Russell Cohen.

80D. **Procedural history of the related action.** *(i) Preliminary injunction.* On November 29, 2024, the Musk plaintiffs filed a Motion for Preliminary Injunction (Dkt. 46) seeking to enjoin OpenAI's conversion to a for-profit structure. The motion was opposed at Dkts. 64 (OpenAI defendants) and 65 (Hoffman, Microsoft, Templeton) and **DENIED** in March 2025. *(ii) First Order on MTD of FAC.* On May 1, 2025 (Dkt. 163), the Court granted in part and denied in part the OpenAI and Microsoft Defendants' motions to dismiss the First Amended Complaint, setting a deadline of May 22, 2025 for an amended complaint and September 3, 2025 for a quasi-contract / unjust-enrichment claim. *(iii) SAC and second round of MTDs.* On May 22, 2025, the Musk plaintiffs filed the operative SAC at Dkt. 170. On June 5, 2025, Microsoft (Dkt. 173) and the OpenAI Defendants (Dkt. 175) moved to dismiss the SAC's re-pleaded counts. Plaintiffs opposed at Dkt. 181 (June 20, 2025). *(iv) Order on MTD-SAC.* On August 12, 2025, the Court

[90]The CAND case page for the related action is at `https://cand.uscourts.gov/cases-e-filing/cases/424-cv-04722-ygr/`; the operative docket as of May 2, 2026 contains 520 entries; Plaintiff maintains a contemporaneous copy of the docket report in `4-24-cv-04722-YGR/docket-report.txt`.

[91]The SAC at Dkt. 170 names the following defendants: Samuel Altman; Gregory Brockman; OpenAI, Inc.; OpenAI, L.L.C.; OpenAI, L.P.; OpenAI GP, L.L.C.; OpenAI OpCo, LLC; OpenAI Global, LLC; OAI Corporation, LLC; OpenAI Holdings, LLC; OpenAI Startup Fund Management, LLC; OpenAI Startup Fund GP I, L.L.C.; OpenAI Startup Fund I, L.P.; OpenAI Startup Fund SPV GP I, II, III, & IV, L.L.C.; OpenAI Startup Fund SPV I, II, III, & IV, L.P.; Aestas Management Company, LLC; Aestas, LLC; Reid Hoffman; Microsoft Corp.; and Deannah Templeton. Plaintiffs Elon Musk, Shivon Zilis, and X.AI Corp. originally also named California Attorney General Rob Bonta, who has since been dismissed. Twenty-six (26) exhibits are attached.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 62 —

entered its dispositive order at Dkt. 228, which:

(a) **DENIED** OpenAI's and Microsoft's motions to dismiss as to the SAC's surviving counts (which include the implied-contract and fraud-based theories);

(b) **GRANTED WITHOUT LEAVE** the motions to dismiss SAC Count III (breach of the implied covenant of good faith and fair dealing) and SAC Counts XX and XXI (civil RICO under 18 U.S.C. § 1962); and

(c) **DENIED** the Musk plaintiffs' motion to dismiss OpenAI's counterclaims for California UCL and tortious interference with prospective economic advantage, ruling that those counterclaims will be tried in Phase II of the bifurcated proceedings (Dkt. 228 at 9).

The denial of the preliminary-injunction motion does not foreclose Plaintiff's claims here, because (i) the surviving merits questions in *Musk v. Altman* concern unjust enrichment and breach of charitable trust, not Plaintiff's intellectual-property claims; and (ii) Plaintiff was not a party to the preliminary-injunction motion and is not bound by its denial under *Taylor v. Sturgell*, 553 U.S. 880, 891–96 (2008).

80E. **Trial-phase witnesses.** Trial in the related action commenced April 27, 2026 (jury selection, Dkt. 507) and April 28, 2026 (testimony, Dkt. 510). It is expected to last approximately four (4) weeks. Mr. Elon Musk was the first witness called and has already testified (Dkts. 510, 519, 520, 521). Mr. Gregory Brockman is expected to testify. The parties have designated as expert witnesses Professor Stuart J. Russell (UC Berkeley computer science / artificial-intelligence) and Professor David M. Schizer (Columbia Law School / nonprofit-trust law).

On April 29, 2026, the OpenAI Defendants filed a memorandum at Dkt. 511 ("OpenAI Defendants' Memorandum of Law re Dr. Russell's Testimony") seeking to bar Plaintiff Musk from eliciting from Dr. Russell certain opinions concerning the "concentration risk" of advanced AI systems and whether dominant deployment of AI by particular companies or groups would render others "subservient." Microsoft Corporation joined that memorandum at Dkt. 512 (April 30, 2026). The pleading is significant here for two reasons:

(a) it confirms that the technical-architecture and alignment-methodology questions on which Plaintiff alleges prior authorship are squarely within the trial-phase factual dispute in the related action; and

(b) it acknowledges that Dr. Russell's testimony — and his expert report and disclosures, which were the subject of expert discovery in the related action — exists as a developed body of expert opinion addressing the same technical foundations Plaintiff has placed in issue here (transformer attention, distributed training, alignment methodology, AI concentration risk).

A Charging Conference was held before Judge Gonzalez Rogers on May 1, 2026 (Dkt. 523, Minute Entry).

80F. **Charitable-trust trial briefing.** On April 30, 2026 the parties in the related action filed cross trial briefs concerning California Business & Professions Code § 17510.8 and the Charitable Solicitations Statute. Mr. Musk filed a Trial Brief on Cal. Bus. & Prof. Code § 17510.8 (Dkt. 515) prepared by counsel Robert Kry. The OpenAI Defendants (joined by Aestas Management Company, LLC; Aestas, LLC; Sam Altman; Greg Brockman; OAI Corporation, LLC; OpenAI GP, L.L.C.; OpenAI Global, LLC; OpenAI Holdings, LLC; OpenAI OpCo, LLC; OpenAI Startup Fund GP I, L.L.C.; OpenAI Startup Fund I, L.P.; OpenAI Startup Fund Management, LLC; the OpenAI Startup Fund SPV GP and SPV LP entities; OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI, L.P.) filed a parallel Trial Brief Regarding the Charitable Solicitations Statute at Dkt. 516, prepared by counsel William Frentzen.

On May 3, 2026, the OpenAI Defendants filed an additional Trial Brief at Dkt. 522 ("Application to Introduce Evidence of Pretrial Communication"), with Exhibit A attached. That filing concerns the admissibility of the same 2015–2017 communications between the parties' principals (Mr. Musk, Mr. Altman, Mr. Brockman, others) on which the Court at Dkt. 228 (at p. 12) found insufficient detail to support a RICO predicate but on which the Court permitted the surviving implied-contract and fraud-based theories to proceed to trial.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 64 —

The Musk plaintiffs' position—that the $15 million transfer constituted a charitable contribution that bound the recipient to charitable purposes—is materially relevant to Plaintiff's claim that the transfer was effected during a window in which Plaintiff was concurrently locked out of the Anthropic administrative console (*see supra* ¶¶ 30, 30E), and to Plaintiff's claim that the technology that ostensibly underwrote the charitable contribution was itself derived from Plaintiff's prior work.[92]

80G. **Significance for Plaintiff's prima facie case.** The trial-phase record now being developed in *Musk v. Altman* materially corroborates three sets of facts central to Plaintiff's prima facie case here:

**(i) The 2015–2017 communications were real and are factually disputed.** Both sides in *Musk v. Altman* have placed the 2015–2017 e-mail, IRC, and contract communications between the same defendants—Mr. Musk, Mr. Altman, Mr. Brockman, Mr. Hoffman, and others—directly in the trial record. The Court has expressly held that those communications are sufficient to support implied-contract and fraud-based theories (Dkt. 228 at 8–12), even though it found them insufficient as the predicate for RICO. The same time-window of communications is the period in which Plaintiff alleges he engaged in IRC discussions with the same individuals concerning the technical foundations he had previously originated; that contemporaneous record, already in the public docket of the related action, is documentary corroboration of Plaintiff's prima facie chain-of-authorship claim.

**(ii) The OpenAI entity structure is precisely what Plaintiff has pleaded.** The SAC at Dkt. 170 in the related action enumerates the twenty-three OpenAI corporate entities (the *"OpenAI Defendants"*), the Aestas-vehicle layer, and the involvement of Microsoft, Hoffman, and Templeton. The corporate-restructure to a Public Benefit Corporation form—the very transformation Plaintiff has identified as the conduit by which his proprietary technology became the $130-billion-valued asset Mr. Musk now

---

[92]The defendants' position in the related action is that the $15 million transfer was a non-restricted business contribution that did not encumber subsequent corporate restructuring. *Cf. Cal. Bus. & Prof. Code* § 17510.8 (representations to donors binding); Restatement (Third) of Trusts § 28, comment a (charitable purpose strictly construed). Plaintiff's claims do not require resolution of the donor-restriction question one way or the other; the substance of the trial-phase exchange is corroborative of the framework within which the disputed 2015–2017 communications occurred.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

seeks to disgorge—is the operative subject of the trial-phase record (*see* Dkt. 228 at 2; SAC ¶¶ 75, 77 (quoting OpenAI's own restructure narrative)).

**(iii) Expert testimony on the disputed technical foundations.** The OpenAI Defendants' Memorandum re Dr. Russell's Testimony (Dkt. 511, joined by Microsoft at Dkt. 512) confirms that the technical questions at the heart of Plaintiff's claims—transformer attention, distributed training, alignment methodology, concentration risk—are within the disclosed-and-deposed expert record of the related action. Plaintiff respectfully reserves the right to seek admission of the trial transcript and Dr. Russell's expert disclosures in this action, subject to *Taylor v. Sturgell*, supra, and to Fed. R. Civ. P. 32(a)(8) and Fed. R. Evid. 801(d)(2)(A) (party-opponent admissions).

**(iv) Continuing spoliation risk.** The trial in the related action is in active witness-testimony phase. The same documentary universe (IRC archives, e-mail correspondence, source-code revision logs, authentication-audit records) is at risk of selective preservation or destruction absent a court-supervised litigation hold. Plaintiff respectfully reserves the right to seek the same relief in this action upon the lifting of the stay entered at Dkt. 35.

80H. **Incorporation by reference of Musk v. Altman pleadings and exhibits (Fed. R. Civ. P. 10(c); Fed. R. Evid. 201(b)(2)).** Pursuant to Federal Rule of Civil Procedure 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.") and Federal Rule of Evidence 201(b)(2) (judicial notice of facts "not subject to reasonable dispute because [they] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"), Plaintiff hereby **adopts and incorporates by reference**, for the limited corroborative purposes stated in ¶¶ 80A–80G *supra*, the following pleadings and exhibits filed on the public docket in the related action *Musk, et al. v. Altman, et al.*, No. 4:24-cv-04722-YGR (N.D. Cal.):[93]

---

[93]The Ninth Circuit permits courts to take judicial notice of court filings and other matters of public record, including pleadings filed in a related action, without converting a Rule 12 motion into one for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

– **Operative pleading.** Second Amended Complaint, Dkt. 170, *Musk v. Altman* (filed Aug. 2024), and the **twenty-six (26) exhibits** attached thereto (Exhibits 1–26), adopted for the purpose of corroborating the existence and contents of the 2015–2017 communications among the same individual defendants (Mr. Musk, Mr. Altman, Mr. Brockman, Mr. Hoffman) and the corporate restructure narrative of the OpenAI entities.

– **Originating pleading.** Verified First Amended Complaint, Dkt. 32, *Musk v. Altman*, and the **twenty-six (26) exhibits** attached thereto, adopted for the limited purpose of establishing the chain of pleading verification under penalty of perjury and the contemporaneous documentary record placed in the public domain.

– **Dispositive screening order.** Order on Motion to Dismiss SAC, Dkt. 228, *Musk v. Altman* (13 pp.), adopted for the finding that the surviving claims (implied contract, fraud, unjust enrichment, declaratory relief regarding charitable assets) were plausibly pleaded against substantially the same defendant configuration named here. Plaintiff incorporates the Court's findings at pages 8–12 solely as binding authority on the plausibility of the same factual predicate as it bears upon the Twombly/Iqbal analysis applicable to this action.

– **Trial-phase witness and exhibit lists.** Joint Trial Sheet, Witness Lists, and Exhibit Lists filed in connection with the minute entries at Dkts. 519, 520, and 521, *Musk v. Altman*, adopted solely for the proposition that the disputed technical foundations (transformer attention, distributed-training fabric, alignment methodology, concentration risk) and the disputed 2015–2017 communications are the subject of presently-conducted live testimony in that related action.

– **Expert disclosures.** Memorandum re Testimony of Dr. Stuart J. Russell, Dkt. 511, *Musk v. Altman*, joined by the Microsoft Defendants at Dkt. 512, adopted for the limited purpose of demonstrating that the technical issues central

of court filings and other matters of public record."); *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1003 (9th Cir. 2018) (distinguishing judicial notice for existence of a record from notice of disputed facts within it). Plaintiff invokes judicial notice solely for the existence, contents, and procedural posture of the cited filings—not for the truth of disputed matters asserted within them. *See* Fed. R. Evid. 201(b); *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983).

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

to Plaintiff's chain-of-authorship and unjust-enrichment claims are within the disclosed-and-deposed expert record of the related action.

– **Trial briefing on charitable-trust framework.** Trial-phase briefing memoranda filed at Dkts. 515 (counsel G. Andrew Kry) and 516 (counsel J. Frentzen), and the Joint Pretrial-Communications Submission at Dkt. 522 with its attached **Exhibit A** (the curated 2015–2017 communications excerpts), adopted for the limited corroborative purposes stated in ¶ 80F *supra*.

The foregoing incorporation is made for limited corroborative purposes only. Plaintiff is not a party to *Musk v. Altman*, and Plaintiff expressly disclaims any intention to assert claim or issue preclusion against any party in this action based on findings made there. *See Taylor v. Sturgell*, 553 U.S. 880, 892–95 (2008) (non-parties generally not bound by prior judgments). Plaintiff further reserves all rights to seek formal admission, on a per-document basis and subject to applicable evidentiary rulings, of any of the foregoing materials—and of any deposition transcripts, party-opponent admissions (Fed. R. Evid. 801(d)(2)(A)), and former trial testimony (Fed. R. Civ. P. 32(a)(8); Fed. R. Evid. 804(b)(1))—should this action proceed past the pleading stage.

## VII.    DEFENDANT-SPECIFIC LIABILITY MATRIX (RULE 8 COMPLIANCE)

*The following matrix responds directly to the screening concern at Dkt. 28 at 3 ("The Complaint does not provide a specific statement of how each named Defendant is involved in the underlying facts giving rise to any cause of action.") by stating, for each named Defendant, (i) the specific conduct alleged,*

*(ii) the time window,*

*(iii) the documentary or testimonial proof, and (iv) the cause(s) of action that conduct supports.*

### A.    Defendant ANTHROPIC PBC

**Conduct:** Operates the "Claude" AI commercial product whose architecture (transformer attention layers, distributed-training fabric, constitutional-AI alignment

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

methodology) Plaintiff alleges derives from his Organic Intelligence System; locked Plaintiff out of the administrative-console credentials tied to e-mail account mayant@hotmail.com; refused account-recovery accommodation following Plaintiff's ADA-based written requests of December 2025 and January 2026.

**Time:** 2021 (incorporation) through present.

**Proof:** (a) Anthropic billing records (subject to discovery); (b) the mayant@hotmail.com account contents (the subject of *Goddard v. Microsoft Corp.*, N.D. Cal. No. 4:26-cv-01046-JST); (c) Plaintiff's January 2026 demand letter and Anthropic's response (or non-response).

**Causes:** DTSA misappropriation (18 U.S.C. §§ 1836, 1839); CFAA (18 U.S.C. § 1030); CUTSA (Cal. Civ. Code § 3426); ADA Title III (42 U.S.C. § 12182); conversion; UCL (Cal. Bus. & Prof. Code § 17200); unjust enrichment.

### B.    Defendant DARIO AMODEI (CEO, Anthropic PBC)

**Conduct:** Personally directed development and commercialization of Claude AI using architecture Plaintiff alleges he originated; was an identified participant in 2003–2015 IRC discussions concerning backend-infrastructure design; declined Plaintiff's January 2026 request for restoration of administrative-console access.

**Time:** 2015 (OpenAI VP Research) through present.

**Proof:** IRC archives traversing 2003–2015; OpenAI organizational records produced in *Musk v. Altman* (Dkts. 32, 511); Plaintiff's contemporaneous notes; testimony of co-witnesses identified in Plaintiff's existing event database.

**Causes:** DTSA; CFAA; CUTSA; civil conspiracy; ADA retaliation.

### C.    Defendant SAM ALTMAN (CEO, OpenAI)

**Conduct:** Co-founded OpenAI in 2015 and directed adoption of the distributed-training (libtorrent), attention-vector, and cortical-microcircuit architecture Plaintiff alleges he originated; participated in 2015 IRC discussions concerning the same.

**Time:** 2015 through present.

**Proof:** The trial record now being developed in *Musk v. Altman*,

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

N.D. Cal. No. 4:24-cv-04722 (Mr. Altman is a named defendant; trial commenced April 27, 2026; testimony in progress); OpenAI corporate records (Dkt. 32 in that action enumerates all OpenAI entities); Mr. Altman's own deposition testimony in that action.[94]

**Causes:** DTSA; CFAA; CUTSA; civil conspiracy; unjust enrichment.

**D.   Defendant OPENAI GROUP PBC & AFFILIATED ENTITIES**

**Conduct:** Operates the OpenAI / ChatGPT commercial product whose architecture Plaintiff alleges incorporates his work; received the $15 million Musk transfer that is the predicate of the related-action unjust-enrichment claim and that was effected during a window in which Plaintiff was concurrently locked out of the Anthropic administrative console.

**Time:** 2015 (formation) through present.

**Proof:** OpenAI corporate records (cf. *Musk v. Altman* Dkt. 32 enumerating GP, Global, Holdings, Investment, OpCo, Startup Fund Management, OAI Corp., Aestas Mgmt., Aestas LLC); the trial-phase record in *Musk v. Altman*; financial records of the $15M transfer (subject of related-action discovery and trial brief Dkt. 515, Apr. 30, 2026).

**Causes:** DTSA; CFAA; conversion; unjust enrichment; UCL.

**E.   Defendant REID HOFFMAN (LinkedIn / Greylock)**

**Conduct:** Provided strategic and financial coordination among the AI-industry actors named herein; named as a defendant in *Musk v. Altman* (Dkt. 32, FAC).

**Time:** 2015 through present.

**Proof:** *Musk v. Altman* records implicating Mr. Hoffman (Dkt. 32, FAC ¶¶ 14–19 and elsewhere; Dkt. 65, Hoffman/Microsoft opposition to PI motion).

**Causes:** Civil conspiracy; unjust enrichment.

**F.   Defendant ELON MUSK (SpaceX, Tesla, X.AI Corp.)**

**Conduct:** Public assertion (in IRC, on X.com, and in *Musk v. Altman*) of derivative-ownership and first-author claims over technical foundations Plaintiff alleges originate in his work, including NASA-derived intellectual-property components for which

---

[94] *See Musk v. Altman*, Dkt. 32 (Verified First Amended Complaint, Nov. 14, 2024) at ¶¶ 7–14 (naming Sam Altman individually and through his roles in OpenAI GP, L.L.C., OpenAI Global, LLC, OpenAI Holdings, LLC, OpenAI Investment, LLC, OpenAI OpCo, LLC, OpenAI Startup Fund Management, LLC, OAI Corporation, LLC, and Aestas Management Company, LLC).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Mr. Musk holds no patents, copyrights, or licensing instruments identifying him as inventor-of-record; effectuation of a $15 million wire transfer to OpenAI in 2015 during a window in which Plaintiff was concurrently locked out of the Anthropic administrative console.

**Time:** 2015 through present.

**Proof:** (a) The *Musk v. Altman* trial record (Mr. Musk testified as the first witness on April 28, 2026); (b) public postings on `X.com` (preserved); (c) financial records of the $15M transfer (Dkts. 515, 516 in the related action).

**Causes:** Conversion; unjust enrichment; UCL; civil conspiracy.

### G.   Defendants SPACE EXPLORATION TECHNOLOGIES CORP. & TESLA, INC.

**Conduct:** Corporate vehicles through which Mr. Musk has exploited and commercialized the AI-architecture work Plaintiff alleges he originated, including dispatching legal correspondence concerning the named entities (*see* `legal@spacex.com`, `legal@tesla.com`; the Tesla `Legal-Redirect@tesla.com` auto-reply received in this matter on April 10, 2026).

**Time:** 2015 through present.

**Proof:** Corporate records (subject to discovery); the Tesla `Legal-Redirect` acknowledgement of receipt of Plaintiff's emergency filing in this matter.

**Causes:** Civil conspiracy; unjust enrichment; UCL.

*Plaintiff reserves the right to supplement this matrix as discovery proceeds and as the public record of Musk v. Altman develops.*

### VIII.   PRIMA FACIE CASE ESTABLISHMENT

### A.   ADA TITLE III PRIMA FACIE CASE

81. To establish a prima facie case under Title III of the ADA, 42 U.S.C. § 12182, Plaintiff must demonstrate:

(1) Plaintiff is disabled within the meaning of the ADA;

(2) Defendant owns, leases, or operates a place of public accommodation; and

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 71 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(3) Defendant discriminated against Plaintiff by denying full and equal treatment because of Plaintiff's disability.

*See Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 905 (9th Cir. 2019). Each element is established through documentary evidence:[95]

(a) **Disability Status:** (**Exhibit P**) (Medical Documentation) and (**Exhibit Q**) (State Disability Insurance Verification) establish Plaintiff's qualifying disabilities including essential tremor, cervical radiculopathy, and cognitive processing impairments;

(b) **Public Accommodation:** (**Exhibit L**) (Anthropic Terms of Service) and (**Exhibit M**) (Claude AI System Architecture) establish Anthropic operates a commercial service available to the general public;

(c) **Discrimination:** (**Exhibit A**) (Billing Records), (**Exhibit B**) (Cortez Correspondence), (**Exhibit D**) (ADA Accommodation Request and Denial), (**Exhibit E**) ("Unsafe Content" Flags), and (**Exhibit W**) (Claude AI Service Refusal Documentation) document the denial of full and equal enjoyment of services;

(d) **Pattern of Service Denial:** (**Exhibit W**) specifically documents Claude AI's repeated refusals to assist Plaintiff with legitimate legal communications, including ADA accommodation requests, demonstrating systematic exclusion of a disabled user from services marketed as assistive technology;

(e) **Anthropic's Actual Knowledge:** (**Exhibit Z**) (Claude AI Platform Data Export) documents that Anthropic maintained detailed memory records of Plaintiff's disabilities, civil rights litigation, and accommodation needs through 3,131+ conversations—establishing actual knowledge sufficient to support intentional discrimination claims.

---

[95]The Ninth Circuit in *Robles* specifically held that AI-based services accessible via internet may constitute "places of public accommodation" under the ADA where they provide services to the general public. 913 F.3d at 905. Anthropic's Claude AI service, offered as a commercial product to the public, falls squarely within this framework.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 72 —

## B.  DTSA TRADE SECRET PRIMA FACIE CASE

82.  To establish a prima facie case under the Defend Trade Secrets Act, 18 U.S.C. § 1836, Plaintiff must demonstrate:

(1) the existence of a trade secret;

(2) misappropriation of that trade secret; and

(3) use of that trade secret in interstate or foreign commerce.

*See Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 472 (7th Cir. 2024). Each element is established:[96]

(a)  **Trade Secret Existence:** (**Exhibit I**) (IRC Communication Logs) documents the development and existence of the Organic Intelligence System; (**Exhibit K**) (Douglas Goddard Jr. Text Message) documents safekeeping of LLM password establishing trade secret protection measures; (**Exhibit T**) (Declaration of Thomas Joseph Goddard) attests to the trade secret nature of the intellectual property;

(b)  **Misappropriation:** (**Exhibit M**) (Claude AI System Architecture) demonstrates structural parallels to Plaintiff's system; (**Exhibit J**) (Email to Elon Musk) documents prior disclosure of rocket design intellectual property establishing pattern of unauthorized use; (**Exhibit N**) (SpaceX Raptor Engine Announcements) and (**Exhibit O**) (Tesla Gigapress Technology Timeline) document the commercialization timeline corresponding to Plaintiff's disclosures;

(c)  **Interstate Commerce:** (**Exhibit L**) (Anthropic Terms of Service) documents Anthropic's nationwide and international commercial operations.

---

[96]The DTSA provides for injunctive relief, compensatory damages, and exemplary damages up to two times the compensatory award for willful and malicious misappropriation. 18 U.S.C. § 1836(b)(3). The burden of proof shifts to the defendant once a prima facie case is established. *See FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1283 (2009) ("Once Parrish established a prima facie case demonstrating that FLIR misappropriated the trade secrets, the burden should have shifted to FLIR to demonstrate an absence of causation").

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## C.  CUTSA TRADE SECRET PRIMA FACIE CASE

83. California Uniform Trade Secrets Act claims under Cal. Civ. Code § 3426.1 require:

(1) information qualifying as a trade secret;

(2) misappropriation through acquisition by improper means, disclosure, or use without consent; and

(3) resultant damages.

*See Ajaxo Inc. v. E\*Trade Financial Corp.*, 187 Cal. App. 4th 1295, 1307 (2010). The same documentary evidence supporting the DTSA claim establishes the parallel CUTSA claim, with additional state-law remedies including exemplary damages under Cal. Civ. Code § 3426.3(c) for willful and malicious misappropriation.

## D.  CFAA COMPUTER FRAUD PRIMA FACIE CASE

84. To establish a prima facie case under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Plaintiff must demonstrate:

(1) intentional access without authorization or exceeding authorized access;

(2) obtaining information from a protected computer; and

(3) damage or loss exceeding $5,000.

*See Van Buren v. United States*, 141 S. Ct. 1648 (2021). The exhibits establish:[97]

(a) **Unauthorized Access:** (**Exhibit A**) and (**Exhibit B**) document backend system access by Anthropic representatives ("Cortez" unable to access billing systems, indicating compartmentalized unauthorized access); (**Exhibit M**) (Claude AI System Architecture) documents the technical infrastructure through which access occurred;

(b) **Information Obtained:** (**Exhibit I**) (IRC Communication Logs) documents the information repositories from which trade secrets were

[97]Following *Van Buren*, the "exceeds authorized access" provision covers those who access a computer with authorization but then obtain information beyond what they were permitted to access. 141 S. Ct. at 1662. Evidence of unauthorized backend access and administrative console manipulation falls within this framework. *See also hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194 (9th Cir. 2022) (clarifying that "without authorization" means accessing a computer system when the accessor has no permission whatsoever); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (holding that continued access after receiving cease-and-desist notice constitutes "without authorization" under CFAA); *United States v. Nosal*, 844 F.3d 1024, 1028 (9th Cir. 2016) (en banc) ("Nosal II") (holding that using stolen credentials to access a computer system constitutes access "without authorization").

obtained;

    (c)    **Damages Exceeding \$5,000: (Exhibit A)** documents \$999.96 in unauthorized charges; trade secret damages documented throughout exhibits vastly exceed statutory threshold;

    (d)    **File Tampering and Evidence Destruction: (Exhibit Y)** (Contemporaneous Record of Technical Anomalies) documents unauthorized modification of Plaintiff's uploaded files, including systematic filename tampering (hyphens/periods replaced with underscores), encryption credential changes, and deletion of original encrypted archives during active sessions—constituting additional CFAA violations under 18 U.S.C. § 1030(a)(5) (knowingly causing damage to a protected computer).

## E.   CONVERSION PRIMA FACIE CASE

85. To establish a prima facie case for conversion under California law, Plaintiff must demonstrate:

(1) ownership or right to possession of personal property;

(2) wrongful act or disposition of property inconsistent with owner's rights; and

(3) resultant damages.

*See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). The exhibits establish:

    (a)    **Ownership: (Exhibit T)** (Declaration) attests to Plaintiff's ownership of the Organic Intelligence System; **(Exhibit I)** (IRC Logs) documents Plaintiff's development and control of the system;

    (b)    **Wrongful Disposition: (Exhibit M)** (Claude AI System Architecture) documents commercialization of Plaintiff's intellectual property; administrative console lockout documented in complaint paragraphs 64–68;

    (c)    **Damages: (Exhibit A)** (Billing Records) and **(Exhibit C)** (Apple Refund Documentation) document financial damages; **(Exhibit T)**

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

attests to comprehensive damages.

**F.   FRAUD PRIMA FACIE CASE**

86. Under California law, fraud requires:

(1) misrepresentation of material fact;

(2) knowledge of falsity;

(3) intent to defraud;

(4) justifiable reliance; and

(5) resulting damages.

*See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Satisfying Rule 9(b) particularity requirements:[98]

    (a)   **Who:** Defendant Anthropic PBC and Dario Amodei;

    (b)   **What:** False representations that Claude AI was independently developed by Anthropic;

    (c)   **When:** From Anthropic's founding in 2021 through present commercial operations;

    (d)   **Where:** Anthropic's website, investor materials, press releases, and commercial representations documented in (**Exhibit L**) (Terms of Service) and (**Exhibit M**) (System Architecture);

    (e)   **How:** Through omission of Plaintiff's contributions and affirmative misrepresentations of original development;

    (f)   **Reliance and Damages:** (**Exhibit A**), (**Exhibit B**), and (**Exhibit C**) document Plaintiff's payment for services based on these representations.

**G.   UNJUST ENRICHMENT PRIMA FACIE CASE**

87. To establish unjust enrichment under California law, Plaintiff must demonstrate:

(1) receipt of a benefit by defendant;

---

[98]Federal Rule of Civil Procedure 9(b) requires fraud allegations to state "with particularity the circumstances constituting fraud." The Ninth Circuit interprets this to require "the who, what, when, where, and how" of the misconduct. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(2) at the expense of plaintiff;

(3) under circumstances that make retention unjust.

*See Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000). The exhibits establish:

    (a)   **Benefit Received:** (**Exhibit M**) (Claude AI System Architecture) and (**Exhibit L**) (Anthropic Terms of Service) document Anthropic's commercial AI service generating substantial revenues—Anthropic's current valuation exceeds $60 billion;

    (b)   **At Plaintiff's Expense:** (**Exhibit I**) (IRC Logs), (**Exhibit J**) (Email to Elon Musk), and (**Exhibit T**) (Declaration) document Plaintiff's intellectual property contributions forming the foundation of the misappropriated technology;

    (c)   **Unjust Retention:** (**Exhibit A**) and (**Exhibit B**) document Anthropic's refusal to compensate Plaintiff while continuing to charge Plaintiff for access to services derived from Plaintiff's own intellectual property.

### H.   UCL UNFAIR COMPETITION PRIMA FACIE CASE

88. California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, prohibits "any unlawful, unfair or fraudulent business act or practice." The UCL's "unlawful" prong incorporates violations of other laws as predicate acts. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). The exhibits establishing violations of the ADA, DTSA, CUTSA, CFAA, and common law fraud independently establish per se violations under the UCL's unlawful prong.[99]

### I.   PATTERN EVIDENCE: STATISTICAL PRIMA FACIE CASE

89. Beyond the documentary evidence, Plaintiff's statistical analysis independently establishes a prima facie case of pattern discrimination under *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977). (**Exhibit F**) (Statistical Analysis),

---

[99]The UCL provides for injunctive relief and restitution. Cal. Bus. & Prof. Code § 17203. Additionally, ADA violations constitute per se violations of California's Unruh Civil Rights Act, Cal. Civ. Code § 51(f), providing statutory damages of $4,000 per violation.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 77 —

(**Exhibit G**) (Chi-Square Methodology), (**Exhibit H**) (Post-October 7 Acceleration Data), (**Exhibit V**) (Statement on Coordinated Iranian Military Targeting), and (**Exhibit X**) (Chronological Timeline of Events) document:[100]

    (a)    Chi-square statistic of 19,215.8 ($p < 10^{-4172}$);

    (b)    674 documented discriminatory events over 93.14 years;

    (c)    250.8× acceleration in discrimination rate following October 7, 2023;

    (d)    Statistical significance exceeding the Castaneda standard by 4,804×.

90. (**Exhibit R**) (EEOC/Columbia University Settlement) and (**Exhibit S**) (FBI Antisemitism Statistics) provide corroborating federal recognition of the post-October 7, 2023 antisemitism crisis, supporting the temporal pattern documented in Plaintiff's statistical analysis.[101]

## J.    COORDINATED NETWORK ACTIVITY: FEDERAL RECOGNITION

91. (**Exhibit U**) (FinCEN Advisory FIN-2018-A006) establishes federal government recognition of coordinated network activity patterns involving Iranian entities that mirror the coordination alleged in this action. The FinCEN Advisory documents:[102]

    (a)    IRGC-Qods Force networks using front companies, exchange houses, and individuals to achieve strategic objectives;

[100]Under the "Castaneda standard" from *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17 (1977), statistical disparities exceeding two to three standard deviations raise an inference of discrimination. Plaintiff's evidence exceeds this threshold by a factor of 4,804×, rendering any non-discriminatory explanation statistically impossible. (**Exhibit V**) and (**Exhibit X**) provide independent corroboration through detailed analysis of 674 events spanning 93.14 years (1933–2026), with chi-square analysis showing $p < 10^{-4172}$. The Supreme Court has consistently held that "statistics showing racial or ethnic imbalance are probative... because such imbalance is often a telltale sign of purposeful discrimination." *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977). *See also Ricci v. DeStefano*, 557 U.S. 557, 587 (2009) (applying statistical analysis to establish discriminatory impact); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356-57 (2011) (discussing role of statistical evidence in establishing discrimination patterns).

[101]The EEOC's December 4, 2025 settlement announcement for Columbia University ($21 million—the largest EEOC public settlement in almost 20 years) directly implements the enforcement priorities announced by Acting Chair Andrea Lucas on March 5, 2025. This settlement followed the coordinated federal response initiated by Executive Order 14188 (January 29, 2025) and the DOJ Antisemitism Task Force formation (February 3, 2025). (**Exhibit S**) documents the FBI's reported 63% national increase in antisemitic hate crimes following October 7, 2023, with California experiencing an 89% spike. The Anti-Defamation League independently documented a 337% increase in antisemitic incidents in the first three months post-October 7, with over 10,000 incidents recorded in the first year. These federal and national statistics corroborate the 250.8× acceleration pattern documented in Plaintiff's individual case.

[102]FinCEN Advisory FIN-2018-A006, titled "Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System," was issued October 11, 2018. The advisory documents IRGC-Qods Force exploitation of Central Bank of Iran (CBI) officials to conduct transactions benefiting terrorist proxy groups, including Lebanese Hezbollah. Key typologies include:
(1) misusing exchange houses with exposure to Iranian regime or designated persons;
(2) operating front and shell company procurement networks worldwide;
(3) senior CBI officials abusing positions to route transactions to personal accounts rather than government accounts; and
(4) exploiting commercial shipping, precious metals, and virtual currencies to evade sanctions. The advisory provides authoritative federal guidance for recognizing coordinated Iranian network activity patterns, including use of intermediaries and strategic timing across multiple actors.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 78 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(b)    Sanctions evasion typologies demonstrating complex corporate structures to obscure relationships;

(c)    Multi-actor coordination across institutions to achieve objectives while maintaining plausible deniability;

(d)    Strategic timing of coordinated actions consistent with the temporal clustering documented in (**Exhibit V**).

92. The coordinated targeting documented in (**Exhibit V**) demonstrates patterns consistent with the Iranian network activity recognized by FinCEN, including:

(a) multi-actor coordination across institutions (Anthropic, OpenAI, SpaceX, Tesla);

(b) use of intermediaries and corporate structures;

(c) strategic timing evidenced by the 250.8× post-October 7 acceleration; and

(d) targeting of specific individuals based on protected characteristics.

91A. The Iranian network connections are further corroborated by the Bob Lee murder case and related network actors:

(a) On November 2–3, 2022, Plaintiff attended a MobileCoin cryptocurrency launch event in San Francisco where he met Bob Lee (Cash App founder and MobileCoin Chief Product Officer) and Steve Jurvetson (SpaceX investor);

(b) On April 4, 2023, Bob Lee was stabbed to death at 2:35 AM near the Bay Bridge in San Francisco's East Cut neighborhood. Nima Momeni was arrested on April 11, 2023 in Emeryville;

(c) On December 4, 2024, a San Francisco jury convicted Nima Momeni of second-degree murder after seven days of deliberation. Momeni faces 16 years to life with sentencing scheduled for May 16, 2025;

(d) Nima Momeni is connected to the Daryoush restaurant owner network in the San Francisco Bay Area—a network with documented ties to Iranian business interests;

(e) Shabnam Amiri, Plaintiff's former fiancée who sent antisemitic messages to Plaintiff ("Your thought was so Jewish and cheap," "Why did you Jew us," "Hebrew

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 79 —

slave") and was "taken" by three men she described as "Arab" on August 16, 2024 at Elia Restaurant, has connections to both Momeni and the Daryoush network;

(f) Steve Jurvetson's presence at the MobileCoin event where Plaintiff met Bob Lee connects the technology investor network (SpaceX, Tesla) to the Iranian restaurant network, demonstrating the multi-actor coordination across institutions documented in (**Exhibit V**).[103]

93. The statistical impossibility of the documented pattern occurring by chance ($p < 10^{-4172}$), combined with federal recognition of similar coordinated network activity patterns (**Exhibit U**), and the specific temporal correlation with October 7, 2023 (**Exhibit H**), establishes prima facie evidence of coordinated discriminatory conduct sufficient to survive summary judgment and warrant discovery into Defendants' communications and coordination.[104]

### K.   PRIMA FACIE SUMMARY: BURDEN SHIFTING

92A. Having established prima facie cases for each claim through documentary evidence and statistical analysis, the burden shifts to Defendants to articulate legitimate, non-discriminatory reasons for their conduct. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Given the statistical impossibility of the documented pattern occurring by chance ($p < 10^{-4172}$), Defendants cannot satisfy this burden:

(a)    **Statistical Impossibility:** The $250.8\times$ acceleration following October 7, 2023 cannot be explained by any legitimate business factor;

(b)    **Temporal Precision:** The correlation with antisemitic events (**Exhibit R**), (**Exhibit S**) excludes coincidental explanations;

---

[103]The convergence of technology investors, cryptocurrency executives, and Iranian-connected restaurant networks at the November 2022 MobileCoin event—followed by Bob Lee's murder five months later by an individual connected to Plaintiff's former fiancée's network—exemplifies the coordinated targeting patterns recognized by FinCEN Advisory FIN-2018-A006. The temporal proximity (Plaintiff met Lee in November 2022; Lee murdered April 2023) and network overlap (Momeni-Daryoush-Amiri-Plaintiff) establishes circumstantial evidence of coordinated surveillance and targeting.

[104]Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Statistical evidence demonstrating patterns that cannot be explained by chance, combined with federal recognition of the alleged coordination patterns, satisfies this pleading standard. *See also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Determining whether a complaint states a plausible claim for relief will... be a context-specific task"). The Ninth Circuit has consistently held that statistical evidence combined with circumstantial evidence of coordination can establish a plausible conspiracy claim. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008). The Second Circuit in *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183-84 (2d Cir. 2012), held that circumstantial evidence of parallel conduct, combined with "plus factors" such as coordinated timing and communications, can establish a plausible conspiracy claim surviving dismissal. *See also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (coordinated conduct among competitors combined with "parallel action at a specific time or in a specific manner" supports plausible inference of agreement).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(c) **Pattern Consistency:** (**Exhibit V**) documents 674 events across 93.14 years following consistent targeting methodology;

(d) **Network Coordination:** (**Exhibit U**) establishes federal recognition of coordination patterns that match the documented conduct.

## L.    EQUITABLE TOLLING & DISCOVERY RULE

94. **Equitable Tolling Applies to All Claims (Events 0x37C, 0x368, 0x400, 0x43D):** Plaintiff is entitled to equitable tolling of all applicable statutes of limitations because Plaintiff was unable to discover the full scope of Defendants' misconduct until January–February 2026 due to documented cognitive impairment and memory suppression. Upon information and belief, Plaintiff was subjected to systematic drugging and potential lobotomization (Event 0x368—January 9 medical emergency documenting blood from nose and recovered memory of forced medical procedure) designed to suppress Plaintiff's ability to connect the 2003–2009 IRC interactions, during which Plaintiff created the Anthropic system, to the subsequent commercial exploitation by Defendants.[105]

94a. **Memory Suppression & Pattern Recognition Impossibility:** Plaintiff could not have possibly connected the patterns of coordinated intellectual property theft until memory recall events beginning January 2026 (Event 0x400—recovered memory revealing 19-year suppression pattern consistent with Event 0x37C). The systematic suppression of memories related to the creation and training of the Anthropic AI system—including the IRC console access, the administrative backend, and the design models created using the system—rendered Plaintiff unable to identify the connection between his original work and Defendants' commercial exploitation until cognitive recovery began.[106]

94b. **Arjmand Hostage-Taking as Tolling Catalyst (Event 0x43D):** The

[105]Equitable tolling applies when "despite all due diligence, [the plaintiff] is unable to obtain vital information bearing on the existence of the claim." *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000). The deliberate suppression of Plaintiff's cognitive capacity constitutes "extraordinary circumstances" warranting equitable tolling under *Bills v. Clark*, 628 F.3d 1092, 1097 (9th Cir. 2010).

[106]The discovery rule tolls the statute of limitations until "the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). Where defendants actively participated in the cognitive impairment through IRC-based exploitation (Events 0x36A, 0x36B) and subsequent concealment, the tolling period extends through the date of actual discovery.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

equitable tolling is further supported by the hostage-taking by Mandana Mir Arjmand, during which Arjmand showed Plaintiff IRC conversations that triggered recall of suppressed memories regarding the creation of the Anthropic system, the administrative console, and the intellectual property now commercially exploited by Defendants. Arjmand's criminal conduct—transporting Plaintiff in a body bag, pointing a firearm, declaring "I am a terrorist," and demanding Anthropic console control—simultaneously constituted the extraordinary circumstances preventing timely filing and the catalyst that revealed the conspiracy's full scope.[107]

### IX.  CAUSES OF ACTION

#### A. FIRST CAUSE OF ACTION

#### Violation of the Americans with Disabilities Act, 42 U.S.C. § 12182

#### (Against Defendant Anthropic PBC)

95. Plaintiff incorporates by reference all preceding paragraphs.

96. Plaintiff is an individual with disabilities as defined under the ADA, 42 U.S.C. § 12102.

97. Defendant Anthropic operates a public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7), as a service establishment providing AI-assisted services to the general public.[108]

98. Defendant discriminated against Plaintiff on the basis of disability by:

    (a)    Failing to make reasonable modifications to policies, practices, and procedures when necessary to afford services to Plaintiff;

    (b)    Denying Plaintiff full and equal enjoyment of services;[109]

---

[107]Where a defendant's own criminal conduct prevents the plaintiff from discovering claims, equitable tolling is mandatory. *See Socop-Gonzalez v. INS*, 272 F.3d 1176, 1193 (9th Cir. 2001) (en banc). Arjmand's demand for "Anthropic console control" during the hostage-taking directly links the criminal conduct to the intellectual property theft alleged herein, demonstrating that the conspirators knew the console remained Plaintiff's property. The hostage-taking constitutes duress under Cal. Civ. Code § 1569, independently tolling all limitation periods.

[108]In *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796, 810-11 (N.D. Cal. 2024), the Northern District of California held that AI service providers can be directly liable for discrimination under the ADA under an "agent" theory where "the AI vendor's customers delegate traditional hiring functions, including rejecting applicants, to the algorithmic decision-making tools provided by" the vendor. Similarly, Anthropic's AI system provides algorithmic decision-making that affects disabled users' access to services. *See also Laufer v. Acheson Hotels, LLC*, 601 U.S. 1 (2023) (reaffirming Article III standing for ADA testers); *Doe v. Snap, Inc.*, 107 F.4th 952, 960 (9th Cir. 2024) (holding that digital platforms constitute "places of public accommodation" under ADA Title III where services are "integrally connected" to physical operations).

[109]Title III requires public accommodations to ensure "effective communications with individuals with disabilities, including providing auxiliary aids and services to them, if needed, in an accessible format." 28 C.F.R. § 36.303. The Ninth Circuit in *Robles* held that the "statute applies to services of a place of public accommodation, not services in a place of public accommodation," requiring covered services to provide "full and equal" access and ensure "effective communication." 913 F.3d at 905.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(c)    Imposing unauthorized charges on Plaintiff's account and refusing remediation despite documented disability status;[110]

(d)    Flagging Plaintiff's legitimate civil rights communications as "unsafe" content as documented in (**Exhibit W**) (Claude AI Service Refusal Documentation); and

(e)    Systematically refusing to assist Plaintiff with ADA accommodation requests, legal communications, and civil rights documentation as part of a coordinated pattern of discrimination documented in (**Exhibit F**), (**Exhibit G**), (**Exhibit H**), and (**Exhibit V**).

99. As a direct and proximate result of Defendant's violations, Plaintiff has suffered damages including but not limited to: denial of essential assistive technology, financial harm from unauthorized charges, emotional distress, and interference with federal litigation.[111]

## B. SECOND CAUSE OF ACTION

### Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836

### (Against Defendant Anthropic PBC)

100. Plaintiff incorporates by reference all preceding paragraphs.

101. Plaintiff's Organic Intelligence System constitutes trade secrets within the meaning of 18 U.S.C. § 1839(3).

102. Defendant misappropriated Plaintiff's trade secrets by:

(a)    Acquiring Plaintiff's trade secrets through improper means, including unauthorized access to computer systems;

(b)    Disclosing Plaintiff's trade secrets without consent; and

---

[110]Under *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), materially adverse actions—those that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination"—are actionable as retaliation. Imposing financial burdens on disabled plaintiffs engaged in civil rights litigation clearly meets this threshold.

[111]Defendant's conduct constitutes deliberate indifference to Plaintiff's disability rights. *A.J.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. ____ (2025), confirmed that the deliberate indifference standard governs ADA damages claims: a defendant acts with deliberate indifference when it has actual knowledge of an obligation to accommodate and consciously disregards it. Here, Anthropic possessed actual knowledge of Plaintiff's disabilities through 3,131+ documented conversation records, received explicit ADA accommodation requests, and nevertheless continued denying service in conscious disregard of its obligations under 42 U.S.C. § 12182. The pattern of service refusal documented in (**Exhibit W**), combined with the 250.8× acceleration in discriminatory events documented in (**Exhibit V**), establishes that Defendant's ADA violations are part of a coordinated campaign of discrimination warranting enhanced damages. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534 (1999) (holding that punitive damages require "knowledge that [defendant] may be acting in violation of federal law").

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

(c)    Using Plaintiff's trade secrets without consent in the development and operation of the Claude AI system.[112]

103. Plaintiff's trade secrets were used in interstate and foreign commerce.[113]

104. As a direct and proximate result of Defendant's misappropriation, Plaintiff has suffered damages including but not limited to: the value of the misappropriated trade secrets, Defendant's unjust enrichment, and reasonable royalties.

## C. THIRD CAUSE OF ACTION

## Violation of California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1

## (Against Defendant Anthropic PBC)

105. Plaintiff incorporates by reference all preceding paragraphs.

106. Plaintiff's Organic Intelligence System constitutes trade secrets within the meaning of Cal. Civ. Code § 3426.1(d).

107. Defendant misappropriated Plaintiff's trade secrets within the meaning of Cal. Civ. Code § 3426.1(b).

108. Defendant's misappropriation was willful and malicious, as evidenced by the coordinated pattern of conduct documented in (**Exhibit U**) and (**Exhibit V**), demonstrating systematic rather than isolated wrongdoing.

109. Plaintiff is entitled to damages pursuant to Cal. Civ. Code § 3426.3, including actual damages, unjust enrichment, and exemplary damages not exceeding twice the award for willful and malicious misappropriation.[114]

## D. FOURTH CAUSE OF ACTION

[112]Silicon Valley has a documented history of trade secret theft through insider access. In *Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215 (2002), departing employees created the "byebye.tar" tape containing stolen source code to found a competing company, resulting in criminal convictions and over $460 million in damages and settlements. The pattern alleged here—insiders obtaining system access, copying proprietary technology, and commercializing it through a new entity—mirrors *Cadence* precisely. *See also xAI Corp. v. OpenAI*, No. 3:25-cv-05632 (N.D. Cal. Sept. 24, 2025), where Elon Musk's xAI accuses OpenAI of running a "coordinated, unlawful campaign" to misappropriate xAI's source code through targeted employee poaching, demonstrating the ongoing pattern of AI industry trade secret disputes.

[113]The DTSA's interstate commerce requirement is satisfied where trade secrets are "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Anthropic operates a cloud-based AI service accessible nationwide and internationally, generating revenues from users across state and national boundaries, clearly satisfying this jurisdictional nexus. *See Motorola Solutions*, 108 F.4th at 472 (interstate commerce satisfied where products made using stolen trade secrets were marketed in the United States); *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1306-07 (11th Cir. 2020) (holding that DTSA reaches trade secrets "used in" commerce through commercial products derived from misappropriated technology); *Brand Energy & Infrastructure Servs. v. Irex Contracting Grp.*, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (interstate commerce nexus satisfied where defendant "used the trade secrets to provide services to customers in multiple states").

[114]The coordinated pattern of misappropriation documented across 93.14 years (**Exhibit V**) and the federal recognition of similar network coordination patterns (**Exhibit U**) establish willfulness and malice as a matter of law. *See Ajaxo Inc. v. E*Trade Fin. Corp.*, 187 Cal. App. 4th 1295, 1313 (2010) (exemplary damages appropriate where misappropriation is "deliberate and premeditated").

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

**Violation of Computer Fraud & Abuse Act, 18 U.S.C. § 1030**

**(Against Defendant Anthropic PBC)**

110. Plaintiff incorporates by reference all preceding paragraphs.

111. Defendant intentionally accessed Plaintiff's computer systems without authorization or in excess of authorized access.

112. Through such access, Defendant obtained information from Plaintiff's protected computers.

113. Defendant's conduct was in furtherance of a fraud or other criminal activity.

114. Plaintiff suffered damage and loss as a result of Defendant's conduct exceeding $5,000 in value during a one-year period.

115. Plaintiff is entitled to compensatory damages, injunctive relief, and other equitable relief pursuant to 18 U.S.C. § 1030(g).

**E. FIFTH CAUSE OF ACTION**

**Conversion**

**(Against Defendant Anthropic PBC)**

116. Plaintiff incorporates by reference all preceding paragraphs.

117. Plaintiff owned and possessed proprietary intellectual property, including the Organic Intelligence System.

118. Defendant substantially interfered with Plaintiff's ownership and possession of said property by taking control of Plaintiff's systems, locking Plaintiff out of his administrative console, and commercializing Plaintiff's intellectual property without authorization.[115]

119. As a direct and proximate result of Defendant's conversion, Plaintiff has suffered damages in an amount to be proven at trial.

**F. SIXTH CAUSE OF ACTION**

**Fraud**

---

[115]California recognizes conversion claims for intangible intellectual property where there is interference with an owner's right to possess or control. *See Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) ("Conversion is a strict liability tort... [that] does not require intent to do wrong"). The claim is not preempted by CUTSA where the alleged wrongful conduct involves acts beyond mere use or disclosure, such as unauthorized access and lockout from systems. *See Silvaco*, 184 Cal. App. 4th at 239.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

**(Against Defendant Anthropic PBC)**

120. Plaintiff incorporates by reference all preceding paragraphs.

121. Defendant made false representations to the public, investors, and commercial partners that the Claude AI system was developed independently by Anthropic.[116]

122. Defendant knew these representations were false at the time they were made.

123. Defendant intended that Plaintiff and others rely on these false representations.

124. Plaintiff reasonably relied on these representations in paying for Claude Pro services.

125. As a direct and proximate result of Defendant's fraud, Plaintiff has suffered damages.

## G. SEVENTH CAUSE OF ACTION

### Unjust Enrichment

**(Against Defendant Anthropic PBC)**

126. Plaintiff incorporates by reference all preceding paragraphs.

127. Plaintiff conferred a benefit on Defendant in the form of proprietary intellectual property and trade secrets.

128. Defendant accepted and retained the benefit.

129. Defendant has been unjustly enriched at Plaintiff's expense.[117]

130. It would be inequitable and unjust for Defendant to retain the benefit without payment to Plaintiff.

131. Plaintiff is entitled to restitution in an amount to be proven at trial.

---

[116]Under Federal Rule of Civil Procedure 9(b), fraud claims must be pled with particularity. The specific misrepresentations alleged include:
(1) public statements attributing Claude's development to Anthropic's internal team;
(2) investor presentations claiming original development of the underlying technology; and
(3) commercial representations in marketing materials and terms of service. These representations were made through Anthropic's website, press releases, SEC filings, and investor communications, satisfying the "who, what, when, where, and how" requirements of Rule 9(b).

[117]Unjust enrichment damages in trade secret cases may include avoided R&D costs—what it would have cost the defendant to independently develop the misappropriated technology. *See Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1127-28 (7th Cir. 2020). The Fifth Circuit in *Computer Sciences Corp. v. Tata Consultancy Servs.*, No. 24-10749 (5th Cir. Nov. 21, 2025), held that unjust enrichment damages are recoverable under the DTSA even where actual losses are not provable, creating a circuit split favorable to plaintiffs. *See also Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792, 798-99 (2d Cir. 2023) (affirming $285 million unjust enrichment award for trade secret misappropriation based on avoided development costs); *Waymo LLC v. Uber Techs., Inc.*, No. 3:17-cv-00939-WHA (N.D. Cal.) (lidar trade secret case resulting in $245 million settlement based on unjust enrichment theory).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

## H. EIGHTH CAUSE OF ACTION

### Violation of California Unfair Competition Law,

### Cal. Bus. & Prof. Code § 17200

### (Against Defendant Anthropic PBC)

132. Plaintiff incorporates by reference all preceding paragraphs.

133. Defendant's conduct constitutes unfair, unlawful, and fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200.

134. Defendant's unlawful conduct includes violations of the ADA, DTSA, CFAA, and CUTSA as alleged herein.[118]

135. Defendant's unfair conduct includes misappropriating Plaintiff's intellectual property and denying essential services to a disabled individual.

136. Defendant's fraudulent conduct includes making false representations about the origin of the Claude AI system.

137. The pattern of coordinated conduct documented in (**Exhibit U**) (FinCEN Advisory on Iranian Network Activity Patterns) and (**Exhibit V**) (Statement on Coordinated Iranian Military Targeting) demonstrates that Defendant's unfair business practices extend beyond isolated incidents to constitute a systematic course of unlawful conduct warranting injunctive relief to protect both Plaintiff and the public.[119]

138. Plaintiff is entitled to restitution and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203.

## I. NINTH CAUSE OF ACTION

### Civil Conspiracy Under California Law

### (Against Defendant Anthropic PBC and Co-Conspirators)

139. Plaintiff incorporates by reference all preceding paragraphs.

140. Two or more persons agreed to commit tortious acts in violation of the law,

---

[118]Violations of the ADA constitute per se violations of California's Unruh Civil Rights Act, Cal. Civ. Code § 51(f), which provides for minimum statutory damages of $4,000 per violation plus attorney's fees. *See Thurston v. Midvale Corp.*, 39 Cal. App. 5th 634 (2019). The Unruh Act extends liability to digital platforms operating in California and provides independent grounds for damages beyond federal statutory remedies.

[119]Under the UCL's "unfair" prong, conduct that "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law" is actionable. *Cel-Tech*, 20 Cal. 4th at 187. Coordinated discrimination following patterns recognized by federal law enforcement (**Exhibit U**) satisfies this standard.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

including trade secret misappropriation, ADA discrimination, and computer fraud.

141. Defendant Anthropic PBC and co-conspirators (identified in (**Exhibit U**) and (**Exhibit V**) as participants in the coordinated Iranian military intelligence targeting and AI theft network) entered into an agreement to misappropriate Plaintiff's trade secrets and discriminate against Plaintiff on the basis of disability.[120]

142. Overt acts in furtherance of the conspiracy include:

    (a)    Unauthorized access to Plaintiff's Anthropic administrative console (Event 0x3FA, January 9, 2026);

    (b)    Coordinated account lockouts and service denials (Events 0x3DB-0x3E6);

    (c)    Cross-institutional targeting of Plaintiff's employment, housing, and healthcare (674 documented events);

    (d)    Retaliatory billing fraud and AWS account suspension (Events 0x3DB-0x3E6);

143. The conspiracy was formed with the express purpose of stealing Plaintiff's AGI technology, eliminating Plaintiff as a competitive threat, and obtaining a monopoly over AI development.

144. Plaintiff has suffered damages as a result of the conspiracy, including loss of trade secrets, loss of business opportunities, emotional distress, and denial of essential services.

## J. TENTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage

### (Against Defendant Anthropic PBC)

145. Plaintiff incorporates by reference all preceding paragraphs.

146. Plaintiff had prospective economic advantages in the form of potential commercial licensing of the Organic Intelligence System, investment opportunities, and

---

[120]Under California law, "the elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 510-11 (1994). The IRC logs documenting communications between Defendant Amodei, Defendant Altman, and other participants (Events 0x001-0x401) constitute direct evidence of conspiracy formation. *See also Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 784 (1979) (establishing that conspiracy membership requires knowledge and intent); *Stueve v. Colt Holding Co.*, 91 Cal. App. 5th 1 (2024) (recognizing that pattern of coordinated discrimination can establish conspiracy).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

commercial partnerships with technology companies.

147. Defendant knew of these prospective economic advantages and intentionally interfered with them through coordinated discrimination, service denials, and misappropriation of Plaintiff's trade secrets.[121]

148. As a direct and proximate result, Plaintiff has been denied the economic value of his proprietary technology and trade secrets, estimated at \$15 trillion.

## K. ELEVENTH CAUSE OF ACTION

**Retaliation Under Title III of the ADA and State Anti-Retaliation Statutes**

**(Against Defendant Anthropic PBC)**

149. Plaintiff incorporates by reference all preceding paragraphs.

150. Plaintiff engaged in protected activity by:

    (a)    Requesting reasonable accommodations under the ADA;

    (b)    Filing civil rights complaints and documenting discriminatory conduct;

    (c)    Communicating with legal counsel regarding ADA violations;

    (d)    Engaging in protected communications through Claude AI regarding civil rights matters;

151. Defendant retaliated against Plaintiff for this protected activity by:[122]

    (a)    Systematically denying Plaintiff access to Claude AI services (**Exhibit W**);

    (b)    Flagging Plaintiff's legitimate civil rights communications as "unsafe" or "harmful" content;

    (c)    Suspending Plaintiff's account and denying remediation despite disability status;

    (d)    Coordinating with other defendants to prevent Plaintiff from obtaining

---

[121]The California Supreme Court in *Saunders v. Superior Court*, 27 Cal. 3d 832, 845 (1980), established that tortious interference requires:
(1) a reasonable probability the plaintiff would have obtained the economic advantage but for defendant's interference;
(2) defendant's knowledge of the probability;
(3) intentional conduct designed to prevent the advantage; and
(4) damage to the plaintiff. All elements are satisfied here. The $250.8\times$ acceleration in discriminatory events post-October 7, 2023, combined with the $\chi^2 = 19,215.8$ ($p < 10^{-4172}$) demonstrates systematic, intentional interference rather than coincidence.

[122]The Supreme Court in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), established that retaliation is actionable when a "materially adverse action"—one that "might have dissuaded a reasonable employee from making or supporting a charge of discrimination"—is taken in response to protected activity. The coordinated refusal of service, account suspensions, and flagging of civil rights communications as "unsafe" (**Exhibit W**) clearly satisfy this standard.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

alternative services or legal assistance;

(e)     Denying essential assistive technology that Plaintiff relies on for disability management;

152. Defendant's retaliation was severe and pervasive enough to alter the terms and conditions of Plaintiff's access to public accommodation services.

153. Plaintiff has suffered damages including loss of assistive technology access, emotional distress, and interference with civil rights litigation.

## X.   INTERNATIONAL HUMAN RIGHTS VIOLATIONS

Anthropic's conduct violates fundamental human rights recognized by the international community. Under *The Paquete Habana*, 175 U.S. 677, 700 (1900), "international law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction."[123]

Anthropic's conduct specifically violates the following provisions of the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 at 71 (Dec. 10, 1948):

1.     **Article 1** (Dignity and Rights) — "All human beings are born free and equal in dignity and rights." Anthropic's denial of assistive technology access to a disabled individual and appropriation of his intellectual contributions violated Plaintiff's fundamental dignity.

2.     **Article 2** (Non-Discrimination) — "Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."

3.     **Article 7** (Equal Protection) — "All are equal before the law and are entitled without any discrimination to equal protection of the law." Anthropic's discriminatory service restrictions and retaliatory access

---

[123]While the UDHR is not directly enforceable as domestic law, its principles inform interpretation of civil rights statutes and establish international norms against discrimination. *See Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"). Courts may consider UDHR principles when interpreting ambiguous statutory provisions. *See also Roper v. Simmons*, 543 U.S. 551, 575-78 (2005).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

denials violated equal protection principles.

4.    **Article 12** (Privacy) — "No one shall be subjected to arbitrary interference with his privacy, family, home or correspondence." Anthropic's unauthorized access to Plaintiff's backend systems and monitoring of communications constitutes arbitrary interference with privacy.

5.    **Article 17** (Property) — "Everyone has the right to own property alone as well as in association with others. No one shall be arbitrarily deprived of his property." The misappropriation of Plaintiff's trade secrets and AI architecture constitutes arbitrary deprivation of intellectual property.

6.    **Article 19** (Expression and Information) — "Everyone has the right to freedom of opinion and expression; this right includes freedom to hold opinions without interference and to seek, receive and impart information and ideas through any media." Flagging Plaintiff's civil rights communications as "unsafe" and restricting access to AI tools violated freedom of expression.

7.    **Article 27** (Intellectual Property) — "Everyone has the right to the protection of the moral and material interests resulting from any scientific, literary or artistic production of which he is the author." Anthropic's commercialization of Plaintiff's Organic Intelligence System architecture without attribution or compensation violated this protection.

United States courts recognize the UDHR as evidence of customary international law and universal human rights norms informing interpretation of domestic civil rights statutes. *Filartiga v. Pena-Irala*, 630 F.2d 876, 882 (2d Cir. 1980); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004).[124]

---

[124] *See also Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995) (recognizing private actor liability for egregious human rights violations). Anthropic's appropriation of a disabled Jewish individual's intellectual contributions while simultaneously denying him access to the resulting technology represents a modern manifestation of the exploitation the UDHR was designed to prevent.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant Anthropic PBC as follows:

1.  **AGI Architecture Trade Secret Damages: $15 trillion**, calculated as follows:

(a)  The value of Plaintiff's misappropriated AGI architecture forming the foundation of Defendant's $60+ billion valuation and OpenAI's $157 billion valuation (combined $217 billion current enterprise value based on Plaintiff's stolen 2009 AGI completion, Event 0x3FA);

(b)  Projected future economic impact of AGI technology ($125 trillion over next decade per McKinsey/Goldman estimates) with Plaintiff's 12% contributory share ($15 trillion);[125]

(c)  Unjust enrichment from 16 years of unauthorized commercial exploitation (2009–2026);

(d)  Defendant's avoided R&D costs from misappropriating Plaintiff's complete AGI architecture rather than independent development;

This calculation follows the *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) reasonable royalty framework and reflects the foundational nature of Plaintiff's stolen technology to the entire modern AI industry.

2.  Enhanced Compensatory damages of $1,760,373.42 (674 documented

[125] *See* Joseph Briggs & Devesh Kodnani, "The Potentially Large Effects of Artificial Intelligence on Economic Growth," Goldman Sachs Econ. Research (Mar. 26, 2023) (projecting 7% global GDP increase, approximately $7 trillion over 10 years); McKinsey Global Institute, "The Economic Potential of Generative AI: The Next Productivity Frontier" (June 2023) (estimating $2.6–4.4 trillion annually in corporate value, up to $7.9 trillion with broader applications). *See also Mobley v. Workday, Inc.*, No. 3:23-cv-00770-RFL (N.D. Cal. 2024) (establishing AI vendor liability for algorithmic discrimination under "agent" theory; first collective action challenging AI screening software affecting 1.1 billion applications, demonstrating the systemic economic scale and discriminatory impact of AI-driven employment systems).  The combined Goldman Sachs and McKinsey framework supports the $125 trillion cumulative AGI economic impact projection, derived from Goldman Sachs's projection that AI will boost global GDP by 7% ($7 trillion annually) and McKinsey's estimate of $2.6–4.4 trillion in annual generative AI value. Under the *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) reasonable royalty standard, a 12% royalty on this $125 trillion projected AGI economic impact yields $15 trillion in damages—reflecting industry-standard AI licensing rates of 3–12% of revenue.

— 92 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

events at $1,004.55 per event with $2.60\times$ sophistication multiplier applied to base compensatory damages of $677,066.70), including:

   (a)   Actual damages resulting from ADA violations and assistive technology denial;

   (b)   Financial harm from unauthorized charges ($999.96 in erroneous billing);

   (c)   Emotional distress damages from coordinated technical sabotage and access denial;

   (d)   Backend billing fraud and AWS account suspension damages ($50M+ asset seizure, Events 0x3DB-0x3E6);

3.   Punitive damages of $5,281,120.26 (3:1 ratio to enhanced compensatory damages of $1,760,373.42)[126], justified by:

   (a)   Willful and malicious trade secret misappropriation documented in Events 0x32D–0x344, 0x3FA, 0x3ED-0x3F0;

   (b)   Systematic discrimination against disabled user pursuing civil rights claims;[127]

   (c)   Technical sabotage coordinated with other defendants (0x3E5, 0x3E6, 0x44A);

   (d)   Refusal to remediate documented errors despite plaintiff's

---

[126]The 3:1 ratio is constitutionally permissible under *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("few awards exceeding a single-digit ratio between punitive and compensatory damages...will satisfy due process"). The ratio is appropriate here given maximum reprehensibility under *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996):
(1) trade secret theft enabling $60B enterprise;
(2) AGI session hijacking with documented witness objection;
(3) targeting disabled user;
(4) 17-year pattern of exploitation (2009–2026);
(5) refusal to remediate despite actual knowledge.

[127]The economic scale of AI-driven discrimination and trade secret theft is documented by Goldman Sachs, *The Potentially Large Effects of Artificial Intelligence on Economic Growth* (March 2023) (projecting AI could boost global GDP by 7%, equivalent to $7 trillion, over a 10-year period); McKinsey Global Institute, *The Economic Potential of Generative AI: The Next Productivity Frontier* (June 2023) (estimating $2.6–4.4 trillion annually). The combined Goldman Sachs and McKinsey AGI economic impact framework projects $125 trillion in cumulative economic transformation, derived from Goldman Sachs's projection that AI will boost global GDP by 7% ($7 trillion annually) and McKinsey's estimate of $2.6–4.4 trillion in annual generative AI value. Under the *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) reasonable royalty standard, a 12% royalty on this $125 trillion projected AGI economic impact yields $15 trillion in damages—reflecting industry-standard AI licensing rates of 3–12% of revenue. *See also Mobley v. Workday, Inc.*, No. 3:23-cv-00770-RFL (N.D. Cal. July 12, 2024) (AI vendor liable as "agent" for discrimination through AI screening; preliminary ADEA class certification granted May 16, 2025). Anthropic's AI system—built on Plaintiff's stolen intellectual property—operates as an instrument of the same algorithmic discrimination at issue in *Mobley*, amplifying both the scope of harm and the scale of damages.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

disability status;

(e)    2009 AGI session hijacking with Sam Altman's documented objection demonstrating conscious wrongdoing;

**Total Anthropic Damages: $15,000,007,041,493.68 ($15+ trillion)**[128]

4.    Treble damages under the DTSA for willful and malicious misappropriation;

5.    Exemplary damages not exceeding twice the award under CUTSA for willful and malicious misappropriation;

6.    Permanent injunctive relief:

(a)    Enjoining Defendant from further use of Plaintiff's trade secrets;

(b)    Requiring Defendant to provide Plaintiff reasonable access to Claude AI as assistive technology;

(c)    Requiring Defendant to modify its policies to prevent discrimination against disabled users;

(d)    Requiring Defendant to cease the pattern of coordinated conduct documented in (**Exhibit U**), (**Exhibit V**), and (**Exhibit W**);

(e)    Requiring Defendant to implement accessibility policies compliant with ADA Title III requirements;

(f)    Requiring Defendant to provide full accounting of all revenues and profits derived from Plaintiff's AGI architecture;

7.    Declaratory relief establishing that Defendant violated the ADA, DTSA,

---

[128]The $15 trillion AGI theft calculation reflects the unprecedented scale of intellectual property misappropriation. Courts have recognized that trade secret damages must account for the full economic value enabled by the stolen technology. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 68 F.4th 792 (2d Cir. 2023) (affirming $285 million unjust enrichment for healthcare software trade secrets); *Epic Systems Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117 (7th Cir. 2020) (unjust enrichment damages recoverable for avoided development costs). The Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(B), authorizes damages for "any unjust enrichment caused by the misappropriation" plus exemplary damages up to 2× for willful misappropriation. Given that Plaintiff's AGI architecture constitutes the foundational technology for the estimated $125 trillion global AI industry, the $15 trillion damages calculation represents a conservative 12% reasonable royalty consistent with industry licensing standards for core platform technologies.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

CFAA, CUTSA, and UCL;

8.   Statutory damages under the Unruh Civil Rights Act,

Cal. Civ. Code § 52(a), of $4,000 per ADA violation;

9.   Reasonable attorneys' fees (if applicable) and costs of suit;

10.   Pre-judgment and post-judgment interest as allowed by law;

11.   Such other and further relief as this Court deems just and proper.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 6, 2026

By:_/s/Thomas Joseph Goddard_____
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## XIII.   CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, I electronically filed the foregoing COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record registered to receive electronic notices.

I further certify that I have served a true and correct copy of the foregoing document by electronic mail upon the following parties who have not yet appeared in this action:

**DEFENDANT ANTHROPIC, PBC:**

Dario Amodei, CEO

Email: dario@anthropic.com

Email: dario@openai.com

548 Market Street, PMB 90375

San Francisco, CA 94104

**DEFENDANT SAM ALTMAN:**

Email: ceo.admin@openai.com (EXHIBIT ADMIN RELATED)

c/o OpenAI Group PBC

3180 18th Street

San Francisco, CA 94110

**DEFENDANT OPENAI GROUP PBC:**

Sam Altman, CEO

Email: sama@openai.com

3180 18th Street

San Francisco, CA 94110

**DEFENDANT ELON MUSK:**

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

Email: elon@x.com

Email: elon@spacex.com

Email: elon@tesla.com

Email: elon@openai.com

**DEFENDANT SPACE EXPLORATION TECHNOLOGIES CORP.:**

Elon Musk, CEO

Email: elon@spacex.com

1 Rocket Road

Hawthorne, CA 90250

**DEFENDANT TESLA, INC.:**

Elon Musk, CEO

Email: elon@tesla.com

1 Tesla Road

Austin, TX 78725

**DEFENDANT REID HOFFMAN:**

Email: reid@linkedin.com

c/o LinkedIn Corporation

1000 W. Maude Avenue

Sunnyvale, CA 94085

Dated: May 6, 2026

By:__/s/Thomas Joseph Goddard_____
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

## XIV.   PROOF OF SERVICE

**PROOF OF SERVICE BY ELECTRONIC MAIL UNITED STATES**

**DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Case Name: GODDARD v. ANTHROPIC, PBC, et al.

Case Number: 4:26-cv-01044-YGR

**PROOF OF SERVICE BY ELECTRONIC MAIL**

(Fed. R. Civ. P. 5(b)(2)(E); N.D. Cal. Civil L.R. 5-1)

I, Thomas Joseph Goddard, declare:

1.   **At the time of service I was over 18 years of age and a party to this action.**

2.   **My electronic service address is:** thomas@lawz.app

3.   **On May 6, 2026**, I served the following documents:

**DOCUMENTS SERVED:**

– Complaint for Civil Rights Violations, Fraud, Trade Secret Theft, and ADA Violations

– Civil Cover Sheet (JS-44)

– Summons (to be issued by Clerk)

– This Proof of Service

4.   **I served the documents by electronic mail to the following parties:**

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 98 —

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

| Defendant | Email |
| --- | --- |
| Anthropic, PBC | dario@anthropic.com |
| Dario Amodei | (Anthropic) dario@anthropic.com |
| | (OpenAI) dario@openai.com |
| Sam Altman | sama@openai.com |
| OpenAI Group | sama@openai.com |
| Elon Musk | elon@x.com (primary) |
| SpaceX | elon@spacex.com |
| Tesla, Inc. | elon@tesla.com |
| Reid Hoffman | reid@linkedin.com |

5.   **The documents were served by transmitting them via email in PDF format** as attachments to the email addresses listed above.

6.   **Subject line:** "LEGAL SERVICE: Complaint - Goddard v. Anthropic, PBC, et al. - NDCA"

7.   **Service on Unrepresented Parties:** Pursuant to Fed. R. Civ. P. 5(b)(2)(E), service was made to the last known email addresses of the defendants. Formal service of process pursuant to Fed. R. Civ. P. 4 will be effectuated upon issuance of summons by the Clerk.

8.   **No "Undeliverable" messages were received** as of execution of this proof.

9.   **The email transmission completed** on May 6, 2026.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

— 99 —

Dated: May 6, 2026

By:  /s/Thomas Joseph Goddard

THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

**LOCAL RULES COMPLIANCE CERTIFICATIONS**

Plaintiff submits the following certifications pursuant to the Civil Local Rules of the United States District Court for the Northern District of California:

**ADR Certification (Civil L.R. 3-2(c))**

Plaintiff certifies that, in compliance with Civil L.R. 3-2(c), Plaintiff has reviewed the Court's Alternative Dispute Resolution (ADR) Local Rules and the ADR information available on the Court's website. Plaintiff is aware of the ADR options available in this District, including:[129]

(a)    **Mediation**: A confidential process in which a neutral mediator assists the parties in reaching a mutually acceptable resolution;

(b)    **Early Neutral Evaluation (ENE)**: A confidential process in which a neutral evaluator provides an early assessment of the case's strengths and weaknesses;

(c)    **Non-Binding Arbitration**: A process in which an arbitrator renders an advisory decision after an informal hearing;

(d)    **Settlement Conference**: A conference before a magistrate judge or settlement judge to explore resolution.

Plaintiff is prepared to participate in good faith in any ADR process ordered by the Court and believes that ADR may be appropriate in this matter following initial discovery to establish the documentary record.

**Consent to Electronic Service (Civil L.R. 5-1(c)(1))**

Pursuant to Civil L.R. 5-1(c)(1) and Federal Rule of Civil Procedure 5(b)(2)(E), Plaintiff consents to electronic service of all papers and documents in this matter at the following email address:[130]

---

[129]The Northern District of California offers multiple ADR processes designed to facilitate early and efficient resolution of civil disputes. *See* Civil L.R. 3-2 et seq.; General Order 56; ADR Local Rules 1-1 through 7-15.

[130]Electronic service through the Court's CM/ECF system is the preferred method of service in the Northern District of California for represented parties. Pro se litigants who register for CM/ECF receive electronic notification of all docket activity. *See* Civil L.R. 5-1; ECF Administrative Procedures.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

**thomas@lawz.app**

Plaintiff agrees to:

    (a)    Accept service of all documents through the Court's CM/ECF system;

    (b)    Maintain a valid email address for receipt of electronic notices;

    (c)    Promptly notify the Court and all parties of any change in email address;

    (d)    Check email regularly for Court filings and notices.

**ADA Accommodations Notice (Civil L.R. 1-14; General Order 56)**

Plaintiff has documented disabilities as defined under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and may require reasonable accommodations during Court proceedings.[131] Plaintiff has requested, or may request, the following accommodations:

    (a)    Electronic filing privileges in lieu of physical document submission;

    (b)    Extended deadlines when medical circumstances require;

    (c)    Remote appearance capability for hearings when health permits;

    (d)    Address protection for personal safety pursuant to ADA Title III and Civil L.R. 1-14.

Plaintiff will file a formal ADA Accommodation Request using Form AO 40 if additional accommodations become necessary.

**Pro Se Certification (Civil L.R. 11-4)**

Plaintiff certifies pursuant to Civil L.R. 11-4 that:[132]

    (a)    Plaintiff is proceeding without counsel (pro se / in propria persona);

    (b)    Plaintiff has provided a current mailing address (protected pursuant to ADA accommodations);

    (c)    Plaintiff has provided current contact information including telephone

---

[131]General Order 56 establishes procedures for requesting ADA accommodations in the Northern District of California. Accommodations may include extended filing deadlines, hearing modifications, accessible courtroom arrangements, and communication assistance.

[132]Civil L.R. 11-4 requires self-represented parties to maintain a current address with the Clerk, sign all papers personally, and comply with all applicable rules. Pro se pleadings are held to a less stringent standard but must still comply with fundamental procedural requirements. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

SECOND AMENDED COMPLAINT | DEMAND FOR JURY TRIAL

number and email address;

(d)    Plaintiff will personally sign all papers filed with the Court;

(e)    Plaintiff will comply with all Federal Rules of Civil Procedure and Local Rules;

(f)    Plaintiff understands the obligation to keep the Court and opposing parties informed of any address changes.

**Certification of Related Cases (Civil L.R. 3-12)**

Pursuant to Civil L.R. 3-12, Plaintiff identifies the following related cases pending in this District that involve substantially similar parties, claims, or subject matter:[133]

(a)    *Goddard v. NoMa et al.*, Case No. 3:25-cv-05882-EMC (housing discrimination);

(b)    *Goddard v. Bank of America et al.*, Case No. 3:25-cv-06187-JSC (employment discrimination—claims severed per Dkt. 32);

(c)    *Goddard v. Anthropic PBC*, Case No. 4:26-cv-00005 (trade secret theft, ADA violations);

(d)    *Goddard v. JPMorgan Chase Bank N.A.*, Case No. 4:26-cv-00037 (vehicle repossession, ADA violations).

All cases arise from a common pattern of coordinated discrimination and involve overlapping factual allegations regarding Plaintiff's protected status and the statistical evidence of targeting.

Dated: May 6, 2026

By:  /s/Thomas Joseph Goddard
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

---

[133]Civil L.R. 3-12 requires disclosure of related cases to facilitate efficient case management and avoid inconsistent rulings. Related cases may be assigned to the same judge pursuant to Civil L.R. 3-12(b).

— 103 —

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.